

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

Signed August 31, 2007

United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE HERITAGE ORGANIZATION, | § | CASE NO. 04-35574-BJH-11 |
| L.L.C., | § | |
| Debtor. | § | |

## MEMORANDUM OPINION

Before the Court is confirmation of the Second Amended Joint Plan of Liquidation (the "Second Amended Plan") filed by Dennis Faulkner, as Chapter 11 trustee of The Heritage Organization, L.L.C. (the "Trustee") and the Client Claimants (as defined hereinafter) (collectively, the "Plan Proponents"). Gary M. Kornman ("Kornman") and GMK Family Holdings, LLC ("GMK") (collectively, the "Kornman Parties") object to confirmation of the Second Amended

Plan.[1] The Court has core jurisdiction over the confirmation hearing, which was commenced on June 11–15, 2007 (the "Original Hearing")[2] and concluded on July 31, 2007 (the "Supplemental Hearing"),[3] in accordance with 28 U.S.C. §§ 1334 and 157. This Memorandum Opinion contains the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.[4]

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Heritage's Relationship with Its Clients In General

The Heritage Organization, L.L.C. ("Heritage") is a Delaware limited liability company that was formed in 1994. Heritage filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 17, 2004, which was assigned Case No. 04-35574 (the "Case"). Prior to Heritage's bankruptcy filing, Heritage provided various estate and tax planning strategies to extremely high net-worth individuals for a fee. Those individuals included the "Client Tax Claimants" and the

---

[1] W. Ralph Canada, Jr. ("Canada") also objected to the original plan of liquidation filed by the Plan Proponents. On the eve of the commencement of the confirmation hearing, and after further negotiations with the Plan Proponents, Canada and the Plan Proponents reached an agreement on certain amendments to the plan, which would cause him to vote in favor of the plan, as modified. Canada supports confirmation of the Second Amended Plan.

[2] During the Original Hearing, the Court also heard a stand-alone motion seeking approval of the same settlement with the Client Claimants and Mikron Industries, Inc. ("Mikron") that is contained in the Second Amended Plan. If the Second Amended Plan is confirmed, the stand-alone settlement motion is unnecessary. If confirmation of the Second Amended Plan is denied, the Trustee seeks approval of the proposed settlement through this Court's consideration of the stand-alone motion. *See infra* at p. 127.

[3] As will be explained in more detail later in this Memorandum Opinion, during the Supplemental Hearing, the Court heard additional evidence relating to the proposed settlement with Canada and the further amendments proposed to the plan as set forth in the Second Amended Plan.

[4] The Court held lengthy evidentiary hearings at which literally hundreds of exhibits were admitted. The Court has endeavored to use a uniform system of citation when referring to the exhibits in this Memorandum Opinion, but it has not always been possible, as the parties' evidence is in various forms with different numbering systems. In general, the Court has cited to the exhibit number, followed by the paragraph, section or article where one was identified, followed by the appendix page number (though the entirety of the evidence is not consecutively numbered). For example, Ex. P 999, § 999, at APP 999.

"Sandwith Claimants."[5]

In the Second Amended Plan, the Trustee seeks to (i) settle the pending objections to all of the Client Tax Claimants' claims in the Case by allowing each of those claimants an allowed unsecured claim in the amount of 65% of the fees they paid to Heritage for the tax and/or estate planning strategies, (ii) settle the adversary proceedings pending against three of the Client Tax Claimants – *i.e.*, the Skinner Children's Trust, the Skinner Trust No. 2 (collectively, the "Skinner Trusts"), and Love – by forgiving the notes payable to Heritage from those claimants, (iii) settle the adversary proceeding pending against Mikron in connection with the estate planning strategies provided to the Sandwith Claimants by accepting $2,750,000 in cash in satisfaction of the note payable to Heritage by Mikron, (iv) allow the Sandwith Claimants an unsecured claim of $3,250,000, and (v) cap the Heritage estate's liability at $2,340,000 with respect to certain litigation in which damages of approximately $50,000,000 are sought. In short, as it relates to the Client Tax Claimants, the Sandwith Claimants (collectively, the "Client Claimants"), and Mikron, the Second Amended Plan presents a comprehensive, integrated settlement of (i) the Heritage bankruptcy estate's claims against all of the Client Claimants and Mikron and (ii) all of the Client Claimants' and Mikron's claims against the Heritage bankruptcy estate. Because the Second Amended Plan contains a comprehensive, integrated settlement, the Court cannot approve the settlement terms as they may

---

[5]The Second Amended Plan defines the term Client Tax Claimants to mean the Fluharty Claimants, the Jenkins Tax Claimants, the JET Troutt Claimants, the JWT Troutt Claimants, Love, Patterson, the Powell Claimants, the Rainwater Claimants, the RWT Troutt Claimants, the Skinner Children's Trust, the Skinner Trust No. 2, and Woodruff, each of whom implemented a Heritage capital gains tax savings strategy. Second Amended Plan at ¶ 1.38. As used in this Memorandum Opinion, however, the term also includes the "Jenkins Tax Claimant Affiliates," as defined in the Second Amended Plan. The term Sandwith Claimants is defined to include William Ronald Sandwith ("Sandwith"), his probate estate, and his 4 adult children, Jeffrey S. Sandwith, Mark A. Sandwith, David A. Sandwith, and Susan R. Crader (collectively, the "Sandwith Children"), Second Amended Plan at ¶ 1.107, who implemented a Heritage estate planning strategy. For the meaning of these other defined terms, see Article 1 of the Second Amended Plan.

relate to individual Client Claimants and/or Mikron; rather, the Court must consider the proposed settlement with the Client Claimants and Mikron as a whole.

To put Heritage's client relationships with the Client Claimants in perspective, a brief background of Heritage and its "typical" relationships with its clients will be helpful.[6] In a typical Heritage client scenario, Heritage cold-called the prospective client. The Heritage employees who made these cold-calls were referred to as "Initiators."[7] If the prospective client was interested in learning more about Heritage's tax and estate planning strategies, another Heritage employee, referred to as a "Contractor," would meet with the prospective client, either in person or over the telephone. If the prospective client continued to express interest in learning more about Heritage's tax savings strategies, a "Principal" would then make the sales pitch to the prospect and try to close the deal.

Heritage's sales process had several common themes. First, Heritage provided a training manual to its employees, which contained scripts to be used in making cold-calls and other contacts with prospective clients. These scripts were to be used by employees when responding to difficult questions posed by prospective clients, and many of the scripts taught employees to use a diverting answer which sounded good, but which was truly unresponsive to the prospective client's question.[8]

_____

[6]The facts contained herein that relate to Heritage's "typical" client relationships, general historical operations, and certain administrative problems encountered by the Trustee in administering the Heritage bankruptcy estate are either matters the Court is aware of from presiding over the Case or are supported by the evidence introduced at the Original Hearing or the Supplemental Hearing. No record citations are provided because the Court does not believe that these facts are disputed by the Kornman Parties.

[7]Heritage had a relatively large research department. The employees who worked within this department were responsible for identifying high net-worth individuals who might be interested in implementing Heritage's strategies. Once identified, the name of the prospective client was turned over to an "Initiator" for further contact.

[8] For example, Heritage's "Contractor Training Manual" contains a section which provides sample answers to prospective clients' "frequently asked questions." When a prospective Heritage client tells the Heritage employee – "My advisors say the [tax] problem is taken care of. Is it?" – the manual provides the following response for the

Second, the agreement which was ultimately executed between Heritage and its clients was very one-sided in Heritage's favor. It was, for all practical purposes, a form contract that Heritage had developed over the years, and it was presented to the prospective clients on a take-it-or-leave-it basis. While some prospective clients were able to negotiate modifications to the agreement, most were not.

Third, a key component of the Heritage sales strategy was to separate the prospective client from his/her traditional legal and/or financial advisors, as is evident from the training manual itself.[9] Once a "Principal" of Heritage was involved in the discussions, prospective clients were told that they would have to maintain strict confidentiality of Heritage's tax and/or estate planning strategies if an agreement was signed and the strategies were revealed to the client.[10] Under the terms of the

---

employee to use: "What have they done to eliminate the tax? Well, what have they told you that your estate taxes will end up being? Well, if they haven't told you, then chances are they don't know, and that is half the problem. We have a department in our firm that does nothing but economic modeling of 'what if's' for our clients. We want to know exactly what will occur with every dollar in the estate given every possible scenario. By going through the first few steps of the process with us, and it not even costing you one dollar, we can tell you exactly what you could do to make sure the problem is solved. Call it a second opinion if you will." Ex. P 68-92, at APP 2132-33.

[9] The manual provided to Heritage's "Initiators" advises Heritage employees that "Initial meetings with outside advisors are **not permitted** under any circumstances. Outside advisors are attorneys, accountants, life insurance agents, and estate planners who have other clients besides Mr. [Prospective Client]. We will not provide an initial consultation with such advisors present. The reasons for this are relatively simple. First, most outside advisors perceive us as potential competitors. It is in their best interest to make us look as bad as possible. For this reason, many attorneys falsely tell our [prospective clients] that either [Heritage] cannot do what is promised or that the same results can be achieved at a reduced cost. Second, these outside advisors could potentially steal and/or corrupt our ideas for the benefit of their other clients. Third, most outside advisors are insistent on learning the nature of our ideas up front, and we are not willing to provide details until we are further into the process. Consult the "Loops" section of this manual for appropriate responses to a [prospective client] who wishes to either redirect you or have such an advisor present in the initial meeting. **Again, we will not provide an initial consultation with an outside advisor present**." Ex. P 68-93 at APP 2307 (emphasis in original).

[10]These strict confidentiality provisions are interesting, given that the clients were required to acknowledge in the client agreements that "the Strategies are not necessarily composed of information which is proprietary, trade secrets or exclusively known to [Heritage]." Ex. P 68-3 at APP 153 (¶ 4.3). According to Heritage, it was the "timing, sequencing, and combinations of the various non-proprietary components of the Strategies" or the fact that "the Strategies may not be known to the [clients] even though they may be known to others" that made them so confidential. *Id*.

client agreements, only "Authorized Advisors" or "Authorized Persons" could see the "Strategies," without the client becoming obligated to pay Heritage an additional fee of at least $2 million. To become an "Authorized Advisor" or an "Authorized Person," a separate agreement had to be signed with Heritage pursuant to which the "advisor" or "person" would agree to keep the "Strategies" confidential and would itself agree to pay Heritage a substantial fee for any breach of that agreement.[11] The term "Strategies" was defined very broadly in the client agreements and typically included "the securities, contracts, Persons identified, facts, data, knowledge, documentation, opinions, combinations of concepts, ideas, techniques, methods, transactions, combinations, sequences of events, timing, financial models, diagrams, illustrations, and procedures divulged, described, communicated, detailed, arranged or identified by [Heritage], and all variations, modifications, sequences, rearrangements and recombinations thereof." *See, e.g.*, Ex. P 68-3 at APP 157 (¶ 10.18). The combined effect of these provisions was to discourage traditional advisors from getting involved in their client's relationship with Heritage.[12]

Because the client's receipt of a legal opinion from an independent advisor was a component

---

[11] *See, e.g.*, Ex. P 68-72. The agreement between Heritage and Michael Mulligan, Esq. of the Lewis Rice & Fingersh, L.C. law firm ("Lewis Rice"), for example, provides in Section 3.3 that if the "Advisor Reveals the Strategies to any Person other than Authorized Advisors, the Advisor agrees to pay to [Heritage] the following fees: (i) Two Million Dollars ($2,000,000) for each Person to whom the Strategies are Revealed, directly or indirectly, by the Advisor himself or through any Persons, which fees shall be due and payable, with respect to each such Person, ten (10) days after the Strategies are Revealed to such Person and (ii) if any of the Strategies are Implemented by any Person to whom the Strategies are Revealed, directly or indirectly, by the Advisor himself or though any Persons, six percent (6%) of the Value of all Property used to Implement any of the Strategies or attempt to obtain a result using the Strategies . . . ." *Id*. at § 3.3, APP 1894.

[12] Or, if the client's traditional advisor(s) was willing to sign its own agreement with Heritage such that it could be provided access to the strategies, the complexity of those strategies could cause the advisor to conclude that he could be of little help in analyzing the strategies, as appears to be the case with L. Ross Love, Jr. *See* Ex. P 270, Tab 7 (Depo. of Luther Ross Love, Jr., 6/7/07), at p. 101:10-102:24 (stating that after his advisors viewed the Heritage presentation of the strategies, the advisors said "they didn't feel that they had sufficient experience with those type [sic] of transactions to be able to provide advice . . . .[T]hey really weren't in a position to offer advice one way or the other.").

of the implementation process for any of Heritage's estate planning or tax strategies,[13] Heritage

would recommend certain "Authorized Advisors" to the prospective clients.[14] Heritage told clients

that these recommended lawyers were experienced, knowledgeable estate planning and/or tax

specialists, who could give the independent advice about the validity of Heritage's strategies that the

clients desired. However, neither Heritage nor the law firms serving as "Authorized Advisors"

disclosed the extent of the prior and ongoing relationships between them.[15]

Once the client agreement was signed, the client typically owed Heritage $22,500, which

served to reimburse Heritage for its travel expenses in connection with meetings with the client. The

client agreement did not obligate the client to use the Heritage strategies, but if the client elected to

use the Heritage strategies, it owed a substantial fee to Heritage. Although the client agreement

contained a detailed formula for calculating Heritage's fee, an oversimplified statement is that the

---

[13]The receipt of a legal opinion from an independent law firm opining that it was "more likely than not" that the Heritage strategies as implemented by the client were lawful may have served to protect the client from being liable for penalties if the IRS audited the client's tax returns and disallowed the strategy. Broadly speaking, the IRS will not penalize a taxpayer for an underpayment of taxes if the taxpayer can show that the taxpayer acted in good faith and there is reasonable cause for the underpayment, which may be shown by reasonable reliance on the advice of a professional tax advisor who concludes that there is a greater than 50% likelihood that the tax treatment will survive an IRS challenge. *See generally Santa Monica Pictures, LLC v. Comm'r,* 89 T.C.M. (CCH) 1157 (2005) (applying 26 U.S.C. § 6664(c)(1) and 26 C.F.R. 1.6662-4(g)(4)(B)).

[14]Some clients have provided affidavits in opposition to the Trustee's motion for summary judgment in connection with their contested claim objections or adversary proceedings, and have sworn there that they were (i) simply told that Lewis Rice would prepare all the implementation documents, along with the required legal opinion, and (ii) not permitted a choice in the selection of the law firm who would represent them in connection with the implementation of the Heritage strategies. *See, e.g.,* Ex. P 87, ¶ 16, at APP 6 (Affidavit of L. Ross Love, Jr.).

[15]In fact, a principal of one of the law firms, Ed Ahrens ("Ahrens") of Ahrens and DeAngeli ("A&D"), had an undisclosed override interest in Heritage's success in selling the strategies to prospective clients. Apparently, Ahrens and/or A&D itself actually developed the capital gains strategy Heritage was selling to the Client Claimants (except the Sandwiths). For every Heritage client that implemented the strategies, Ahrens received a 5% royalty payment, indirectly through an entity set up for that purpose, FWP Technologies. Not surprisingly, the Heritage clients who relied upon Ahrens and A&D as their "independent counsel" have filed claims against Heritage in the Case seeking to recover, among other things, the fees they paid to Heritage for strategies which have been disallowed by the Internal Revenue Service, for, among other things, fraud and fraudulent inducement into entering into the client agreements.

client would owe Heritage 25% of the anticipated tax savings. Because of the size of the anticipated tax savings, Heritage's fee was usually several million dollars.[16] Under the client agreement, a portion of the fee, usually one-half, was due when (or shortly after) the client orally advised Heritage that it intended to implement the strategies, with the balance of the fee due ten business days after the client implemented the strategies. However, it was not uncommon for Heritage to agree to accept a portion of the fee in cash and to accept a note, with varying terms, for the balance of the fee.

### B. The Client Claimants at Issue in the Second Amended Plan

Returning to the specific Heritage clients at issue in the Second Amended Plan, in this Memorandum Opinion the Court will analyze, in detail, the relationships of four of the Client Claimants – *i.e.*, the Jenkins Tax Claimants,[17] Love,[18] the Skinner Claimants,[19] and the Sandwith Claimants, with Heritage. While there are several other Client Claimants whose claims are proposed to be settled in the Second Amended Plan, the Kornman Parties agreed that if the Court found that the proposed settlement as it relates to these four claimants satisfied the relevant legal test for the approval of settlements in accordance with Federal Rule of Bankruptcy Procedure 9019, the

---

[16]Of the Client Claimants, the smallest fee Heritage received was $356,297 from the Powell Claimants and the highest fee Heritage received was $15,096,930 from the Jenkins Tax Claimants.

[17]The term "Jenkins Tax Claimants" is defined in the Second Amended Plan to include Meralex, L.P. ("Meralex") and Howard M. Jenkins ("Jenkins"). Second Amended Plan at ¶ 1.70. BBM, Inc. f/k/a Jenkins-Baldwin Corporation ("JBC") and Revanche, L.L.C. are defined as "Jenkins Tax Claimant Affiliates." Second Amended Plan at ¶ 1.69.

[18] Love is defined in the Second Amended Plan to mean Luther Ross Love, Jr. Second Amended Plan at ¶ 1.81.

[19] The Skinner Claimants are defined in the Second Amended Plan to mean the Skinner Children's Trust and the Skinner Trust No. 2. Second Amended Plan at ¶ 1.115.

**Memorandum Opinion**  **Page 8**

settlement would also satisfy that legal test as it relates to the remaining Client Claimants.[20]  *See Audiotape*: Hearing conducted 06/15/07 at 1:33:40 - 1:35:32 p.m. (on file with the Court). Accordingly, each of these claimants' relationship with Heritage and relevant factual contentions will be separately addressed below.

### 1.    The Jenkins Tax Claimants

Turning first to the Jenkins Tax Claimants' relationship with Heritage, Jenkins alleges that Heritage began providing financial, tax, and estate planning services to him and his family in 1994. Jenkins further alleges that, as part of its services, Heritage advised Jenkins to form the Howard M. Jenkins Perpetual Asset Shield Trust I, Meralex, JBC, a general partner of Meralex, and certain other related entities (the "Jenkins-Related Entities").  Following the formation of the Jenkins-Related Entities, Jenkins alleges that Heritage continued acting as a "trusted fiduciary" for Jenkins and the Jenkins-Related Entities through August 2000. According to Jenkins, Kornman acted as an officer of JBC and took action on behalf of Meralex as an officer of JBC.  Jenkins also alleges that Heritage managed the day-to-day affairs of the Jenkins-Related Entities from Heritage's offices in Dallas, Texas.

---

[20]The Kornman Parties object to the settlement contained in the Second Amended Plan on various grounds, including the fact that the Trustee's proposed settlement does not take into consideration the various factual distinctions between the Client Claimants' individual relationships with Heritage.  In short, the Kornman Parties contend that the Client Claimants who entered into client agreements with Heritage prior to the issuance of IRS Notice 2000-44 and, in particular, the delivery of the May 2, 2001 IRS notification letter (discussed *infra* at p. 15) have much weaker claims against Heritage, and that those claims should be found to be completely barred by the waiver/release/merger/reliance disclaimer provisions of the client agreements.  Even the Kornman Parties acknowledge that the Client Claimants who entered into client agreements with Heritage after the May 2, 2001 IRS notification letter have stronger claims against Heritage, although they still contend that even these claims are barred by the terms of the client agreements.  According to the Kornman Parties, the Trustee's "one size fits all" settlement structure is legally improper.  An analysis of the proposed settlement as it relates to these four claimants determines the fate of the settlement because (i) the Jenkins Tax Claimants are the earliest of the Client Claimants, having signed a client agreement in 1998 and having implemented the strategies in May 1999, (ii) the notes executed by Love and the Skinner Trusts are being forgiven, thus requiring special scrutiny, and (iii) the Mikron note is being discounted, also requiring special scrutiny.

It is undisputed that Jenkins was satisfied with the 1994 estate planning services provided by Heritage.  In fact, Jenkins agreed to serve as a reference for Heritage in the 1995, 1996, 1997 time frame, signing glowing letters (ghost-written by Heritage) to prospective Heritage clients.  Kornman Ex. 81, p.54:7-55:13.  Jenkins also spoke to several prospective Heritage clients by telephone, recommending Heritage's services.  Kornman Ex. 81, p.278:9-11.

The Jenkins Tax Claimants' claim in the Case arises from a different transaction.  Specifically, in December 1998, Heritage presented a capital gains tax savings strategy (the "752 Strategy") to Jenkins.  According to Jenkins, Kornman and Canada told him that the 752 Strategy would allow Meralex, a partnership whose main asset was $300 million of nominal tax basis common stock of Publix Super Market, Inc., to avoid paying capital gains tax on future sales of that stock.  Thereafter, on December 18, 1998, Heritage, Jenkins, and Meralex entered into an agreement pursuant to which Heritage agreed to provide the 752 Strategy to Jenkins and Meralex for a fee (the "Meralex Agreement"). *See* Ex. P 68-2 at APP 125-132.  Heritage recommended that Jenkins and Meralex hire A&D to advise them concerning the validity of the 752 Strategy, Kornman Ex. 81, p. 99:2, which Jenkins and Meralex did on or about December 21, 1998.  Ex. P 68-54 at APP 1739.[21]  In its engagement agreement, A&D disclosed that "we have previously represented and continue to represent [Heritage].  Further, we will receive payment from Heritage for using the capital gains strategy we have discussed."  Ex. P 68-54 at APP 1741.

After several presentations from Heritage and discussions with A&D, Jenkins and Meralex

---

[21] The engagement letter on A&D letterhead is addressed to "Howard M. Jenkins, Meralex, LP, Suite 800E East Tower, 5001 Spring Valley Road, Dallas, TX 75244-3942," and the salutation begins "Dear Howard."  The "Acceptance of Engagement Terms" is signed "Jenkins Baldwin Corp., a Texas corporation by: Howard M. Jenkins, its President."

decided to implement the 752 Strategy in early May 1999. Under the Meralex Agreement, Meralex owed Heritage fees totaling $15,096,930. On May 12, 1999, Meralex paid the Heritage fee in full. In June 1999, Meralex paid A&D's invoice for legal fees and expenses incurred to date of $178,511.61. Additional invoices from A&D were received and paid thereafter by Meralex.

In the late summer/fall of 2000, Jenkins alleges that he obtained, for the first time, a copy of the A&D opinion letter regarding the validity of the 752 Strategy. Upon receipt of the opinion letter, Jenkins alleges that he "concluded that the A&D Opinion Letter could not be used to support the [752 Strategy]." Plaintiffs' Second Amended Complaint, Docket No. 117 in Civil Action No. 3:03-CV-0991-B (N.D. Tex.) ("Second Amended Complaint") at ¶ 51. In essence, Jenkins alleges that the purported factual bases set forth in the A&D opinion letter for the 752 Strategy were fabrications. According to Jenkins, Meralex and he were faced with the "undesirable options of either filing the Meralex tax return prepared by A&D (that inaccurately reflected the substance of the transactions that comprised the [752 Strategy]) or filing a Meralex tax return, contrary to A&D's advice, that conflicted with [another related-entity's] return." *Id.* at ¶ 52. According to Jenkins, he decided to contact the Internal Revenue Service "to resolve the quandary." *Id.* And, according to Jenkins, thereafter various of the Jenkins-Related Entities, including Meralex, entered into a "closing agreement with the Internal Revenue Service whereby several of the transactions that comprise the [752 Strategy] were rescinded and Meralex paid the required capital gains tax on the August 1999 sale of Publix stock." *Id.*

On or about May 19, 2003, Meralex and Jenkins filed suit against Heritage, GMK, Kornman, Canada, A&D, and Ahrens in federal district court in the Northern District of Texas – *i.e.*, Civil Action No. 3:03-CV-0991-B. By Memorandum Order signed January 4, 2005, the District Court

granted, in part, motions to dismiss by the Heritage defendants (Heritage, Kornman, and GMK), A&D and Ahrens, thereby dismissing many of the claims pled in the plaintiffs' First Amended Complaint. In addition, by Memorandum Order entered on February 17, 2005, the District Court dismissed with prejudice plaintiffs' RICO claims, which were the sole source of the District Court's original jurisdiction. The District Court held in abeyance its decision on whether to retain jurisdiction over the remaining state law claims pending a conference with the parties to discuss the effect, if any, of the pending Heritage bankruptcy on the state law claims. On May 27, 2005, the District Court entered an order referring the suit to this Court, for consideration in conjunction with the Case. It was subsequently assigned Adversary Proceeding Number 05-3699-BJH (the "Jenkins/Meralex Adversary").

In light of the District Court's dismissal orders, Meralex and Jenkins agree that the only "live claims" in the Jenkins/Meralex Adversary are their claims for fraud/fraudulent inducement[22] and breach of fiduciary duty against Heritage, GMK, Kornman, A&D, and Ahrens.[23] In vastly oversimplified terms, Meralex and Jenkins allege that they were fraudulently induced into implementing the Strategies by the defendants' misrepresentations regarding the validity and legality of the 752 Strategy. Moreover, Meralex and Jenkins allege that the defendants failed to disclose the extent of the financial and other relationships between and among A&D, Ahrens, Heritage, and

---

[22] The factual allegations have evolved beyond those contained in the Second Amended Complaint as discovery has proceeded. Technically, the Second Amended Complaint contains a claim for common law fraud, and it appears to allege that Jenkins and Meralex were fraudulently induced into implementing the Strategies.

[23] Meralex and Jenkins dismissed all claims against Canada on October 15, 2003. The dismissal was without prejudice, and Canada agreed that the statute of limitations applicable to the plaintiffs' claims against him would be tolled until the entry of a final, non-appealable judgment. *See* Docket No. 59 in 3:03-CV-0991-B. Canada remains a third-party defendant as a result of a cross-claim filed against him by Heritage, which asserts a claim for contractual indemnity to the extent that Heritage may be liable to the plaintiffs.

Kornman, and that the advice that Meralex and Jenkins received from A&D and Ahrens was not truly independent advice due to A&D's and Ahrens' undisclosed financial interest in the fee Meralex would pay to Heritage for implementing the 752 Strategy. According to Meralex and Jenkins, they were defrauded into implementing the Strategies, and have suffered damages in reliance upon the defendants' misrepresentations and material omissions. Meralex and Jenkins also allege that the defendants breached fiduciary and confidential relationships by preparing and entering into the Meralex Agreement (i) without disclosing the alleged conflicts of interest, (ii) which contained terms less favorable than Jenkins and Meralex could have negotiated in an arm's-length transaction, and (iii) which unduly restricted the ability of Jenkins and Meralex to seek independent professional advice.

On or about September 15, 2004, Meralex and Jenkins filed proofs of claim in the Case, seeking to recover on, among other things, the claims stated in the Second Amended Complaint.[24] The Trustee's objections to these claims were asserted in his answer to the complaint in the Jenkins/Meralex Adversary.

As noted previously, the Trustee proposes to settle the Jenkins Tax Claimants' claims against Heritage for an allowed claim in the Case of 65% of the fees actually paid by Meralex to Heritage, or an allowed claim of $9,813,004.50.[25] Even if the Second Amended Plan is confirmed, the Court

---

[24] Jenkins-Baldwin Corporation and Revanche, LLC also filed claims on September 15, 2004. All four claims seek approximately $66 million, of which approximately $16 million is attributable to the claims asserted in the Jenkins/Meralex Adversary (which the Trustee proposes to settle for 65% of the fees paid to Heritage). The balance of the claims, *i.e.* approximately $50 million, arise from other litigation pending between Heritage and several Jenkins entities, *see* Adv. Pro. No. 04-3624-BJH, (in which the Trustee proposes to cap the estate's liability at $2,340,000 by this settlement), and the claim will be liquidated in the District Court, as the reference has been withdrawn with respect to that litigation.

[25] The Trustee has objected to the proofs of claim filed by all of the Client Tax Claimants. In the Second Amended Plan, the Trustee proposes to settle all of these claim objections for 65% of the fees actually paid by the

will have to resolve the non-Heritage estate claims pending in the Jenkins/Meralex Adversary. Specifically, the Court will have to resolve Jenkins' and Meralex's claims against Kornman, GMK, A&D, and Ahrens.[26] The Jenkins/Meralex Adversary is specially set for trial for two weeks beginning on November 5, 2007.

## 2. Love

Love also implemented a Heritage 752 Strategy, which was subsequently disallowed by the IRS. According to Love's affidavit, he received a cold-call from a Heritage representative within days of the announcement of a prospective merger between Blue Chip Broadcasting, Inc. ("Blue Chip"), a company that Love and his family were substantial shareholders of, and Radio One, Inc. ("Radio One"). Pursuant to the proposed merger, Love and his family were to receive low tax basis shares of Radio One in exchange for their Blue Chip stock. Love states in his affidavit that the Heritage representative who called told him that Heritage had a capital gains tax strategy which would reduce or eliminate capital gains on the anticipated sales of Radio One stock. Ex. P 87, ¶ 3, at APP 2. Love apparently agreed to meet with a Heritage representative in Cincinnati a few days later. *Id*.

Thereafter, Love met with a Heritage principal, Anthony Bird ("Bird") and/or certain other Heritage representatives. Throughout these discussions and meetings, Love claims he was told that Heritage had developed proprietary tax strategies which had "a solid legal foundation," but that

---

respective claimant to Heritage. Several of the claimants have filed proofs of claim for damages in excess of the fees actually paid to Heritage, including consequential damages of the fees paid to other professionals to unwind the Heritage strategies, interest and penalties paid to the relevant taxing authorities, etc.

[26]The Court has "related to" jurisdiction over those remaining claims due to Kornman's alleged right to be indemnified by Heritage for any claims made against him, for which a proof of claim was timely filed.

Heritage "would not allow [him] to learn anything about those strategies unless [he] signed an agreement with Heritage agreeing not to disclose or use them." Ex. P 87, ¶ 6 at APP 3. Love also claims that he was "told that [he] could not disclose any such strategies to my personal attorneys or accountants unless they also signed confidentiality agreements." *Id*. According to Love, prior to signing any agreement with Heritage, Bird told him that the strategies which would be disclosed to him

> had a strong or solid legal and technical basis; that Heritage had been in business for thirty (30) years and that none of its clients had ever lost any money as a result of implementation of its strategies; that all of Heritage's clients are satisfied and have had positive results; that [Love] should trust [Bird]; [and] that if the IRS rejected the desired tax effect of the strategies, Heritage would return to [Love] the portion of the implementation fee that [Love] had paid and Heritage would not sue [Love] for the unpaid portion of the implementation fee . . . .

Ex. P 87, ¶ 8 at APP 3-4.

Love signed an agreement with Heritage on or about May 16, 2001 (the "Love Agreement") and paid $22,500 to Heritage in accordance with the Love Agreement to cover Heritage's travel expenses for meetings between Heritage representatives and Love. Ex. P 87, ¶ 10 at APP 4; Ex. P 68-3, Art. III, at APP 152. Thereafter, Heritage revealed the 752 Strategy to Love.

Unbeknownst to Love, Heritage had been notified by the IRS on May 2, 2001 by hand-delivered letter[27] that the IRS was "concerned" that Heritage's tax strategies "lack economic

---

[27]It appears a similar letter from the IRS was sent to Heritage by certified mail on February 21, 2001. Ex. P 68-30 at APP 879 (Decl. of Anthony Ellis dated 12/12/06). Heritage disputes receiving this letter. Notwithstanding this dispute, the Court notes that an IRS letter dated February 21, 2001, which bears the same certified mail number as the one identified in the Ellis declaration, *was produced during discovery by Heritage,* Ex. P 291 (Depo. of Ralph Canada, 11/13/06), at p. 50:1-52:2, and the Trustee testified that Heritage had not turned over the letter to the Trustee upon his appointment or at any time thereafter. Audiotape: hearing conducted 07/31/07 at 10:26:46-10:27:59 a.m. (on file with the Court). It appears that the IRS elected to hand-deliver the May letter because the IRS never received the return receipt for the February letter, despite submitting two "trace requests" to the post office. *See* Ex. P 68-30 at APP 880 (Decl. of Anthony Ellis dated 12/12/06).

substance and that investors in such transactions may claim artificial tax losses." *See* Ex. P 68-80 at APP 1976. Moreover, the IRS asked Heritage to identify all of its clients who had entered into any of the transactions described in the letter within fourteen days. The IRS also asked Heritage to provide all memoranda, correspondence, and any other documents related to any transaction described in the letter, including promotional and marketing material, and other, similar documents. *Id*. at APP 1979.

Still without knowledge of the IRS' concerns about the 752 Strategy, Love elected to implement the 752 Strategy, and the calculated fee due to Heritage was in excess of $2.3 million. Under the Love Agreement, one-half of the Heritage fee was due within five business days after Love orally advised Heritage that he intended to implement the 752 Strategy, and the remainder of the fee was due before the expiration of ten business days after the actual implementation of the 752 Strategy. Ex. P 68-3, ¶ 4.4 at APP 153.

However, Love did not pay the fee in accordance with the written terms of the Love Agreement. According to Love, that is because Bird and he subsequently agreed to different payment terms. Specifically, Love contends that

> [a]t various times between May 16, 2001 and early August 2001 when I was considering whether to implement the Heritage tax strategies, I was told by Anthony Bird that if the IRS later rejected the desired tax treatment from the implementation of the strategy for any reason, Heritage would return the portion of the implementation fee that I had paid and would not sue me for any unpaid portion of the implementation fee. I specifically relied upon this representation and promise which was material to my decision to implement the strategies in order to achieve the business and tax avoidance purpose.
>
> I signed a Promissory Note for the implementation fee. There are several written versions of the Promissory Note. The version that Heritage has produced in this litigation that appears to contain my signature is dated September 15, 2001, but I do not remember when it was signed. . . . I do not remember why there were three

different versions of the Promissory Note submitted to me by Heritage, but I have a firm recollection that Mr. Bird told me that if the IRS rejected the tax strategy, Heritage would not sue me on the Promissory Note.

Ex. P 87, ¶¶ 17-18 at APP 6-7. Further, Love contends that

[a]t the time that the documents were prepared for implementation of the tax strategy in July and August 2001, I had been told by either Mr. Bird or Mr. Czerwinski [another Heritage employee] that I would receive a formal legal opinion from Lewis Rice & Fingersh. The opinion that I received from that firm is a comprehensive 70-page document dated December 28, 2001. I believed that such opinion confirmed the previous Heritage representations that the tax strategies were legitimate and had a solid legal and technical basis.

I caused shares of Radio One to be sold in 2001 and subsequent years, and signed tax returns in 2002 and subsequent years . . . claiming the desired tax treatment as represented to me by Heritage. I believed those tax returns to be based on a solid legal foundation as represented by Heritage.

At no time throughout my dealings with Heritage from 2001 to date did Heritage tell me that it had been notified by the IRS that the IRS questioned Heritage's strategies or that Heritage was being investigated in connection with the tax strategies that it disclosed to me or caused to be implemented.

Ex. P 87, ¶¶ 20-22 at APP 7-8.

Love alleges that he made various payments totaling $1,091,881 on the $2,334,288 note he signed to pay the implementation fee due to Heritage (the "Love Note").[28] The principal balance allegedly due on the Love Note after application of payments on the Love Note is $1,289,404.87.

Love ultimately entered into a closing agreement with the IRS whereby he agreed to reverse

---

[28] Love's original proof of claim attached a letter from Heritage acknowledging receipt of a wire transfer in the amount of $1,069,381, with a balance due of $1,289,405 - but Love's claim asserted "contract damages" of $1,091,881. The Trustee's complaint to recover on the Love Note points out both this discrepancy and the lack of explanation. *See* Docket No. 1 in Adv. Pro. No. 05-3568, ¶ 35. On February 23, 2007, Love filed an amended proof of claim in the amount of $2,708,940 for "contract damages, breach of contract, fraud, negligent misrepresentation, negligence, rescission." The attachment alleges that he made payments of $1,091,881 to Heritage. Perhaps the difference between the amount Love alleges he paid and the amount set forth in Heritage's acknowledgment of its receipt of the wire transfer can be explained by the $22,500 fee that most clients initially paid to Heritage to reimburse Heritage for its travel expenses.

the tax benefits he had claimed by implementing the 752 Strategy. Love calculates his damages against Heritage to be $2,708,940, the amount asserted in his amended proof of claim (the "Love Claim").

The Love Note was turned over to the Trustee after his appointment. Based on the records then-available to the Trustee, on July 18, 2005, the Trustee filed an adversary proceeding against Love (Adversary Proceeding No. 05-3568 (the "Love Adversary")), objecting to the Love Claim and seeking to recover the outstanding balance due on the Love Note. On August 18, 2005, Love filed his initial answer to the Trustee's complaint in the Love Adversary, asserting numerous defenses to the Trustee's efforts to collect the Love Note. Specifically, Love pled defenses of failure to state a claim, statute of limitations, breach of the agreement, unconscionability, fraudulent inducement, unclean hands, lack of consideration, unenforceability due to a right to rescission, setoff, unauthorized practice of law, unenforceability due to excessive fees, waiver, estoppel, subsequent oral modification, ambiguous written document, mutual mistake, and negligent misrepresentation.[29] Love also asserted counterclaims for breach of contract, fraud, negligence/negligent misrepresentation, and rescission.

On January 6, 2006, the Trustee filed a motion for partial summary judgment in the Love Adversary. In his motion for partial summary judgment, the Trustee sought partial judgment disallowing the Love Claim in full. Love responded to the summary judgment motion, attaching numerous documents and affidavits in support of his opposition. In essence, Love contends that (i) he was fraudulently induced into entering into the Love Agreement by both affirmative

---

[29] Love amended his answer on October 31, 2005, January 24, 2006 and, most recently, on May 9, 2007. The recital of the defenses and counterclaims reflects Love's most current allegations.

misrepresentations by Heritage and material omissions by Heritage, (ii) the Love Agreement was modified orally after its execution to include the terms that Heritage would refund fees already paid and not attempt to collect any balance owing on the Love Note if Love were audited by the IRS and the IRS disallowed the 752 Strategy, and (iii) the provisions of the Love Agreement do not bar either the Love Claim or Love's defenses to the Trustee's efforts to collect the Love Note.[30] While hearings have been set on the Trustee's motion for partial summary judgment at least twice, those hearings were continued, initially due to discovery problems precipitated by the Kornman Parties' failure to turn over documents to the Trustee, *see infra* at pp. 28-31, and later because the Trustee reached an agreement with the Client Claimants and Mikron on the material terms of a Chapter 11 plan which, if confirmed, would resolve much of the litigation, and the parties wanted the opportunity to pursue confirmation of the plan before proceeding with the summary judgment hearings. *See* Docket No. 1012 in 04-35574-BJH. The Trustee's motion for partial summary judgment and Love's opposition to that motion remain pending.

In the Second Amended Plan, the Trustee proposes to settle the Love Claim against Heritage by allowing Love an unsecured claim in the Case of 65% of the fees actually paid by Love to Heritage, or an allowed claim of $709,722.65. Moreover, the Trustee proposes to forgive the Love Note.

### 3. Skinner Trusts

---

[30] Love also asserts in summary judgment briefing that the Love Agreement is unconscionable, against public policy, lacking in consideration, and illusory. Although Love's answer raises the defense that Heritage was engaged in the unauthorized practice of law, Love did not brief this issue in response to the summary judgment motions. *See* Docket Nos. 30 and 55 in the Love Adversary.

The Skinner Trusts[31] also implemented a Heritage 752 Strategy, which was subsequently disallowed by the IRS. According to the Declarations of Carl Behnke ("Carl Behnke Declaration") and John S. Behnke ("John Behnke Declaration"), trustees of the Skinner Trusts, Heritage representatives (Canada and Vernon Lee) met with representatives of the Skinner Trusts, including Carl and John Behnke, in Seattle, Washington. Ex. P 95-1, ¶ 3 (Carl Behnke Declaration); Ex. P 95-2, ¶ 3 (John Behnke Declaration). During this initial meeting, Carl and John Behnke claim that the Heritage tax savings strategies were discussed in "general concepts," and that the Heritage representatives stressed that the ideas and strategies could not be shared with anyone else and that "severe monetary penalties would apply for any unauthorized disclosure." Ex. P 95-1 at ¶ 4 (Carl Behnke Declaration); Ex. P 95-2 at ¶ 4 (John Behnke Declaration).

A second meeting apparently occurred around November 16, 2001 in Seattle at which Heritage again

> repeated the same concerns for secrecy regarding the tax strategies. They told us that if we communicated the strategies with anyone without Heritage's prior approval, Heritage would demand payment in full of its entire multi-million dollar fee and would impose a $2 million penalty for each disclosure. This prohibition on disclosure included our attorneys, accountants, and financial planners. . . . Heritage presented a written agreement to us on a 'take it or leave it' basis.

Ex. P 95-1 at ¶ 5 (Carl Behnke Declaration); Ex. P 95-2, at ¶ 5 (John Behnke Declaration).

Carl Behnke further declares that certain power point presentations were made at the second meeting that "described the tax saving concepts." Ex. P 95-1 at ¶ 6. According to Carl Behnke, "[t]he Heritage presentations included a section described as 'Summary of IRS Positions and Court

---

[31]The Skinner Trusts include the Skinner Children's Trust as defined in the Second Amended Plan at ¶ 1.113 and the Skinner Trust No. 2 as defined in the Second Amended Plan at ¶ 1.116.

Decisions.' The Heritage representatives described various legal cases, including a factual description

of the cases, the position of the . . . IRS, and the court's ruling . . . ." *Id*.

Carl Behnke further declares that the Skinner Trusts' representatives "repeatedly asked the

Heritage representatives whether [the] IRS had ever questioned any of Heritage's tax strategies." *Id.*,

¶ 7. And that in response,

> The Heritage representatives assured us 'it was legal' and the 'strategies were legal.'
> The Heritage representatives denied that the IRS had questioned the strategies and
> gave no indication the IRS was in anyway skeptical or interested in the legitimacy of
> Heritage's strategies. The Heritage representatives never told us that the IRS had
> notified Heritage that Heritage was required to divulge the names of any customers
> who implemented the Heritage strategies.

*Id*. Carl Behnke declares that he

> relied upon the representations made by the Heritage representatives regarding the
> legality of the tax strategies in making the decision to execute the agreements with
> Heritage . . . as a group, my mother Sally Behnke, my brother John Behnke, and [I]
> relied on Heritage's assurances that the IRS had never questioned the legitimacy of
> the strategies in making the decision to enter into the agreements with Heritage.
> Whether or not the IRS questioned these strategies was very important to us in
> deciding to contract with Heritage. Because Heritage restricted our contact with
> outside people, we placed considerable weight on what Heritage told us about the
> legitimacy of the approach . . . We would not have entered into the agreements with
> Heritage if we had known that the IRS was questioning the legitimacy of the tax
> saving strategies.

*Id*., ¶ 8. Carl Behnke and John Behnke signed agreements with Heritage on behalf of the Skinner

Trusts on November 16, 2001 (the "Skinner Trusts' Agreements"). *See* Ex. P 95-3 (Declaration of

Michael J. Gearin), ¶ 10, at APP 97; Ex. P 95-3, Ex. I, at APP 404. Heritage apparently agreed to

forgo the $22,500 expense reimbursement provided for in the form Heritage client agreement, as that

provision of the Skinner Trusts' Agreements is marked out and initialed by the parties. *Id*. at Ex. I,

Art. III, at APP 404. Thereafter, Heritage revealed the 752 Strategy to the Behnkes, as representatives

of the Skinner Trusts.

Unbeknownst to the Behnkes, and as noted previously, Heritage had been notified by the IRS on May 2, 2001 by hand-delivered letter that the IRS was "concerned" that Heritage's tax strategies "lack economic substance and that investors in such transactions may claim artificial tax losses" and that the IRS wanted Heritage to identify all of its clients who had entered into any of the transactions described in the letter within fourteen days. *See supra* at pp. 15-16.

Still without knowledge of the IRS' concerns about Heritage's capital gains strategies, the Behnkes elected to implement the 752 Strategy, after consulting with their "approved advisor" – *i.e.*, Lewis Rice, which Heritage had recommended to them, and who would be opining as to the validity of the 752 Strategy. The calculated fee due to Heritage was in excess of $3.9 million for both trusts. Under the Skinner Trusts' Agreements, one-half of the Heritage fee was due within five business days after the Behnkes orally advised Heritage that they intended to implement the 752 Strategy, and the remainder of the fee was due before the expiration of ten business days after the actual implementation of the 752 Strategy. Ex. P 95-3, Ex. I, ¶ 4.4 at APP 405.

However, the Behnkes did not pay the fee in accordance with the written terms of the Skinner Trusts' Agreements. According to the Behnkes, that is because Canada and they subsequently agreed to different payment terms – *i.e.*, the Behnkes signed two promissory notes, on behalf of the Skinner Trusts, payable to Heritage in the aggregate amount of $3,915,489.35 (the "Skinner Trusts' Notes"). Thereafter, the Skinner Trusts made various payments of principal and interest totaling $750,405.70 on the Skinner Trusts' Notes before learning of the IRS' views regarding the 752 Strategy. The aggregate principal balance allegedly due on the Skinner Trusts' Notes is $3,294,962.21 as of May 23, 2003.

According to Carl Behnke's declaration, in 2003, the Skinner Trusts

finally learned that the Heritage tax strategies had been listed by the IRS as illegitimate. The Trusts sought independent legal advice about the taxes and returns that had been based upon [Heritage's] advice. In October 2003, the Trusts filed 2002 federal income tax returns. In November 2003, the Trusts filed amended returns and reversed the strategies. The Trusts participated in the Son of Boss Settlement Initiative pursuant to IRS Announcement 2004-46. As a consequence of following Heritage's advice, the Trusts paid substantial professional fees and penalties after unwinding the Heritage transactions.

Ex. P 95-1, ¶ 20 at APP 7. The Skinner Trusts calculate their damages against Heritage to be $1,457,158.10, the amounts asserted in their filed proofs of claim (the "Skinner Trusts' Claims").

The Skinner Trusts' Notes were turned over to the Trustee after his appointment. Based on the records then-available to the Trustee, on July 18, 2005, the Trustee filed an adversary proceeding against the Skinner Children's Trust (Adversary Proceeding No. 05-3569) and the Skinner Trust No. 2 (Adversary Proceeding No. 05-3570) (collectively, the "Skinner Trusts' Adversaries"), objecting to the Skinner Trusts' Claims and seeking to recover the outstanding balance of the Skinner Trusts' Notes. On August 18, 2005, the Skinner Trusts answered the Trustee's complaints in the Skinner Trusts' Adversaries, asserting numerous defenses to the Trustee's efforts to collect the Skinner Trusts' Notes. Specifically, the Skinner Trusts pled defenses of estoppel, lack of consideration, unfair and deceptive acts and practices in violation of federal and state law, unauthorized practice of law, "impermissible dealing between an attorney and its client," and the unlicensed brokering of business opportunities in Washington State.[32]

_____

[32] On May 9, 2007, the Skinner Trusts filed an amended answer in Adv. Pro. No. 05-3569 (the Skinner Trusts' Adversaries were consolidated by Order entered on May 2, 2006). The amended answer asserts the defenses of fraudulent inducement, unauthorized practice of law, impermissible dealings between attorney and client, "abuse of the fiduciary relationship between Heritage and the Trusts," undue influence, lack of consideration and unconscionability. The recently amended answer also for the first time asserts counterclaims "as presented in the Trusts' summary judgment briefing filed with the Court in February 2006." *See* Docket No. 61, p. 2, n.1. The asserted counterclaims are fraudulent inducement, fraud, and negligent misrepresentation. The counterclaim seeks

On January 6, 2006, the Trustee filed motions for partial summary judgment in the Skinner Trusts' Adversaries. In his motions for partial summary judgment, the Trustee sought disallowance of the Skinner Trusts' Claims. The Skinner Trusts responded to the summary judgment motion, attaching numerous documents and declarations in support of their opposition. In essence, the Skinner Trusts contend that (i) the Behnkes were fraudulently induced into entering into the Skinner Trusts' Agreements by both affirmative misrepresentations by Heritage and material omissions by Heritage, and the provisions of the Skinner Trusts' Agreements do not bar the fraudulent inducement defense to the Trustee's efforts to collect the Skinner Trusts' Notes, (ii) the Skinner Trusts' Agreements are null and void because they resulted from the unauthorized practice of law by Heritage and demand an unethical attorney fee, (iii) Heritage breached its fiduciary relationship with the Behnkes, (iv) the Skinner Trusts' Agreements are unenforceable based on Heritage's undue influence over the Behnkes, and (v) the Skinner Trusts' Agreements are unenforceable for lack of consideration and unconscionability.

Like the hearings on the Trustee's motion for partial summary judgment in connection with the Love Claim and the Love Note, the hearings on the Trustee's motion for partial summary judgment in connection with the Skinner Trusts' Claims and the Skinner Trusts' Notes have been continued. The Trustee's motion for partial summary judgment and the Skinner Trusts' opposition to that motion remain pending.

In the Second Amended Plan, the Trustee proposes to settle the Skinner Trusts' Claims

damages for the fees and expenses related to the agreement, damages for the penalty imposed by the IRS, an order rescinding the note, attorneys' fees, and an award of exemplary damages. The Skinner Trusts' Claims, as amended in February, 2006, seek "damages for recovery of fees and expenses related to Agreement referenced above" in the amount of $724,637.34 for the Skinner Childrens' Trust and $732,520.75 for Skinner Trust No. 2. *See* Proofs of Claim Nos. 87 and 88.

against Heritage by allowing the Skinner Children's Trust and the Skinner Trust No. 2 unsecured claims in the Case of 65% of the fees actually paid by it to Heritage, or an allowed claim of $238,517.92 and $249,245.79, respectively. Moreover, the Trustee proposes to forgive the Skinner Trusts' Notes.

### 4. The Sandwith Claimants and the Mikron Note

The relevant facts surrounding the claims asserted by the Sandwith Claimants (the "Sandwith Claimant Claims") and the note executed by their closely-held corporation, Mikron, are contained in a Memorandum Opinion and Order entered on November 27, 2006 (Docket No. 52) (the "Prior Mikron Opinion") in Adversary Proceeding No. 05-3671 (the "Mikron Adversary"). *See Faulkner v. Mikron, Inc. (In re The Heritage Organization, L.L.C.)*, 354 B.R. 407 (Bankr. N.D. Tex. 2006). In the Mikron Adversary, the Trustee is attempting to collect a note signed by Mikron in the "initial amount" of $5,386,919.00 (the "Mikron Note") in connection with Heritage's provision of certain estate planning strategies to the Sandwith Claimants. In its answer, Mikron asserted numerous defenses to the Trustee's efforts to collect the Mikron Note. In the Prior Mikron Opinion, this Court denied Mikron's motion for summary judgment and granted the Trustee's motion for summary judgment in part, thereby narrowing the issues left for trial in the Mikron Adversary. Specifically, those remaining issues surround Mikron's unauthorized practice of law defense to the Trustee's attempt to collect the Mikron Note. *See* Prior Mikron Opinion, 354 B.R. at 444.

After the Prior Mikron Opinion was issued, Mikron was granted leave to amend its answer to assert a fraudulent inducement defense to collection of the Mikron Note. In its latest defense, Mikron contends, in essence, that the Sandwiths would not have used Heritage for estate planning had the Sandwiths known that Heritage's 752 Strategies were being challenged by the IRS, that

Heritage's references included counsel with a secret financial stake in promoting Heritage's strategies, that the Sandwiths' "independent" counsel had a longstanding client relationship with Heritage and Kornman, and that Mikron would not have signed the Mikron Note if it had known of the fraud upon the Sandwiths. The Mikron Adversary is set for trial docket call on November 6, 2007.

### C. The Relationship Between Heritage and Canada

Canada, a lawyer, was the former President and Chief Operating Officer of Heritage and was one of the "Principals" responsible for making the final sales pitch to prospective clients to try to "sell" the Heritage tax savings strategies. Canada was involved in the transactions with several of the Client Claimants, although with respect to the Jenkins Tax Claimants, Kornman was the person primarily responsible for getting Jenkins and Meralex to sign the Meralex Agreement. Canada went to work for Heritage in 1995, pursuant to the terms of an employment agreement. *See* Def.'s Ex. 1 (the "Employment Agreement").[33] He never held an equity interest in Heritage or in any entity that was a member of Heritage. Ex. P 290, p. 11, ¶ 4-5.

At some point in 2001, a dispute arose between Canada and Kornman over Canada's level of compensation, which resulted in the non-renewal of Canada's Employment Agreement and Canada's filing of an arbitration demand against Heritage and Kornman. Canada claimed, among other things, that Heritage had failed to honor an oral promise to pay Canada fifteen percent of the fees generated by what the parties all refer to as the "Connecticut Client." *See generally* Docket. No. 186 in Adv. Pro. No. 04-3338-BJH (the "Canada Adversary"). In 2004, the arbitrators issued an

---

[33] A copy of the Employment Agreement was admitted into evidence at the Supplemental Hearing and was marked "Defendant's Exhibit One".

award in Canada's favor for approximately $6.1 million. Canada then applied in state court for an order confirming the arbitration award, and on the same date such an order was entered, Heritage filed a motion to vacate a portion of the award. Canada then moved for entry of judgment based on the order confirming the award, but the day before the hearing, Heritage filed its bankruptcy petition.

During the Case, the action pending in state court was removed to this Court, and GMK objected to Canada's proof of claim (which was filed in the amount of the arbitration award) on the ground that the claim was for services of an insider or attorney of the debtor and exceeded the reasonable value of the services in violation of 11 U.S.C. § 502(b)(4). This Court, through former Chief Judge Felsenthal, issued a Memorandum Opinion which confirmed the arbitration award in part and vacated it in part and left several issues remaining for trial: (i) the amount of attorneys' fees to be awarded to the Trustee (who became the representative of the estate upon his appointment), (ii) the splitting of arbitration fees, and (iii) the objection to Canada's claim pursuant to 11 U.S.C. § 502(b)(4). *In re The Heritage Organization, L.L.C.*, 322 B.R. 285 (Bankr. N.D. Tex. 2005). After six days of trial, this Court[34] issued a Memorandum Opinion on January 5, 2006 and a Judgment on January 19, 2006, which allowed Canada's claim as an unsecured, non-priority claim in the amount of $5,050,152.12 subject to a further request for attorneys' fees. *See* Docket Nos. 186 and 189 in the Canada Adversary.

Heritage and the Kornman Parties appealed, and Canada filed a cross-appeal. On September 14, 2006, the District Court entered a Memorandum Opinion reinstating and affirming the arbitration award in its entirety, *see* Docket No. 225 in the Canada Adversary, and allowing Canada an

---

[34] Former Chief Judge Felsenthal left the bench in 2005; the Case and the Canada Adversary were re-assigned to the undersigned on July 28, 2005.

unsecured, non-priority claim against Heritage in the amount of $6,218,679.40 (comprised of the original arbitration award plus $57,409.32 of prejudgment interest). The Kornman Parties and the debtor (out of possession) appealed the District Court's decision to the Fifth Circuit, where it remains pending.

### D. Procedural and Other Facts Regarding the Heritage Bankruptcy Case

#### 1. Difficulties in the Trustee's Administration of the Case

After having sold its tax and estate planning strategies to a number of wealthy clients, Heritage filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 17, 2004, thereby initiating the Case. On August 13, 2004, the Court entered an order for the appointment of a Chapter 11 trustee in the Case, and on August 16, 2004, the Trustee was appointed.

While Heritage had ceased operations prior to the filing of the Case, the Trustee, an experienced bankruptcy professional, has had a difficult time administering the Heritage estate, in large part due to the lack of cooperation with, if not outright obstruction of, that administration by Heritage's former principals, including the Kornman Parties. Stated most simply, the persons in control of Heritage pre-petition have frustrated the Trustee's efforts to administer the estate at virtually every turn. At a minimum, they (i) failed to turn over all of the books and records of Heritage upon the Trustee's appointment, (ii) have not been candid with the Trustee throughout his administration of the estate to date,[35] and (iii) have doled out information to the Trustee as it suited

---

[35] By way of example only, the Trustee testified that he was told early on in the Case that Heritage had leased all of its computers, and that the lessors had "confiscated" this equipment prior to his appointment. Audiotape: Hearing conducted 06/12/07 at 10:22:45 - 10:23:07 a.m. (on file with the Court). The Trustee further testified that he was told that the lessors, Strategic Leasing, L.P. and Valiant Leasing, L.L.C., were independent companies. Audiotape: Hearing conducted 06/12/07 at 10:23:48 - 10:24:01 a.m. (on file with the Court). The Trustee later learned that these entities are controlled, indirectly, by Kornman, members of his immediate family, or his long-time employees. *See* Joint Pre-Hearing Order (Docket No. 1155) at ¶¶ 16-29.

their purposes. It is only after the Trustee was forced to file a motion for turn-over, which was ultimately resolved by the entry of an agreed order after a hearing before this Court, and later after a motion for contempt and sanctions was filed (for those parties' failure to comply with the earlier agreed turn-over order) and a series of hearings before this Court, that significant volumes of documents were finally disclosed and produced. In fact, the motion for contempt is still pending and was supplemented as recently as April, 2007, with the Trustee alleging that since the filing of the contempt motion, he has received "hundreds of boxes" of documents and tapes that had not previously been turned over.[36] Moreover, the Kornman Parties are engaging in these same tactics in an adversary proceeding pending against them. *See* Adv. Pro. No. 06-3377-BJH (the "Kornman Adversary Proceeding"). The Trustee has also been forced to file a motion for turn-over, a motion to compel initial disclosures under Rule 26, and a motion for sanctions in the Kornman Adversary Proceeding.

As a result of the continuing problems with the turn-over of assets, documents, and records to the Trustee, the Court directed the turn-over and production of all such assets, documents, and records in the Case no later than May 17, 2006 and, in the Kornman Adversary Proceeding, directed each of the defendants to file a certification under penalty of perjury detailing the diligence of their search for responsive documents and the completeness of their production.[37] *See* Transcript of

_____

[36] The motion for contempt is scheduled for hearing on September 18, 2007.

[37] The Court has reserved for later determination the question of appropriate sanctions for these ongoing problems for at least two reasons. First, the Court was most concerned about getting the documents produced so that discovery in the myriad of contested matters and adversary proceedings in the Case could move forward expeditiously. Second, the Court wanted to be in a position to assess the damages caused by these parties' conduct at one time and *after* the Court had confidence that the Trustee had received all property of the estate to which he was entitled. The Court still has no confidence that the Court's prior orders have been complied with fully and anticipates further hearings regarding these matters.

hearing held 5/2/07 (Docket No. 128 in 06-3377-BJH). However, notwithstanding these procedures, and certain of the former principals' certifications of diligent compliance, significant amounts of documents continue to be turned over to the Trustee on a time-table that appears only to suit Heritage's former principals.

For example, some 5,000 audio tapes were turned over to the Trustee in March and April 2006, over 19 months after the Trustee's appointment. Of course, these tapes should have been turned over to the Trustee immediately upon his appointment. Heritage apparently taped many of its conversations with third parties, including its former clients and the lawyers representing those clients. It appears that these third parties were unaware that their conversations were being taped by Heritage. This production of audio tapes came after a series of hearings on the motion to compel and for contempt. While only a relative handful of the audio tapes have been transcribed (less than 200), many contain information that is relevant and discoverable in connection with the contested claim objections and/or adversary proceedings pending in the Case relating to the Client Claimants. Moreover, it appears that certain of the information from these audio tapes is inconsistent with positions taken by Kornman-related entities in those contested matters and proceedings, and the positions taken by the Trustee in those contested matters and proceedings.[38]

An additional 3,000 audio tapes were turned over about a year later, over 30 months into the Trustee's administration of the Heritage bankruptcy estate. Specifically, these additional 3,000 tapes were provided to the Trustee literally only days before Kornman pled guilty to a criminal indictment pending against him in federal district court in the Northern District of Texas styled United States v.

---

[38] Of course, at the time the Trustee took his positions, he was unaware of the audio tapes and their potential content, as a direct result of the Kornman-related parties' failures to provide those tapes on a timely basis.

Gary M. Kornman, Criminal Action No. 3:05-CR-0298P (the "Kornman Criminal Case"). Kornman entered into a plea agreement on April 9, 2007, in which he pled guilty to one count of making false statements to the Securities and Exchange Commission in violation of 18 U.S.C. § 1001.[39] The Court notes that the plea agreement, entered into by the U.S. Attorney without any consultation with the Trustee,[40] also contains a provision stating that the government "agrees not to bring any additional charges against Kornman for alleged obstructive conduct relating . . . to the production of records to the bankruptcy trustee appointed over The Heritage Organization, L.L.C. after his appointment on or about August 16, 2004." Ex. P. 142, ¶ 7. The Court therefore strongly suspects that the Kornman Parties are well aware that their conduct in the Case has been inappropriate, arguably obstructive, and could have resulted in their criminal prosecution in accordance with 18 U.S.C. §§ 152 and 1519 (2000 & Supp. 2007).

While there has not been time (or the financial resources) to transcribe any significant portion of these additional audio tapes, certain of the additional tapes that have been transcribed to date contain relevant and discoverable information in connection with the Client Claimants' contested matters and adversary proceedings. More significantly, it appears that certain of the information recovered from the recently produced tapes that have been transcribed is damaging to the Kornman-related entities' and the Trustee's position in those matters.

It is not surprising that the Trustee continues to testify that he has no confidence that he either has, or has access to, all of Heritage's assets, business records, and other documents.

### 2. The Nature of the Creditor Body

---

[39]Kornman was sentenced on July 11, 2007 to two years' probation.

[40]Audiotape: hearing conducted 06/12/07, 10:46:25-10:49:25 a.m. (on file with Court).

The creditors in the Case can be divided into five groups: (1) the IRS, which asserts a priority tax claim of $913,499 and which has not been active in the Case, (2) sixteen small creditors, who are not former clients of Heritage and whose claims aggregate some $45,000, over $40,000 of which are held by two of them and none of whom have been active in the Case,[41] (3) the Client Claimants, whose filed proofs of claim aggregate some $109 million and whose claims the Trustee has proposed to settle in the Second Amended Plan for about $20 million, all of whom have been active in the Case, (4) Canada, who has been active in the Case, and whose allowed claim in the Case is approximately $6.2 million, although that allowance is currently on appeal to the Fifth Circuit by the debtor (out of possession) and the Kornman Parties, and (5) Kornman, various Kornman-related entities, and certain other Heritage/Kornman employees and/or former employees, most (in dollar amount) of whose claims are contingent and/or unliquidated indemnity claims that have been objected to by the Trustee.[42]

With the exception of the IRS and the holders of Small General Unsecured Claims, it is a significant understatement to say that the other creditor groups do not care for each other. The Client

---

[41]The claims held by these creditors are defined in the Second Amended Plan as the Small General Unsecured Claims. Second Amended Plan at ¶ 1.118. The Trustee testified at the Supplemental Hearing that one of those creditors (holding a claim for approximately $13,000) withdrew its proof of claim on July 30, 2007. *See* Docket No. 1252.

[42]For example, Heritage's formation documents contain a very broad indemnity provision covering its officers and employees and giving Heritage discretion to indemnify others in certain circumstances. Kornman has filed a proof of claim in the Case claiming a right to indemnity. As part of the contested confirmation hearings, Kornman had to provide a statement of the maximum amount of his claim, which he claims is more than $64 million. In addition, on May 10, 2007, Kornman filed an amendment to his proof of claim, clarifying what amounts of his indemnity claim are currently liquidated. Kornman claims some $6 million of liquidated indemnity claim, nearly all of which are reimbursement for the legal fees and costs he has incurred in defending himself against suits brought against him by unhappy former clients and, surprisingly, for defending himself in the Kornman Criminal Case, which, as previously noted, resulted in his plea of guilty to a charge of lying to the Securities and Exchange Commission. Kornman's lawyers assure the Court that Kornman's indemnity agreement with Heritage is broad enough to include the Kornman Criminal Case fees and expenses. The Kornman claim has been objected to by the Trustee, but no hearing has yet been held on the claim objection. *See infra* at pp. 84-85.

Claimants, who dealt with Kornman, Canada, or Bird, believe that they were defrauded by Heritage. None of the Heritage strategies that the Client Claimants "bought" from Heritage withstood IRS scrutiny, and all of the Client Claimants have incurred substantial fees undoing the strategies. They have not only paid the taxes that the Heritage strategies were supposed to save them, but have also paid interest on the taxes and, in most cases, penalties. Kornman's lawyers argue that the Client Claimants understood that the agreements they signed bar the claims they now make, and that the Client Claimants simply feel stupid for having bought into inherently risky tax strategies. As for Canada, a Harvard lawyer, the Client Claimants point out that after leaving Heritage, Canada "switched sides" and began suing other tax promoters like Heritage for defrauding clients[43] – an irony not lost on the Client Claimants.

### 3. Procedural Twists and Turns

Notwithstanding the significant difficulties faced by the Trustee in attempting to bring these disparate groups of creditors together, after years of protracted litigation in the Case,[44] the Trustee was able to negotiate a comprehensive settlement with the Client Claimants and Mikron. As a result, on March 10, 2007, the Trustee and the Client Claimants (as joint proponents) filed a Joint Disclosure Statement Pursuant to 11 U.S.C. § 1125 in Support of Trustee's and Client Claimants' Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement"),

---

[43]The Court understands that Canada's firm has been quite successful in these suits, including a significant participation in the litigation that resulted in the financial demise of a well-regarded Dallas law firm, Jenkens & Gilchrist.

[44] The Court notes that a Chapter 11 trustee was appointed in the Case on motion by the Jenkins Tax Claimants, which motion was filed over three years ago and only five weeks into the Case. Some of the other Client Claimants and Canada joined in that motion. Heritage's disputes with Canada date back even further, to an arbitration demand filed by Canada against Heritage and Kornman in 2002. *See generally* Docket. No. 186 in Adv. Pro. No. 04-3338-BJH.

*see* Docket No. 1021, and the Trustee's and Client Claimants' Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code" (the "Plan"). *See* Docket No. 1020. To address certain objections to approval of the Disclosure Statement and certain concerns raised by the Court at the hearing to consider approval of the Disclosure Statement, the Trustee and the Client Claimants filed their "Joint Disclosure Statement Pursuant to 11 U.S.C. § 1125 in Support of Trustee's and Client Claimants' First Amended Joint Plan of Liquidation . . . " (the "Amended Disclosure Statement"), *see* Docket No. 1091, and the "Trustee's and Client Claimants' First Amended Joint Plan of Liquidation . . . " (the "Amended Plan"), *see* Docket No. 1090. The Amended Disclosure Statement was approved by Order entered on May 3, 2007, *see* Docket No. 1092, and the hearing to consider confirmation of the Amended Plan was set to commence on June 11, 2007.

On the eve of the Original Hearing, a settlement was reached with Canada relating to his objections to confirmation of the Amended Plan and the settlement contained in the Amended Plan as it relates to the Client Claimants. While the general terms of that settlement were announced to the Court at the commencement of the Original Hearing, the Plan Proponents had not had time to prepare the formal documentation required to modify the Amended Plan to contain the new Canada settlement terms. With the agreement of the Kornman Parties, however, the Court proceeded with the confirmation hearing (with Canada now supporting confirmation), understanding that the Kornman Parties could supplement their objections to confirmation with any additional arguments that were precipitated once the formal modification document was filed. The "Plan Modification to Trustee's and Client Claimants' First Amended Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code" (the "Plan Modification") was filed on June 12, 2007, *see* Docket No. 1189, and affected creditors were notified of the opportunity to change their votes. *See* Docket

**Memorandum Opinion** **Page 34**

No. 1190.

At the conclusion of the Original Hearing, the Court took confirmation under advisement. The Court proceeded to orally announce, however, that it had at least two serious concerns over the confirmability of the Amended Plan, as modified by the Plan Modification (the "Modified Plan").[45] First, the Court was concerned that the evidentiary record failed to support the creation of an administrative convenience class of creditors consistent with the requirements of 11 U.S.C. §1122(b). Second, if the administrative convenience class was not legally proper, there appeared to be unfair discrimination between the treatment proposed to those creditors and the creditors contained in Class 5 of the Modified Plan. *See* 11 U.S.C. § 1129(b)(1).

Presumably in response to the Court's expressions of concern, the Plan Proponents filed, on June 22, 2007, the Second Amended Plan, *see* Docket No. 1201, and a "Joint Supplemental Disclosure Statement Regarding Trustee's and Client Claimants' Second Amended Joint Plan of Liquidation . . ." (the "Supplemental Disclosure Statement"). *See* Docket No. 1202. The Kornman Parties filed objections to the Supplemental Disclosure Statement, but an agreement was reached as to those objections and an Amended Joint Supplemental Disclosure Statement (Docket No. 1233) was approved by Order entered on July 12, 2007. The creditors affected by the changes proposed by the Second Amended Plan (Classes 4 and 6) were re-solicited, and the Court scheduled a supplemental confirmation hearing for July 31, 2007.

During the Supplemental Hearing, the Court heard additional evidence regarding, among other things, (i) the proposed settlement with Canada, (ii) relevant facts surrounding the other

---

[45]The Court gave no assurance to the Plan Proponents that these were its only concerns. In fact, the Court specifically stated that other of the Kornman Parties' objections might be sustainable as well – the Court simply needed more time to reflect upon those objections and the extensive evidentiary record that had been made.

**Memorandum Opinion**                                                                                          **Page 35**

changes contained in the Second Amended Plan, and (iii) feasibility of the Second Amended Plan.

At the conclusion of the Supplemental Hearing, the Court took confirmation of the Second Amended

Plan under advisement.

## II.    LEGAL ANALYSIS

A variety of matters must be analyzed in determining whether the Second Amended Plan can

be confirmed, including: (i) whether the settlements contained in the Second Amended Plan – *i.e.*,

the proposed global settlement with the Client Claimants and Mikron and the proposed settlement

with Canada, can be approved; and (ii) whether the Second Amended Plan satisfies the legal

requirements for confirmation – *i.e.*, have the Kornman Parties raised any sustainable objections to

confirmation of the Second Amended Plan.  Because the settlements with the Client Claimants,

Mikron, and Canada are integral to the Second Amended Plan, and because the Second Amended

Plan cannot be confirmed if those settlements fail to satisfy the legal test for approval of settlements

in this Circuit, the Court will start its legal analysis of confirmation with its analysis of the proposed

settlements and will then turn to the Kornman Parties' more technical objections to confirmation of

the Second Amended Plan

### A.    Legal Standard for Approval of Bankruptcy Settlements

This Court is authorized to approve settlements in accordance with Federal Rule of

Bankruptcy Procedure 9019(a). According to the Fifth Circuit, "[a]pproval should only be given if

the settlement is fair and equitable and in the best interest of the estate." *In re Cajun Elec. Power

Coop., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997) (internal quotations omitted).  In *Cajun*, the Fifth

Circuit further stated that

> [t]he fair and equitable standard is not as vague as it might appear to be.  The words
> fair and equitable are terms of art – they mean that senior interests are entitled to full

**Memorandum Opinion**                                                                 **Page 36**

priority over junior ones. In deciding whether a settlement of litigation is fair and equitable, a judge in bankruptcy must make a well-informed decision, comparing the terms of the compromise with the likely rewards of litigation. In particular, the judge must evaluate and set forth in a comprehensible fashion: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise.

*Id.* at 355-56 (internal quotations omitted).[46] In explaining what bankruptcy courts must do to satisfy the first factor – *i.e.*, probability of success in the litigation, the Circuit further stated that "it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. 'The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision . . . .'" *Id.* at 356 (quoting *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)* 841 F.2d 159, 163 (7th Cir. 1987)). Finally, the Fifth Circuit noted in *Cajun* that

[u]nder the rubric of the third, catch-all provision, we have specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider the best interest of the creditors, with proper deference to their reasonable views. Second, the court should consider 'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.

*Id.* at 356 (internal citations omitted).

The parties agree this is the relevant legal standard to be applied. They disagree, however, about its proper application here.

### B. Application of the Legal Standard to the Settlement with the Client Claimants and Mikron

---

[46] To the extent that the phrase "fair and equitable" means simply that senior interests get full priority over junior ones, as the Fifth Circuit says it does, then arguably the language subsuming the four factors identified in *Cajun* is somewhat imprecise, and the four *Cajun* factors should be analyzed instead in light of the phrase "in the best interest of the estate." *In re Mirant Corp.*, 348 B.R. 725, 739 (Bankr. N.D. Tex. 2006) (noting that cases sometimes "appear to conflate the 'best interests of creditors' standard and the 'fair and equitable' standard"). The distinction in this Case, however, is without practical significance.

**Memorandum Opinion** **Page 37**

### 1. Complexity and Likely Success

At the outset of its analysis, the Court notes the complexity of the legal and factual issues raised in the contested claim objections pending against the Client Claimants and the adversary proceedings pending against Love, the Skinner Trusts, and Mikron. Over 500 exhibits were admitted into evidence in connection with the Original Hearing and the Supplemental Hearing.[47] The Court has spent incalculable hours dealing with the legal issues presented by the Trustee, the Kornman Parties, Mikron, and/or the affected Client Claimant in connection with the Mikron Adversary and the Trustee's motions for summary judgment (or partial summary judgment) in both the contested matters and the other adversary proceedings pending in the Case. By way of example, the Court notes that there are a total of seventeen motions for summary judgment pending – eight filed by Heritage and GMK (with respect to claim objections those entities filed in the Case) and nine by the Trustee (five in the Case with respect to claim objections, three in the various adversary proceedings in which a claim objection is asserted in the Trustee's complaint, and one in the Jenkins/Meralex adversary proceeding where the Trustee asserts a claim objection in his answer). Over thirty briefs, responsive briefs, reply briefs and sur-reply briefs have been filed with respect to these motions.[48] The Court has had to create its own spreadsheet to track the numerous claims and defenses asserted by each of the parties in the Case and the myriad of adversary proceedings. The Court has already

---

[47] The number is actually quite a bit higher, since of the more than 500 numbered exhibits, several have sub-numbering systems. For example, Trustee's exhibit 68 spans four five-inch binders and contains sub-numbers 68-1 through 68-114. Similarly, Trustee's exhibit 196 spans three such binders and contains sub-numbers 196-1 through 196-48.

[48] Some are duplicative copies filed in multiple cases and some are not; even locating each of the parties' pleadings has been challenging. Some of the claim objections have been consolidated with an adversary proceeding, but not before certain pleadings were filed. For example, GMK's objection to the Love proof of claim and corresponding summary judgment motion is filed in the main Heritage bankruptcy case, but the Trustee's motion for summary judgment on *his* claim objection appears in Adv. Pro. No. 05-3568. Love's responses to GMK's claim objection are docketed in the Love Adversary although the motion to which they are responding was filed in the Case.

ruled on a summary judgment motion in the Mikron Adversary Proceeding, and the Prior Mikron Opinion is fifty-one pages of fairly terse legal analysis. While the Court has not actually heard the other summary judgment motions, it has prepared for hearings on those motions *twice* and has studied the voluminous summary judgment appendices filed by the parties in connection with those motions, all of which materials were introduced into evidence here. Countless hours have been spent doing independent research on the novel legal issues raised by the various parties. In short, the Court is intimately familiar with the legal and factual contentions of the parties; those issues are complex, as will become more apparent as the Court proceeds with its analysis of the proposed settlement.

Regarding the Trustee's likelihood of success on the merits of the claim objections and the adversary proceedings at issue here, and as noted previously, the Heritage client agreements (including the Meralex Agreement, the Love Agreement, the Skinner Trusts' Agreements, and the Sandwith Agreements), as drafted by Heritage, are very one-sided in Heritage's favor. If these client agreements are enforceable as written, several of the defenses to the collection of the notes payable to Heritage and the theories which underlie the Client Claimants' claims against Heritage are likely barred. For example, in Section 5.1 of the client agreement, entitled "Uncertainty of Results," the client acknowledged that results from the Strategies "are subject to interpretations of current Law and may be substantially impacted by changes of Law . . ." and that the IRS "could possibly disallow or contest these large tax savings and that tax payments and court proceedings may be necessary to gain or defend any tax savings." *See, e.g.*, Ex. P 87, Ex. A, § 5.1 at APP 10. Similarly, in Section 5.2 of the client agreement, entitled ""No Reliance On [Heritage]," the client acknowledged that he would

> act solely on the advice of [his] Authorized Advisors, that [he has] exercised and will
> at all times in the future exercise independent judgment in determining to enter into

this Agreement and to Implement any of the Strategies or attempt to achieve a Result using any of the Strategies, and that [he has] not relied and will not rely upon any advice, information, representations or agreements, oral or otherwise, of [Heritage].

*Id*. at § 5.2. Moreover, in Section 5.3 of the client agreement, entitled "Indemnification of [Heritage]," the client agreed to release, hold harmless, and indemnify Heritage

from Any and All Claims . . . arising out of or relating in any way to any Strategies . . . [or] to any Results . . . including, by way of example but not limited to, any claims alleging negligence, gross negligence, error, omission or wrongful conduct by [Heritage], and extending to any and all damages, costs, attorneys' fees, experts' costs, valuation costs, accounting fees, civil or criminal tax liabilities, penalties, interest and other results or outcomes of any and all tax returns, tax liabilities, tax positions, contracts, transfers, purchases, sales, investments and transactions with respect to any Property . . . whether or not related to taxes, to [the client] or to any Strategies.

*Id*. at § 5.3, APP 11. Section 11.2 of the client agreement, entitled "No Other or Prior Agreements and/or Inducements," provides that

[b]y signing this Agreement [the client] Acknowledge[s] that there were no promises, representation or agreements, oral, written or implied, made to [him] by any Party or other Person which induced [him] to enter into this Agreement. The Parties further Acknowledge that there are no other agreements between them, oral, written or implied, other than those stated explicitly in this written Agreement.

*Id*. at § 11.2, APP 15. In addition, Section 11.4 of the client agreement, entitled "Amendments and Supplemental Agreements," provides that

[t]his Agreement embodies all understandings and all agreements between the Parties, supersedes all prior agreements and understandings, and may be changed, terminated, amended or supplemented only by an agreement, in writing, fully executed . . . by all the Parties affected by the Supplemental Agreement and delivered in accordance with any express terms hereof.

*Id*. at § 11.4, APP 15. Finally, just above the signature block, the client agreement provides, in bold, that "[t]his written Agreement represents the final agreement between the Parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the Parties.

There are no unwritten oral agreements between the Parties." *Id*. at APP 18.

The Trustee relies heavily upon these provisions to assert that the defenses to the collection of the Skinner Trusts' Notes, the Love Note, and the Mikron Note asserted by the Skinner Trusts, Love, and Mikron, respectively, are barred. Similarly, the Trustee relies heavily on the fact that each of these notes is unconditional on its face, and that the alleged conditions to the payment obligations otherwise stated in those notes cannot be found in the notes.[49]

While these contractual provisions and the unconditional nature of the notes may defeat certain of the Client Claimants' defenses and/or counterclaims, it appears equally likely that several of those defenses and/or counterclaims would, for the reasons explained below, survive a motion for summary judgment, thereby requiring further potentially problematic discovery, a trial on the merits, and appeals from any resulting determination. Therefore, notwithstanding the onerous contractual provisions and apparent unconditional nature of the notes, the Court concludes that there are complex legal and factual issues which raise serious questions about the probability of the Trustee's success in easily or completely disposing of the claims and defenses asserted by the Client Claimants and/or Mikron. In exploring these complex legal and factual issues further in connection with its analysis of the likelihood of success factor, the Court will address the claims and defenses of the four controlling Client Claimants and Mikron based upon the Court's current view of which claimants are most likely to succeed and which claimant is least likely to succeed.

>    **a.    The Skinner Trusts' Claims and Defenses to Collection of the Skinner Trusts' Notes.**

---

[49]The Trustee has already been granted a partial summary judgment on Mikron's claim that the Mikron Note was really a stand-by note. *See* Prior Mikron Opinion, 354 B.R. at pp. 428-31. However, the Mikron Note contained a waiver of defenses provision not found in either the Love Note or the Skinner Trusts' Notes. Moreover, the Skinner Trusts and Love each contend that they were fraudulently induced into signing the relevant note, a claim not asserted by Mikron when the Trustee's summary judgment motion was granted in part.

**Memorandum Opinion**                                                                                    **Page 41**

Because of the timing of the signing of the Skinner Trusts' Agreements, the Skinner Trusts' fraudulent inducement claims and defenses to collection of the Skinner Trusts' Notes are quite problematic for the Trustee. The Skinner Trusts were first contacted by Heritage about six months *after* the IRS notification letter had been hand-delivered to Heritage, and it appears undisputed that the Behnkes were not told of (i) the IRS' position regarding the 752 Strategy, (ii) the ongoing IRS investigation of Heritage, and/or (iii) the IRS' request for identification of Heritage clients who had implemented the 752 Strategy. It is hard to imagine more material information to a prospective Heritage client than this type of information. Proceeding to implement the 752 Strategy while there was an ongoing IRS investigation of Heritage assured the Heritage client of an IRS audit and, in light of the stated position of the IRS, the likely disallowance of the client's tax return.

To date, the Trustee's only response to these extremely difficult facts underlying the Skinner Trusts' fraudulent inducement defenses to collection of the Skinner Trusts' Notes and the Skinner Trusts' Claims is to point to the waiver/release/merger/reliance disclaimer provisions of the Skinner Trusts' Agreements. However, the general rule in Texas is that waiver/release/merger/reliance disclaimer clauses such as the ones contained in the Skinner Trusts' Agreements can be avoided by proof of fraud in the inducement, and the parol evidence rule does not bar proof of such fraud. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997).

If the settlement is not approved, the Trustee will attempt to carve around this general rule by relying upon its exception, also described in *Schlumberger*. The *Schlumberger* court held that such clauses can, in certain circumstances, negate the reliance element of a fraudulent inducement claim and bar such a claim as a matter of law. In summary, the *Schlumberger* court held

that a release that clearly expresses the parties' intent to waive fraudulent inducement

claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement. We emphasize that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim. We conclude only that on this record, the disclaimer of reliance conclusively negates as a matter of law the element of reliance . . . .

*Id*, at 181 (internal citation omitted). Both the state and federal courts in Texas since *Schlumberger* have struggled with the circumstances under which such clauses will or will not be binding, and will or will not negate the reliance element of a fraudulent inducement claim. According to the *Schlumberger* court, "[t]he contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding." *Id*. at 179.

The Trustee will assert that the Skinner Trusts' Adversaries fall within the *Schlumberger* exception and thus the Skinner Trusts' fraudulent inducement defenses and claims are barred as a matter of law. *See, e.g.*, *Armstrong v. Am. Home Shield Corp*., 333 F.3d 566 (5th Cir. 2003); *Steinberg v. Brennan*, No. 3:03-CV-0562, 2005 WL 1837961 (N.D. Tex. July 29, 2005). The Skinner Trusts, on the other hand, will argue that the Skinner Trusts' Adversaries are more like those post-*Schlumberger* cases which uphold the general rule that waiver/release/merger/reliance disclaimer clauses such as the ones contained in the Skinner Trusts' Agreements can be avoided by proof of fraud in the inducement, and the parol evidence rule does not bar proof of such fraud. Ultimately, this Court will be called upon to decide whether these fraudulent inducement defenses are barred as a matter of law under *Schlumberger* and its progeny, and in assessing the probability of the Trustee's success on this issue, this Court concludes that it is more likely than not that the Skinner Trusts' fraudulent inducement defenses would survive the Trustee's pending motion for summary judgment for the reasons explained below.

Briefly, the *Schlumberger* court put particular emphasis on the following facts: the parties

before it were dealing at arm's length. Both were equally sophisticated in the relevant subject matter

in dispute (there, diamond mining). The party asserting the fraudulent inducement claim had

competent (and presumably independent) legal counsel representing it in drafting the agreement

which contained the contractual language alleged to bar the subsequent fraudulent inducement claim.

And, significantly, the contractual language which was alleged to preclude the fraudulent inducement

claim was contained in a document (there, a settlement agreement and release), the very purpose of

which was to end the parties' dispute about the (mis)representations which allegedly formed the

basis of the fraudulent inducement claim. The parties had already been embroiled in the dispute at

the time the release was signed, and thus the release formed a significant part of the basis of the

bargain. *See Carousel's Creamery, LLC v. Marble Slab Creamery, Inc.,* 134 S.W.3d 385 (Tex. App.

– Houston [1st Dist.] 2004). The *Schlumberger* court appeared concerned about finality – "the

ability of the parties to fully and finally resolve disputes between them. Parties should be able to

bargain for and obtain a release barring all further dispute." *Schlumberger* at 179. As one Texas

court has summarized *Schlumberger*, when concluding that a fraudulent inducement claim was

barred as a matter of law by the contractual language at issue there, the *Schlumberger* court focused

on:

> the parties (1) were attempting to end their relationship, (2) were "embroiled in a
> dispute," (3) were dealing at arm's length, (4) were represented by highly competent
> and able legal counsel during the negotiations over the terms of the release itself, (5)
> were knowledgeable and sophisticated business players, and (6) the terms of the
> release "in clear language . . . unequivocally disclaimed reliance" on the specific
> representations of the value of the project, which representations were the basis for
> the . . . lawsuit.

*IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 125 (Tex. App. – Houston [14th Dist.] 2003)

(quoting *Schlumberger* at 179-80).

The Texas state court cases decided post-*Schlumberger* appear to require facts similar to *Schlumberger* before concluding that a fraudulent inducement claim has been contracted away. *See, e.g.*, *Coastal Bank SSB v. Chase Bank of Texas, N.A.,* 135 S.W.3d 840 (Tex. App. – Houston [1st Dist.] 2004) (fraudulent inducement claim barred by contractual disclaimer of reliance contained in a lending syndicate contract between two financial institutions); *Carousel's Creamery,* 134 S.W.3d at 393-94 (fraudulent inducement claim *not* barred by merger/disclaimer/integration clauses in a franchise agreement where the agreement was not intended to resolve an ongoing dispute between the parties and the franchisee was not represented by counsel in negotiating the agreement); *Woodlands Land Dev. Co., L.P. v. Jenkins*, 48 S.W.3d 415 (Tex. App. – Beaumont 2001) (fraudulent inducement claim *not* barred by "as is" clause in real estate contract where buyer was not knowledgeable in real estate and the contract did not have the specific purpose of ending a dispute); *Yzaguirre v. KCS Res., Inc.*, 47 S.W.3d 532 (Tex. App. – Dallas 2000) (merger clause in a settlement agreement which contained terms respecting royalty payments precluded subsequent claim that lessors were fraudulently induced by promises of royalty payments); *Fletcher v. Edwards*, 26 S.W.3d 66 (Tex. App. – Waco 2000) (fraudulent inducement claim *not* barred by "as is" clause in real estate contract where contract was not resolving a dispute about the subject matter of the alleged representations, buyers were not represented by counsel and were not sophisticated in real estate).[50]

---

[50] The federal district court in *Steinberg v. Brennan*, No. 3:03-CV-0562, 2005 WL 1837961 (N.D. Tex. July 29, 2005) noted that *Schlumberger* is "open to different interpretations." *Steinberg*, at *4. The *Steinberg* court then analyzed decisions from the *federal* courts within the Fifth Circuit which purported to interpret Texas state law, and concluded that "Fifth Circuit authority contradicts [the] assertion that *Schlumberger* was specific to the facts of that particular situation. The Fifth Circuit has routinely enforced disclaimers of reliance on the basis of contractually evident intent, without requiring the particular constellation of facts that appeared in *Schlumberger*." *Steinberg*, at *9. However, as noted earlier, Texas state courts have not been quite as forgiving, and continue to look at the factual similarity of the cases pending before them to those of *Schlumberger* – likely because the *Schlumberger* court itself emphasized that "a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim. We conclude only that on this record, the disclaimer of reliance conclusively negates as a matter of law the element of reliance . . . ." *Schlumberger*, at 181. This Court concludes that a narrower interpretation of the circumstances under

*Schlumberger* thus appears to be a fact-sensitive ruling. As should be apparent, the Behnke declarations, when read in light of the case law discussed above, raise serious fact questions. In short, it is unlikely that the Trustee could prevail on a motion for summary judgment on the Skinner Trusts' fraudulent inducement defenses.

The Trustee faces factual hurdles as well. As noted earlier, the Trustee will no doubt argue that the waiver provisions of the Skinner Trusts' Agreements preclude the Skinner Trusts' fraudulent inducement defenses and counterclaims. Ex. P 95-3, Ex. I, § 5.2 at APP 405, 424-25. However, waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right, *In re Gen. Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006), and the record, as it currently stands, strongly suggests that the Skinner Trusts had no way of knowing about the false statements made by Heritage at the time their representatives signed the Skinner Trusts' Agreements and the Skinner Trusts' Notes. Specifically, the evidence is undisputed that Heritage was notified by the IRS by hand-delivered letter that the IRS was "concerned" that Heritage's tax strategies "lack economic substance and that investors in such transactions may claim artificial tax losses." *See* Ex. P 68-80 at APP 1976. Moreover, the IRS asked Heritage to identify all of its clients who had entered into any of the transactions described in the letter within fourteen days.[51] The IRS also asked Heritage to provide all memoranda, correspondence, and any other documents related to any transaction described in the letter, including promotional and marketing material, and other, similar documents. *Id*. at APP 1979.

---

which a prospective reliance disclaimer is enforced is appropriate. Otherwise, courts are encouraging parties to make material misrepresentations to another contracting party while denying any opportunity for redress to the party who had no ability to know of the misrepresentations being made to induce it to enter into the contract.

[51] It does not appear that Heritage responded to the IRS' inquiry. Ex. P 95-2. Ex. A, at APP 91.

**Memorandum Opinion** **Page 46**

Accordingly, at the time the Behnkes signed the Skinner Trusts' Agreements on November 16, 2001 and the Skinner Trusts' Notes on January 2, 2002, Heritage should have known that it was extremely likely that the Skinner Trusts would be audited by the IRS. Yet, the Behnkes' declarations stand un-refuted that the Heritage representatives (i) assured them that the IRS had never questioned any of Heritage's strategies and that the strategies were legal, (ii) gave no indication that the IRS was in anyway skeptical or interested in the legitimacy of Heritage's strategies, and (iii) never told them that the IRS had notified Heritage that it was required to divulge the names of any clients who implemented the Heritage strategies. The Behnkes further declare that they relied on Heritage's assurances that the IRS had never questioned the legitimacy of the strategies and that whether or not the IRS questioned these strategies was very important to them in deciding to contract with Heritage. Finally, the Behnkes declare that they would not have entered into the Skinner Trusts' Agreements with Heritage if they had known that the IRS was questioning the legitimacy of the Heritage strategies.

As the Skinner Trusts' Adversaries currently stand, and in light of the Trustee's failure to refute the Behnkes' factual contentions, relying instead on the waiver/release/merger/reliance disclaimer provisions of the Skinner Trusts' Agreements, it appears there is a substantial likelihood that the Skinner Trusts would prevail on their fraudulent inducement claims and defenses to collection of the Skinner Trusts' Notes. Of course, if the Skinner Trusts were to prevail on their fraudulent inducement claims and defenses, the Trustee would not recover on the Skinner Trusts' Notes and the Skinner Trusts would have allowed claims in the Case well in excess of the fees they actually paid to Heritage. The Skinner Trusts' proofs of claim, as amended on February 23, 2006, include claims for other costs incurred in implementing the strategies; namely, the fees paid to Lewis

Rice, A&D, and Whitley Penn (an accounting firm). These claims amount to $103,051.50 for both Skinner Trusts. Furthermore, the Skinner Trusts' proofs of claim list the professional fees paid to Preston Gates & Ellis, LLP and Whitley Penn for their assistance in undoing the Heritage tax strategies, and the penalties assessed against the Skinner Trusts by the IRS. The Skinner Trusts collectively paid $582,189 in tax penalties to the IRS, $17,113 to Preston Gates & Ellis, LLP in 2003 and 2004, and $4,400 to Whitley Penn in 2004.

All of these costs, which total $706,753.50, may be recoverable as consequential damages caused by Heritage's fraud. A victim of fraud is entitled to recover the actual amount of loss resulting directly and proximately from the fraud. *Tex. Commerce Bank Reagan v. Lebco Constr.*, 865 S.W.2d 68, 73-74 (Tex. App. – Corpus Christi 1993). The Skinner Trusts could plausibly argue that the professional fees paid to implement the strategies, the penalties paid to the IRS for having implemented the strategies, and the professional fees paid to "un-implement" the strategies were all a direct and proximate result of the fraud perpetrated by Heritage – *i.e.*, but for Heritage's fraud, the Skinner Trusts would not have incurred any of these costs. *See also Sorenson v. Fio Rito*, 413 N.E.2d 47, 51-52 (Ill. App. Ct. 1980) (upholding plaintiff's recovery of legal expenses incurred in trying to obtain refund of tax penalties which were assessed against plaintiff solely as a result of defendant's wrongful acts).

In addition, the Skinner Trusts contend that the Skinner Trusts' Agreements are null and void because they resulted from the unauthorized practice of law and they charge an unethical attorneys' fee. These legal contentions are also problematic for the Trustee.

First, the Court has previously held in the Mikron Adversary that Mikron raised a genuine issue of material fact with respect to whether or not Heritage was providing legal services. Moreover,

the Court held that the waiver of defenses contained in the Mikron Note did not preclude the Court from considering whether Heritage was engaged in the unauthorized practice of law – *i.e.*, that it would be against public policy to enforce such a waiver. Finally, the Court concluded that since there was a disputed issue of material fact with respect to whether Heritage was providing legal services, there were disputed material issues of fact with respect to whether fee forfeiture was an appropriate remedy and/or whether the Heritage fee was unconscionable. *See* Prior Mikron Opinion, 354 B.R. at p. 436-37. Given this ruling in the Mikron Adversary, it is likely that the Court would reach the same conclusion in the Skinner Trusts' Adversaries. Accordingly, it is likely that the Trustee would not be able to obtain a summary judgment on this defense to collection of the Skinner Trusts' Notes.

Texas law defines the practice of law to include (i) the preparation of documents or pleadings on behalf of a client incident to a court proceeding, and (ii) a service "rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined." Tex. Gov't Code Ann. § 81.101 (Vernon 2005).[52]

The Behnkes have submitted evidence that Heritage made a presentation to them at which Heritage

> described various legal cases, including a factual description of the cases, the position of the . . . IRS, and the court's ruling. They provided handouts that highlighted important portions of these cases through the use of underlining, bold type, and

---

[52] The acts of which the Behnkes complain took place largely in Seattle, Washington, but the Skinner Trusts' Agreements are governed by Texas law. No party has briefed whether Texas or Washington law is applicable to this defense. The Behnkes have submitted evidence that Heritage is not licensed in either state – Canada is licensed in Texas, but not in Washington. Ex. P 95-3, Ex. G, H at APP 393-402.

**Memorandum Opinion** **Page 49**

enlarged font. The Heritage representatives also . . . assured us 'it was legal' and 'the strategies were legal.'

Ex. P 95-1, ¶ 6-7 at APP 3. Carl Behnke submitted evidence that the Behnkes considered Heritage's advice to be legal advice. *Id*. at ¶ 9, APP 4. Moreover, the Behnkes have submitted a declaration of Linda Eads, a law professor at Southern Methodist University Dedman School of Law who also serves as chair of the State Bar of Texas Committee on the Texas Disciplinary Rules of Professional Conduct. Based upon her review of the presentation that Heritage made to the Behnkes, Professor Eads opines that Heritage provided legal services to the Skinner Trusts, and that the provision of those services constituted the unauthorized practice of law in both Texas and Washington. She further opines that Heritage's fee is an unethical fee because it is unreasonable in both Texas and Washington. Ex. P 95-4 at APP 445-453.

While the parties have obviously not provided the Court with all of the evidence they will introduce on this issue should the Skinner Trusts' Adversaries go to trial, the Court notes that in replying to the Skinner Trusts' opposition to his motion for summary judgment, the Trustee did not provide any evidence to refute any of the Skinner Trusts' summary judgment evidence. The Kornman Parties also provided no evidence to refute the Skinner Trusts' evidence. Instead, the Trustee and/or the Kornman Parties argue that (i) the provisions of the Skinner Trusts' Agreements bar this claim (in the Prior Mikron Opinion, the Court rejected a similar argument made with respect to a waiver of defenses clause contained in the Mikron Note), (ii) there is no private right of action for the unauthorized practice of law, and (iii) even if Heritage had submitted a tax strategy to the Skinner Trusts and advised them on the legal consequences thereof while providing copies of tax regulations and case law, then "such facts obviously do not constitute the practice of law, and are actions taken by virtually every accountant and tax preparer on a daily basis, without a law license."

**Memorandum Opinion** **Page 50**

*Reply Brief of The Heritage Organization, LLC and GMK Family Holdings, LLC in Supp. Of Mot. For Summ. J. On Claims of Skinner Claimants*, Docket No. 713 in 04-35574-BJH, at p. 13-14.

At this stage of the evidentiary record the *only* evidence before the Court supports the Skinner Trusts' unauthorized practice of law claims. The legal issues surrounding these claims are quite complex.

For at least these reasons, and based on the current state of the record, the Court concludes that there are serious and substantial factual and legal impediments to any recovery by the Trustee in the Skinner Trusts' Adversaries and/or in connection with the Trustee's objections to the Skinner Trusts' Claims in the Case.

### b. The Love Claim and Defenses to Collection of the Love Note

Love's claim that he was fraudulently induced into signing the Love Agreement is equally problematic for the Trustee. Love has sworn in his affidavit that at no time throughout his dealings with Heritage did Heritage tell him that Heritage had been notified by the IRS that the IRS questioned Heritage's strategies. Ex. P 87, ¶ 22, at APP 8. Love testified in his deposition that had he "either seen this letter or known about any aspect of it, I would have not done any of those things. I just – no one. No one I know would do something with knowledge of this." Ex. P 270, Tab 7 (Depo. of Luther Ross Love, Jr., 6/7/07), p. 185:2-19. Love would be expected to testify at trial that had he known of the IRS notification letter, he would not have entered into the Love Agreement.

Bird, the Heritage principal responsible for the Love Agreement, does not refute Love's factual contentions in any material respect. In fact, it appears from his deposition testimony that Bird claims to not have known about the IRS notification letter himself. Ex. P 196-1 at APP 908-10, pp. 89:6-91:13. Implicit in that testimony is Bird's admission that he did not inform Love of the IRS

notification letter received two weeks prior to the signing of the Love Agreement. Moreover, Bird testified that the information contained in that notification letter would have been material to a prospective Heritage client. Ex. P 196-1, at APP 910, p. 91:3-8. In addition, it is clear that the May 2, 2001 letter was hand-delivered to Heritage's office and was signed for by Claudia McElwee, a Heritage vice-president. Ex. P 196-2 at APP 953, p. 111:2-25; Ex. P 68-30 at APP 880; *Stipulation of Add'l Facts for Purposes of June 11, 2007 Hearing*, Docket No. 1180 in 04-35574-BJH, at ¶ 5. Bird's apparent lack of personal knowledge is unlikely to provide Heritage a defense to Love's fraudulent inducement claim. *Landon v. S&H Mktg. Group., Inc.*, 82 S.W.3d 666 (Tex. App. – Eastland 2002) (notice to an officer (*i.e.,* McElwee) is notice to the corporation where the officer in his line of duty ought to act upon or communicate the knowledge to the corporation); *Poth v. Small, Craig & Werkenthin, LLP*, 967 S.W.2d 511 (Tex. App. – Austin 1998) (knowledge by corporate officers may be imputed to the corporation itself). Therefore, the fact that Bird claims not to have known about the IRS letter is irrelevant, because it appears from the current record that Heritage had received the letter.

Of course, if Love was fraudulently induced into signing the Love Agreement, the Love Note will not be enforceable against him either, Tex. Bus. & Com. Code Ann § 3.305 (Vernon 2002 & Supp. 2007);[53] *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806, 809 (Tex. 1979) ("our courts have consistently held that fraud vitiates whatever it touches"); *PSB, Inc. v. LIT Indus. Tex. L.P.,* 216 S.W.3d 429, 433 (Tex. App. – Dallas 2006) (a contract procured by fraud is voidable), and

---

[53] Texas's version of Uniform Commercial Code Section 3-305(a) provides that the right to enforce an obligation to pay a note is subject to defenses of the obligor based upon "fraud that induced the obligor to sign the instrument with neither knowledge nor reasonable opportunity to learn of its character or its essential terms; or . . . a defense . . . of the obligor that would be available if the person entitled to enforce the instrument were enforcing a right to payment under a simple contract . . . ."

**Memorandum Opinion** **Page 52**

he will be entitled to recover not only the fees he actually paid to Heritage, but consequential damages as well. Like the Skinner Trusts, Love appears to have expended significant amounts of money as a result of implementing the strategies: first professional fees to Lewis Rice, and then penalties to the IRS and the State of Ohio and other unspecified professional fees, presumably incurred in undoing the tax strategies. *See supra* at p. 17.

For the reasons just discussed in connection with the Skinner Trusts' fraudulent inducement claims and defenses, the waiver/release/merger/reliance disclaimer provisions of the Love Agreement are not likely to bar Love's fraudulent inducement claim and defense to collection of the Love Note as a matter of law. *See supra* at pp. 42-46. Accordingly, if that claim/defense proceeds to trial, it appears there is a substantial likelihood that Love would prevail on his fraudulent inducement claim and defense to collection of the Love Note. Of course, if Love was to prevail on his fraudulent inducement claim and defense, the Trustee would not recover on the Love Note and Love would have an allowed claim in the Case well in excess of the fees he actually paid to Heritage. Love's proof of claim, as amended on February 23, 2007, states claims for $75,000 paid to Lewis Rice, $370 paid to Whitley Penn, $601,142 in federal tax penalties, $265,868 in State of Ohio tax penalties, and $727,549 in "other" professional fees. Including $1,114,381 in fees paid to Heritage, the amended proof of claim demands $2,784,310 plus interest.

Turning to Love's subsequent oral modification defense to collection of the Love Note, this defense is also quite problematic for the Trustee. In his affidavit, Love swears, and should be expected to so testify at trial, that Heritage, acting through Bird, agreed (i) to refund any fees he paid if the IRS disallowed the 752 Strategy, and (ii) that no further fees would be due from him. Ex. P 87, ¶ 17, at APP 6. It is undisputed that the IRS disallowed the 752 Strategy as implemented by

Love. And, while Bird does not admit he made that subsequent agreement per se, neither does he directly deny it. Rather, he states only that he typically told prospective clients that if the IRS ultimately disallowed the strategies, that Heritage "wouldn't be in business 30 days much less 30 years if we went around suing our customers." Ex. P 270, Tab 2 (Depo. of Anthony Bird, 12/15/05), at p. 56:23-24.

While the Love Agreement purports to bar subsequent oral modifications, there is substantial legal authority in Texas allowing parties to orally modify a written agreement, even when the written agreement purports to bar such subsequent oral modifications. *In re The Heritage Organization, LLC*, No. 3:06-CV-0578-H, 2006 WL 2642204 at *3 (N.D. Tex. Sept. 14, 2006) (stating that "[u]nder Texas law older than the undersigned senior judge, an oral agreement may supersede a written agreement not required by law to be in writing, even if the written agreement prohibits oral modification," and citing a Texas Supreme Court decision from 1887); *Am. Garment Props., Inc. v. C.B. Richard Ellis - El Paso, L.L.C.*, 155 S.W.3d 431 (Tex. App. – El Paso 2004); *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144 (Tex. Civ. App. – Texarkana 1988).

As a logical consequence of his subsequent oral agreement defense to collection of the Love Note, Love contends that the Trustee's attempt to collect the Love Note breaches the Love Agreement, as modified by the parties after its execution. Love's damages for such a breach would be whatever amount he is found to owe to Heritage under the Love Note. Those amounts would be offset, resulting, according to Love, in no recovery by the Trustee. Love's contentions make sense if he succeeds in proving a subsequent oral modification of the Love Agreement.

For at least these reasons, the Court concludes that the Trustee faces substantial uncertainty, both factually and legally, in attempting to defeat Love's breach of contract/subsequent oral

modification claim and defense. Therefore, based on the current state of the record, the Court concludes that there are serious and substantial factual and legal impediments to any recovery by the Trustee in the Love Adversary and/or in connection with the Trustee's objections to the Love Claim in the Case.

### c. The Sandwith Claims and Mikron's Defenses to Collection of the Mikron Note.

For the reasons explained in connection with the Skinner Trusts' unauthorized practice of law defense, *see supra* at pp. 48-50, Mikron's unauthorized practice of law defense to the Trustee's efforts to collect the Mikron Note puts the Trustee at risk of losing the Mikron Adversary. If Heritage is found to have engaged in the unauthorized practice of law in either the states of Washington or Texas, the Court will have to decide if the fee charged to the Sandwith Claimants for the estate planning strategies, the balance of which is now due per the Mikron Note, is unconscionable and whether fee forfeiture, in whole or in part, is appropriate. According to Heritage, the fee due under the Sandwith Claimants' agreements with Heritage was $11,386,919, $6,000,000 of which was paid in cash and $5,386,919 of which was paid through the execution of the Mikron Note.

Ironically, and admittedly in a slightly different context, the Trustee and the Kornman Parties argued that the portion of a client fee Canada claimed to be entitled to in connection with another Heritage client relationship (*i.e.*, the so-called "Connecticut Client") represented an unreasonable amount for him to receive for the work he did in connection with Heritage's agreement with that client. *See Trustee's Statement of Position on Remaining Issues for Determination and Joinder in Objection to Canada Claim Pursuant to 11 U.S.C. § 502(b)(4)*, Docket No. 106 in Adv. Pro. No. 04-3338-BJH, at ¶¶ 23-30; *Proposed Findings of Fact and Conclusions of Law*, Docket No.123 in Adv. Pro. No. 04-3338-BJH, at ¶ 57 ("the proposed compensation to Canada is unreasonable as

either an hourly rate or as a contingency fee award"). As part of their legal and factual analysis, the Trustee and the Kornman Parties relied upon an attorney's fee analysis to substantiate their opposition to Canada's receipt of the agreed upon fee, claiming that Canada's portion of the fee was grossly overstated based upon a reasonable analysis of the work he did for the client on Heritage's behalf. *See, e.g., Trustee's Statement of Position on Remaining Issues for Determination and Joinder in Objection to Canada Claim Pursuant to 11 U.S.C. § 502(b)(4)*, Docket No. 106 in Adv. Pro. No. 04-3338-BJH, at ¶ 23 ("the factors generally applicable to determining the reasonableness of attorneys' fees are equally helpful in determining the reasonableness of insider compensation"). Now, in the context of the Client Claimant disputes, the Trustee and the Kornman Parties will apparently reverse field, and argue that the overall Heritage fee is reasonable, even if it represents the payment of legal services.[54]

For all of these reasons, and based upon the current record and briefing by the parties, it appears that there is substantial risk to the Trustee in trying these issues.[55]

In Mikron's recently pled fraudulent inducement defense, Mikron contends that the

---

[54]Equally ironic, Heritage itself sold the Mikron Note to an affiliate prior to its bankruptcy filing at an enormous discount. The Mikron Note was allegedly assigned to US Recovery in exchange for a $100,000 promissory note made payable by US Recovery to Heritage and a contingent $900,000 interest in amounts collected by US Recovery on the Mikron Note. One of the Kornman Parties' current lawyers opined as to the reasonableness of that transaction and the consideration received by Heritage. Before the Trustee could sue Mikron on the Mikron Note, the Trustee had to first avoid that transfer and recover the Mikron Note, which he accomplished by filing Adv. Pro. No. 05-3028-BJH in January of 2005. The Trustee ultimately reached a settlement with US Recovery whereby the Mikron Note was returned to the estate. Of course, now that the Trustee proposes to settle the Mikron Adversary for nearly three times what the Kornman affiliate agreed to pay to Heritage for the Mikron Note pre-petition, the Kornman Parties contend that the Trustee's proposed discount of the Mikron Note is unreasonable.

[55]The Kornman Parties filed a post-hearing brief further addressing the unauthorized practice of law claims and defenses. Mikron and the Sandwith Claimants moved to strike that brief, as it was filed without leave of Court and in violation of the Court's scheduling order in connection with the hearings on the Amended Plan as modified and the stand-alone motion to approve the settlement. The Court agreed and granted the motion to strike. Thereafter, the Kornman Parties did not seek leave to file any supplemental briefing on this, or any other, issue. The Court has not read that post-hearing brief and has not considered any arguments raised in that pleading.

**Memorandum Opinion** **Page 56**

Sandwiths would not have used Heritage for estate planning and Mikron would not have signed the Mikron Note had the Sandwiths known that (i) Heritage's other tax strategies were being challenged by the IRS, (ii) Heritage's references included counsel with a secret financial stake in promoting Heritage's strategies, and (iii) the Sandwiths' "independent" counsel had a longstanding client relationship with Heritage and Kornman. Mikron was granted leave to add this defense by Order entered on February 21, 2007. The Court assumes that the Sandwiths will testify to the facts alleged in their amended answer. If so, the Court notes that since Heritage did not even meet with the Sandwiths until after the IRS notification letter and Mikron did not execute the Mikron Note until early 2003, *see* Prior Mikron Opinion, 354 B.R. at 417, this defense may prove problematic for the Trustee as well.

The Court also notes that the basis of the Sandwiths' claims differ slightly from those of the other Client Claimants. Heritage provided estate planning services to the Sandwiths (as opposed to the 752 Strategies provided to the other Client Claimants) and the Sandwiths, not Mikron, are parties to various client agreements with Heritage. The Mikron Note, however, was signed by Ron Sandwith and Mikron, and not by the Sandwith Children. In connection with the summary judgment motions resulting in the Prior Mikron Opinion, the Sandwith Children argued that the parties' contract consisted of the Mikron Note that Ron Sandwith and Mikron signed, together with the five client agreements between Heritage and Ron Sandwith and Heritage and each of the Sandwith Children. The Sandwith Children asserted that the fee due to Heritage under the five client agreements was to be adjusted after an appraisal of the property used to implement the Strategies – *i.e.*, the Mikron shares – and that the Mikron Note, which purported to liquidate the fee, was therefore unenforceable because it was signed only by Ron Sandwith and Mikron, and not by all of the parties to the

"contract." Essentially, the Sandwith Children argued that Ron Sandwith could not amend his client agreement with Heritage (by liquidating the fee due, in the form of signing the Mikron Note) without the consent of each of his children. And, according to the Sandwith Children, the appraisal of the value of their Mikron stock (which was subsequently performed) determined that not only was no further fee due to Heritage, but, instead, that the Sandwith Children were entitled to a refund of a portion of the fee already paid to Heritage.

The Court ruled in the Prior Mikron Opinion that although the five client agreements would be construed together under Texas law, each of those agreements evinced the parties' intent that Ron Sandwith could modify his client agreement with Heritage if he was the only party affected by the modification. Prior Mikron Opinion, 354 B.R. at 423. The Court ruled that Ron Sandwith was permitted to liquidate the amount of the fee that he was liable for under his client agreement with Heritage, and agree to pay that fee on different terms than those stated in his agreement. *Id*. at 424. The Court further ruled that since the Sandwith Children were not parties to the Mikron Note, they were not bound by Ron Sandwith's liquidation of the fee, and were free to continue to seek a refund of any alleged overpayment they had made to Heritage. *Id*. at pp. 425-26. The Sandwith Childrens' proofs of claim seek such a partial refund of the amounts they had already paid to Heritage.

If the Sandwith Children are correct in their interpretation of their agreements with Heritage, – *i.e.*, that the fee due to Heritage was to be adjusted after an appraisal was done on the value of the Mikron stock used to implement the strategies – then the Court's ruling that the Sandwith Children were not bound by their father's liquidation of the fee means that the Sandwith Children would have a valid claim against the estate for a refund of fees they overpaid.

In addition, if Mikron is correct in its contention that Heritage was engaged in the

unauthorized practice of law, a forfeiture of a substantial portion, if not the entire fee may be appropriate, in which case the Trustee might not collect anything on the Mikron Note, and the Sandwith Children would be entitled to a *full* refund of the fees paid to Heritage – a result much harsher, from the estate's point of view, than the terms of the settlement.

This potential risk helps to explain the terms of the Trustee's proposed settlement with Mikron and the Sandwith Claimants. Under the terms of the settlement proposed with Mikron and the Sandwith Claimants, Mikron will pay $2,750,000 to the estate in satisfaction of the Mikron Note. That payment shall be deemed to constitute a payment by Mikron on behalf of the Sandwith Claimants. The Sandwith Claimants' proofs of claim are in the collective amount of $2,155,352. Upon receipt of the payment from Mikron, the Sandwith Claimants' claims will be deemed proportionately increased in an amount so that the aggregate total of their claims shall be increased by the $2,750,000, for a total claim of $4,905,352. However, as part of the compromise, the Sandwith Claimants have agreed to a reduction of that amount to $3,250,000. Under the terms of the Second Amended Plan, the Sandwith Claimants will have a single, jointly held claim for that amount, and the balance of $1,655,352 will be disallowed.[56]

For at least these reasons, and based on the current state of the record, the Court concludes that there are serious and substantial factual and legal impediments to any recovery by the Trustee in the Mikron Adversary and/or in connection with the Trustee's objections to the Sandwith Claimants' Claims in the Case.

### d.     The Jenkins Tax Claimants' Claims

---

[56] As a result of this settlement structure, it appears that the Sandwith Claimants are being allowed a claim in an amount which exceeds the amounts set forth in their filed proofs of claim. While true, the settlement takes into account the fact that the payment by Mikron is deemed to be a payment on behalf of the Sandwith Claimants.

**Memorandum Opinion**                                                                                          **Page 59**

As noted previously, only two theories of recovery remain pending against Heritage in the Jenkins/Meralex Adversary, which forms the basis for the Jenkins/Meralex proof of claim in the Case – *i.e.*, (i) fraud/fraudulent inducement and (ii) breach of fiduciary duty. After reviewing the contentions of the parties and the evidence introduced at the Original Hearing and the Supplemental Hearing, the Court concludes that these claims are weaker than other of the Client Tax Claimants' claims for several reasons.

First, Jenkins had a prior contractual relationship with Heritage and had signed an equally, if not more, onerous agreement with Heritage in connection with the implementation of his earlier estate planning strategies, as he admitted in his deposition. *Compare* Kornman Ex. 40 and 52; Kornman Ex. 81 (Depo. of Howard Jenkins, 2/13/06), p. 29:3. Jenkins was satisfied with the results of the Heritage estate planning strategies and thereafter served as a reference to prospective Heritage clients – both in written letter format and by telephone. In his letter of reference, Jenkins comments upon the onerous terms of the client agreements, but proceeds to recommend Heritage to the prospective client notwithstanding the inclusion of these onerous provisions in the client agreements. *Id*. at 59:15; Kornman Ex. 48 ("The only problem I encountered was with a law firm with whom I had a long-standing relationship . . . .They advised me not to sign Heritage's agreement.").

Second, Jenkins and Meralex signed the Jenkins/Meralex Agreement and implemented the 752 Strategy very early in the IRS enforcement process regarding capital gains strategies – *i.e.*, the agreement was signed in 1998 and the 752 Strategy was implemented by May 1999. As time passed, the IRS became increasingly vocal about its concerns over the legitimacy of the capital gains strategies Heritage and others were promoting. And, while the 752 Strategy was always risky, as time passed, the degree of risk became more and more significant, as the IRS became more active in

auditing returns utilizing these types of strategies to avoid payment of capital gains taxes otherwise due. To prevail on their claim that Heritage made material misrepresentations regarding the legality and validity of the 752 Strategy, Jenkins and Meralex will have to prove, among other things, that Heritage knew that its statements were false. Factually, it will be more difficult to prove this element of their fraud/fraudulent inducement claim in the 1998/1999 time frame.

Third, Jenkins' and Meralex's fraud/fraudulent inducement claims also arise from the alleged misrepresentations by Heritage regarding, in essence, the legality and validity of the 752 Strategy itself and the failure of Heritage to disclose the extent of Ahrens' financial interest in Jenkins' and Meralex's decision to implement the 752 Strategy – *i.e*, that Heritage never disclosed that Ahrens, who apparently developed the strategy, would earn a 5% override or royalty on fees Heritage received from clients who implemented the 752 Strategy, including Meralex, through an entity he created for that purpose, FWP Technologies.[57] While Jenkins and Meralex contend that their so-called "independent" lawyer was not so independent because of his undisclosed financial interest in making sure that Jenkins and Meralex ultimately decided to implement the 752 Strategy, A&D did disclose the fact that it would receive a fee from Heritage if the strategy was implemented. Specifically, in the engagement agreement between Jenkins/Meralex and A&D, A&D discloses that

> We are bound by our ethical duty as lawyers to disclose to you that we have previously represented and continue to represent [Heritage]. Further, we will receive payment from Heritage for using the capital gains strategy we have discussed. On this project we will work jointly with Heritage in preparing, presenting and implementing the capital gains strategy for you. Since this relationship creates a potential conflict of interest regarding our obligations to both you and Heritage, we ask that you acknowledge this conflict and expressly waive the conflict in writing by

---

[57]The transcript of an audio taped conversation between Kornman and Ahrens on this topic appears quite revealing, and concludes that Ahrens' financial interest should be (i) structured in a way that he would not be required to disclose it to his future clients, and (ii) "confusing." Ex. P 68-18 at APP 807-8. The Kornman Parties argue that portions of this transcript have been taken out of context.

**Memorandum Opinion**                                                                                           **Page 61**

signing the attachment to this letter.

Ex. P 68-54 at APP 1741. Jenkins signed the attachment. *Id*., at 1744. So, while the Court is troubled by the extent of the disclosure, the fact remains that a financial interest of A&D was disclosed. Moreover, in his deposition, Jenkins admitted that he was aware of Heritage's relationship with A&D, A&D's potential conflict of interest, and A&D's ongoing representation of Heritage, yet did not raise any questions about this relationship with anyone. Kornman Ex. 81 (Depo. of Howard Jenkins, 2/13/06), p. 130:16-131:17.

Finally, Jenkins made certain admissions in his deposition that affect the strength of the Jenkins/Meralex claims. For example, when asked about the way the Jenkins/Meralex Agreement was to work, Jenkins admitted that he understood that he would "sign it," that he would "learn about the strategies, and if they didn't work, [he was] releasing and agreeing to hold Heritage harmless if those strategies didn't work." *Id*. at 275:3-10. Moreover, Jenkins admitted that he also understood that the fee he was paying was going to be non-refundable, even if the strategies didn't work. *Id*. at 275:11-15. Jenkins further admitted that he wasn't aware of any fraud by Heritage in connection with the 1994 Heritage estate planning strategies he implemented, *id*. at p. 276:18-23, and that certain of the provisions of the Jenkins/Meralex Agreement that he relies on in connection with his current fraud/fraudulent inducement claims are actually less stringent than they were in connection with the 1994 agreement between the parties. *Id*. at 277:20-24. Specifically, Jenkins agreed that he negotiated for a reduction of the penalty for disclosure in the Jenkins/Meralex Agreement, down to $2 million in that agreement from $5 million in the 1994 client agreement. *See id*. at 276:1-7.

With these potential factual complications for Jenkins/Meralex in mind, the Court will turn to the legal issues connected to the Jenkins/Meralex claims of fraud/fraudulent inducement and

breach of fiduciary duty, and the fact that the Jenkins/Meralex Agreement contains provisions that disclaim reliance on any representations made by Heritage. Notwithstanding the admissions made by Jenkins in his deposition, the Declaration of Jenkins submitted in opposition to the Trustee's motion for partial summary judgment, when read in light of the case law discussed at pp. 42-45, *supra*, raises fact questions that likely preclude a summary judgment in the Trustee's favor on the fraud/fraudulent inducement claims. However, based upon the current state of the record, it appears that the underlying facts surrounding Heritage's relationship with Jenkins and the timing of the execution of the Jenkins/Meralex Agreement and the implementation of the 752 Strategy, give the Trustee a significantly greater likelihood of prevailing at trial. Of course, if the Trustee was to prevail at trial, the Jenkins/Meralex Claim would be disallowed.

Turning next to the breach of fiduciary duty claims alleged by Jenkins/Meralex, the Court notes that Jenkins contends that Heritage, acting primarily through Kornman and Canada, began providing financial, tax, estate planning and management services to Jenkins and his family beginning in 1994. Ex. P 130, Ex. 2, ¶ 3 at APP 11. Jenkins alleges that Heritage advised him in forming several trusts and business entities, and that he relied upon Heritage's advice in these matters because he didn't have any specialized knowledge with respect to the services that Heritage provided. *Id*. He further alleges that Heritage managed the day-to-day affairs of some of the Jenkins entities from Heritage's offices in Dallas, and that the relationship continued until August 2000. *Id*. at ¶ 4. Lastly, Jenkins alleges that Kornman acted as a

> trusted advisor for a number of years and . . . consulted extensively with me during that time, by phone on numerous occasions and in person on approximately twenty occasions. The nature of the relationship was such that I accepted Kornman's professional advice and had executed numerous instruments created by or for Kornman in connection with such financial planning. Kornman had also advised me in my divorce.

*Id*. at ¶ 7.

Under Texas law, in order to recover for a breach of fiduciary duty, a plaintiff must first establish that the defendant owed a fiduciary duty to the plaintiff. *Hartford Cas. Ins. v. Walker County Agency, Inc.*, 808 S.W.2d 681, 687 (Tex. App.–Corpus Christi 1991); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.–Dallas 2006) (citing *Punts v. Wilson,* 137 S.W.3d 889, 891 (Tex. App.–Texarkana 2004)). Texas courts recognize two types of fiduciary relationships – formal and informal. *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.–Houston [1st Dist.] 2003). Formal fiduciary relationships arise as a matter of law – *i.e.*, attorney-client, principal-agent, partners, and joint venturers. *Id.* (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998)). Jenkins' declaration does not allege facts in support of a formal fiduciary relationship between himself and Heritage.

Under Texas law, an informal fiduciary relationship arises where one party is "under a duty to act for or give advice for the benefit of another upon matters within the scope of their relation." *ARA Auto. Group v. Cent. Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997) (quoting *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980)). However, informal fiduciary relationships are disfavored because a fiduciary relationship "imposes extraordinary duties and requires the fiduciary to put the interests of the beneficiary ahead of its own if the need arises." *Id.* (citing *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.*, 55 F.3d 181, 188 (5th Cir. 1995)). Accordingly, "mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship" because "businessmen generally do trust one another, and their dealings are frequently characterized by cordiality." *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962). There must be a "moral, social, domestic or purely personal relationship," and thus, "[t]he existence of the fiduciary relationship is

to be determined from the actualities of the relationship between the persons involved." *Id.*

The *Thigpen* court failed to find a fiduciary relationship even where the defendant, a bank trust officer, had (i) helped the plaintiffs obtain a loan for their business, (ii) personally guaranteed a loan on their behalf, (iii) extended them a personal loan, (iii) seen the plaintiffs frequently on a social basis, (iv) helped the plaintiffs form a corporation in which the defendant then acted as a director and owned shares, and (v) given the plaintiffs business advice on the management of their retail store. The Texas Supreme Court went on to say that, while a fiduciary relationship may arise out of a "purely personal relationship," the [plaintiffs] offered no evidence, other than their own subjective trust, that indicated the relationship in this case was "anything more than a debtor-creditor relationship." *Id.*

Texas courts "do not create [a fiduciary] relationship lightly." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). For example, in *Mauskar v. Hardgrove*, No. 14-02-00756-CV, 2003 WL 21403464 (Tex. App.–Houston [14th Dist.] June 19, 2003), the plaintiff purchased four insurance policies from the defendants over a period of ten years. *Id.* at *1. When he purchased the policies, the plaintiff asked the defendants to provide a very specific type of policy. *Id.* The plaintiff later sued when he discovered that the policies he purchased were not the type of policies he requested. *Id.* The plaintiff claimed a fiduciary relationship existed between the parties because the plaintiff had known the defendants "for many years, had repeated business transactions with them, and had placed a high degree of trust in them as his financial advisors." *Id.* at *6. The court found that the duration of the relationship and the plaintiff's subjective trust in the defendants were not sufficient to create the "requisite special relationship" necessary to create an informal fiduciary relationship. *Id.* (citing *Thigpen*, 363 S.W.2d at 253; *Schlumberger*, 959 S.W.2d at 177.

Moreover, the cases upon which Jenkins relies, several of which arise in the context of financial advisor-client relationships, are distinguishable because the relationships at issue there were significantly different than the relationship which Jenkins alleges between himself and Kornman. *See, e.g., Dominguez v. Brackey Enter., Inc.*, 756 S.W.2d 788, 791 (Tex. App.–El Paso 1988) (finding a fiduciary relationship between a financial advisor and client where the parties were also "good social friends" and relying upon two cases – one in which the financial advisor was "close friends" with the plaintiff and his best man at his wedding and one in which there was a parent-child relationship).

While the Court is unable to speculate as to whether Jenkins would be able to establish such a fiduciary relationship at trial, the Court believes, based on the limited record presented thus far, that the viability of Jenkins' breach of fiduciary duty claim is in doubt. Jenkins' declaration simply does not allege facts which appear to raise a question of fact as to the existence of a fiduciary relationship between Heritage and Jenkins, as he does not allege any facts tending to show a "moral, social, domestic or purely personal relationship," which the Texas courts require in establishing an "informal" fiduciary relationship.

So, while a trial of the Jenkins/Meralex Adversary will likely be required to liquidate the Jenkins/Meralex claim in the Case (at least with respect to the fraud/fraudulent inducement claim), and while there is risk to the Trustee regarding the outcome of that trial, the factual differences between the Jenkins/Meralex claim on the one hand and the Love Claim and the Skinner Trusts' Claims on the other hand cause this Court to conclude that the Jenkins/Meralex claim is significantly less valuable than the Love Claim and the Skinner Trusts' Claims. And, if the settlement is approved, the Jenkins Tax Claimants will have an allowed unsecured claim in the Case of

$9,813,004.50 (65% of the total fee paid to Heritage in connection with the implementation of the 752 Strategy).

Based upon the above analysis of the relative strengths/weaknesses of the Skinner Trusts' claims and defenses, the Love claim and defenses, the Sandwith Claimants/Mikron claims and defenses, and the Jenkins Tax Claimants' claim, the Court concludes that, with the possible exception of the Jenkins Tax Claimants' claim, this factor – *i.e.*, the probability of the Trustee's success in the litigation – militates in favor of approval of the proposed settlement. The Court will address the fact that the Jenkins Tax Claimants' claim is weaker than the other Client Tax Claimants' claims later in this Memorandum Opinion, and will balance that fact against the benefits to be realized if the integrated settlement with all of the Client Claimants and Mikron is approved, in coming to its final conclusion regarding whether the proposed, fully integrated settlement with all of the Client Claimants and Mikron can be approved consistent with the legal standard articulated by the Fifth Circuit. *See infra* at pp. 80-85.

## 2. Complexity and Likely Duration of the Litigation

As the above discussion suggests, the claim objections pending against the Client Claimants, along with the adversaries pending against Love, the Skinner Trusts, and Mikron, raise complex factual and legal issues to be resolved by the Court. While certain of the claims/defenses raised by those parties may be able to be resolved as a matter of law through summary judgment motions, certain claims/defenses will not be able to be resolved so easily, including the fraud/fraudulent inducement claim/defense, the subsequent oral amendment claim/defense, and the unauthorized practice of law claim/defense. Mikron and all of the Client Claimants have raised the fraud/fraudulent inducement claim/defense. Mikron and all of the Client Claimants, except the

Jenkins Tax Claimants, have raised the unauthorized practice of law claim/defense. The Jenkins Tax Claimants have raised a breach of fiduciary duty claim, as have certain of the Client Claimants. And, Love and the Skinner Trusts have raised subsequent oral amendment claims/defenses to the Trustee's efforts to collect the Love Note and the Skinner Trusts' Notes.

If the Court is required to proceed to trial on the claim objections and the adversary proceedings, the Mikron/Client Claimant litigation will go on for years. As noted previously, the Mikron Adversary is set for trial docket call in November, 2007. The Jenkins/Meralex Adversary is specially set for trial for two weeks in November, 2007. The Skinner Trusts' Adversaries and the Love Adversary are currently set for trial docket call in November, 2007. In light of its regular bankruptcy caseload and docket, only the Jenkins/Meralex Adversary will be tried in November, 2007. The Mikron Adversary, the Love Adversary and the Skinner Trusts' Adversaries will have to be set for trial thereafter. Moreover, the claim objections pending against the Troutt Claimants, the Rainwater Claimants, the Powell Claimants, the Fluharty Claimants, Patterson, and Woodruff, do not have firm trial settings. In part, this is because of the ongoing discovery problems encountered by both the Client Claimants and the Trustee in getting all documents turned over by the Kornman Parties and other persons in control of Heritage prior to its bankruptcy filing. Thousands of audio tapes, containing potentially relevant information to the matters in dispute in the contested matters and adversary proceedings involving the Client Claimants, have not been transcribed. Given the illiquid nature of the estate's remaining assets, *see infra* at p.72, it is not clear that the Trustee has the resources to meaningfully address these audio tapes, including the costs associated with identifying the relevant ones and having them transcribed, absent approval of certain litigation settlements – *i.e.*, like the proposed settlement with Carl E. Berg ("Berg") heard concurrently with the Modified Plan

at the Original Hearing.[58] Even then, there are questions about the wisdom of spending precious funds that might otherwise be available for the pursuit of more valuable litigation (or, hopefully, for distribution to creditors) for such purposes. Of course, if the Mikron/Client Claimant litigation is not settled, the Trustee may have little choice – he will need to respond to legitimate discovery requests from those parties prior to any trial.

While the Trustee did not provide the Court with a specific estimate of the likely duration and/or cost of the litigation, he did testify that the costs of continuing litigation with all of these parties would be "tremendous." Audiotape: Hearing conducted 06/12/07 at 12:41:43 - 12:42:08 p.m. (on file with the Court). And, we know that substantial costs have already been incurred in connection with the ongoing Client Claimant/Mikron litigation. Specifically, through April 15, 2007, the Trustee has incurred professional fees and expenses of approximately $1.1 million in connection with these contested matters and adversary proceedings. The Trustee estimated that he incurred additional fees and expenses in prosecuting the Amended Plan, the Modified Plan, and the stand-alone motion to approve the settlement in May and June, 2007 (through the conclusion of the Original Hearing) of $300,000-$350,000. Audiotape: Hearing conducted 06/12/07 at 12:19:54 - 12:20:24 p.m. (on file with the Court). Needless to say, significant additional costs have been incurred since the Original Hearing. At the Supplemental Hearing, the Trustee estimated that accrued administrative expenses for the Trustee and his counsel, as of June 30, 2007 (and, of course, subject to Court approval) are approximately $1.9 million. Ex. P 293.

Moreover, the Trustee recited the relevant facts which will affect the likely length of the

---

[58] The facts underlying the settlement with Berg, and Court's analysis of the terms of the settlement, are set forth in a Memorandum Opinion and Order issued concurrently with this Memorandum Opinion.

**Memorandum Opinion**                                                                 **Page 69**

litigation. First, given the number of Client Claimant contested matters and adversary proceedings, it could easily be mid-2008 before this Court disposes of all of them in the first instance.

Second, it appears likely that an appeal will be taken from this Court's final decision at trial in connection with each of the Client Claimant contested matters and adversary proceedings, whatever that decision may be. The Trustee anticipates an appeal from any ruling in the Love Adversary, the Skinner Trusts' Adversaries, and the Mikron Adversary, as does this Court. The Trustee also anticipates appeals from the disposition of each of the claim objections pending against the Client Claimants' claims. While one can wonder if an appeal, the cost of which is paid in one hundred cent dollars, makes economic sense for the Client Claimants, given the fact that it is unclear what distributions will be made on their allowed claims, if any, in the Case, the obvious hard feelings that exist between the Client Claimants and the Kornman Parties, coupled with the substantial net-worths of all of these parties, cause this Court to agree with the Trustee – appeals are assured. Even assuming that this Court rules in the Trustee's favor at trial, which appears doubtful in most instances (*see supra* at pp. 41-59), it would be years before the judgments and/or orders are final, given appeals to both the District Court and the Fifth Circuit. Depending upon the appellate outcomes, it is even possible that a retrial of some issue or issues would be required (if, for example, partial summary judgments are granted but are subsequently reversed after a trial of remaining issues), with the possibility of even further appeals before decisions are final.[59] As the Trustee testified, if the settlement is not approved

I see this case going back into the ongoing litigation battle. I see a tremendous

---

[59]The good news, if there is any in a continued litigation scenario, is that collection of a final judgment in the Love Adversary, the Skinner Trusts' Adversaries, and the Mikron Adversary, assuming a judgment in the Trustee's favor becomes final, should be easy – either because those parties superceded the judgment with a bond and/or because of those parties' substantial financial resources.

**Memorandum Opinion** **Page 70**

amount of costs being incurred going forward; I don't see where the end potentially is going to be with regard to these particular issues because of the possibilities of appeals if there are positive results for the estate. I am looking at an estate right now that has what might be insufficient funds to launch and continue an extended battle with this group over these claims. I'm very concerned about what might happen if we go forward without this.

Audiotape: Hearing conducted 06/12/07 12:41:56-12:42:43 p.m. (on file with the Court).

This testimony by the Trustee and these facts militate in favor of approval of the settlement, despite the absence of a specific budget of projected legal fees or expert testimony about the potential twists and turns the Client Claimant litigation may take, for several reasons. First, the Court need only "form an educated estimate" of the expense of the potential litigation. *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). This "educated estimate" has been described as an analysis of "the likelihood of complex and protracted litigation, with its attendant expense, inconvenience and delay," *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2nd Cir. 2007) (internal quotations omitted), suggesting that expense and delay is inevitable once the Court determines, as it has here, that complex and protracted litigation will ensue if the settlement is not approved. Second, a proper consideration in evaluating a settlement is the "experience and knowledge of the bankruptcy court judge reviewing the settlement." *Id*. at 462. This Court regularly considers fee applications which include requests for fees in connection with complex litigation matters like those involving Mikron and the Client Claimants. Third, this Court is intimately familiar with the Case and all of the contested matters and adversary proceedings pending in the Case, including all of the difficulties the Trustee has encountered in trying to gather Heritage's assets and records, and in attempting to collect on Heritage's assets, including the client notes receivable and other litigation claims which comprise Heritage's remaining assets. This Court knows the typical range of legal fees incurred in complex, protracted litigation and that knowledge,

**Memorandum Opinion**                                                                                                            **Page 71**

coupled with the Trustee's testimony that the cost of continued litigation will be "tremendous," *see*

Audiotape: Hearing conducted 06/12/07 at 12:41:43 - 12:42:08 p.m. (on file with the Court), forms

a sufficient basis upon which this Court may form an "educated estimate" that the Mikron and Client

Claimant litigations, if they continue through discovery (which, as noted earlier, has not occurred

easily in the Case), trial, and the appellate process, will likely be extremely expensive and last for

several more years.

### 3. Other Factors Bearing on the Wisdom of the Compromise

The Court has considered two other factors to be of particular significance, both of which

militate in favor of approval of the settlement. First, the Heritage bankruptcy estate is

administratively insolvent,[60] and the Trustee needs the proceeds of this settlement to fund the

collection of assets that he deems to be more valuable. The remaining Heritage assets are all illiquid.

Some assets are unliquidated claims with litigation already on file in this Court, which the Trustee

values at a maximum of approximately $41.5 million.[61] Other Heritage assets are unliquidated claims

without any litigation yet pending but with tolling agreements with the potential defendants to

prevent the running of statutes of limitations.[62] Still other assets are liquidated in amount, but will

---

[60]The Trustee testified that as of June 30, 2007, he has about $940,000 of cash on hand and unpaid administrative expenses of slightly in excess of $1,940,000 (professional fee hold backs from prior approved fee applications and un-billed time and expenses of estate professionals). Although the Court has recently approved two other settlements which resulted in another $700,000 being paid into the estate after June 30, 2007, the estate is still administratively insolvent.

[61] The Trustee values the claims pending in the Kornman Adversary Proceeding at a range of $0 – $40,747,512; the Premier receivable claims (a Kornman-related entity) at a range of $0 – $470,000; and the International Restaurant receivable claims (a Kornman-related entity) at a range of $0 – $270,000. Ex. P 2, Ex. B-2.

[62] The Trustee testified that he has potential avoidance claims against (i) Ahrens and FWP Technologies (the entity Ahrens apparently created to receive the 5% royalty payments from Heritage's sale of the strategies to its clients) valued at a range of $0 – $3,048,196; and (ii) Lynn, Tillotson & Pinker, LLP (one of the firms representing the Kornman Parties in connection with the Second Amended Plan) valued at a range of $0 – $2,559,758. On August 13, 2007, while this Memorandum Opinion was being finalized, the Trustee sued Lynn, Tillotson & Pinker LLP and

likely require collection litigation and are perhaps uncollectible.[63] Finally, there are the six remaining client notes. The Trustee proposes to forgive three of these notes – *i.e.*, the Skinner Trusts' Notes and the Love Note – and to settle the Mikron Note for a cash payment of $2,750,000 in connection with this settlement. The Trustee proposes to settle the Berg note for a cash payment of $975,000 in connection with the Berg settlement motion heard concurrently with confirmation during the Original Hearing. The final client note – *i.e.*, the Schuler note (valued at a range of $0 – $5,119,208) – only recently matured, and although demand has been made, no payment has been received, suggesting that litigation will also be required to collect this note.

Obviously, the common denominator with all of Heritage's remaining assets is that the Trustee must have funds in order to attempt to realize on these assets either through the commencement of litigation in which contests can be expected, the continuation of existing and contested litigation, or the commencement of collection efforts against recalcitrant Kornman-related entities. Stated most simply, the Trustee has chosen to liquidate the Mikron Note in order to have the funds to realize on other contingent assets that he believes to be more valuable. The $2,750,000 that the estate will receive upon the approval of this settlement will assist the Trustee in his efforts to collect what he believes to be more valuable contingent assets. The Trustee has chosen to forgive the Skinner Trusts' Notes and the Love Note after considering the relative strengths/weaknesses of his cases and in order to achieve a comprehensive settlement with all of the Client Claimants. The Trustee's decisions to settle with Mikron, the Skinner Trusts, Love, and the other Client Claimants are rational ones, made by him in the exercise of his reasonable business judgment.

_____

certain of its partners to avoid certain transfers of Heritage assets to them. *See* Adv. Pro. No. 07-3247.

[63] The Trustee testified that he holds two judgments against Kornman-related entities (Einstein's Pad and Southwest Security) which he does not expect to be able to collect.

In addition, the Court has considered the best interests of the creditors, with proper deference to their *reasonable* views. *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) (emphasis added). As noted previously, the creditor body in the Case can be divided into five groups. *See supra* at pp. 31-32. Out of these five groups, only two individuals/entities asserting indemnity claims in the Case, allegedly arising from their fraudulent conduct, object to the proposed comprehensive settlement with the Client Claimants and Mikron. Specifically, the only creditors objecting to the settlement are Kornman and his company, GMK. As the targets of much of the Trustee's remaining litigation efforts, it is in the Kornman Parties' interest to block any settlements that the Trustee proposes, since the Kornman Parties would presumably like the estate to remain administratively insolvent and thus unable to pursue litigation against them.[64] The only objectants to the settlement therefore have a non-creditor interest in opposing any settlement by which the estate will receive funds, and the Court must therefore partially discount their opposition and conclude that their views of the merits of the settlement may be skewed.

The stated thrust of their opposition is several-fold. First, they object because the Trustee is allegedly settling his claims against Mikron, Love, and the Skinner Trusts too cheaply. For the reasons set forth above, the Court disagrees. The proposed settlement as it relates to the compromise of the Mikron Note and the forgiveness of the Skinner Trusts' Notes and the Love Note falls within the range of reasonableness given all of the factors considered above and the circumstances of the Case. *In re Allied Props., LLC*, No. 06-33754, 2007 WL 1849017 at *4 (Bankr. S.D. Tex. June 25,

---

[64]The Trustee's main counsel has been retained by Court order on an hourly basis. Special counsel has been retained by Court order to handle the Kornman Adversary Proceeding (valued at $0 – $40,747,512) on a ½ hourly rate/20% contingency fee basis. And, while the Court holds the firm of Lynn, Tillotson & Pinker, LLP, one the firms representing the Kornman Parties in connection with their opposition to confirmation of the Second Amended Plan, in very high regard, the Court notes that the firm also possesses an interest in the Trustee lacking the funds necessary to pursue the avoidance claims pending against it to conclusion.

**Memorandum Opinion** **Page 74**

2007) (the Trustee's burden is "not high;" the Trustee "need only show that his decision falls within the range of reasonable litigation alternatives"); *In re Bradley*, No. 06-51740-RBK, 2007 WL 1500876 (Bankr. W.D. Tex. May 18, 2007) (court should approve a settlement if it is within a range of reasonableness, fair and equitable, and in the best interest of the bankruptcy estate); *In re Mirant Corp.*, 348 B.R. 725, 742 n. 36 (Bankr. N.D. Tex. 2006) ("For a settlement to meet the best interests test, the amount being paid or received by the estate . . . need only be within the extremes of the range.").

Nor does the Court agree that the Trustee's proposed settlement of his objections to the claims asserted by the Client Claimants in the Case are too generous, with the possible exception of the Jenkins Tax Claimants, which will be addressed further below. The Court is satisfied by the Trustee's explanation of how he got to a comprehensive, integrated settlement with the Client Tax Claimants – *i.e.*, the common denominator among all of the Client Tax Claimants is the amount of fees they paid to Heritage and each of those claimants views its claims to be as valuable as any other claimant's claims (because all of them feel strongly that they were defrauded by Heritage). For the reasons set forth above, the Court concludes that the allowance of unsecured claims in the Case to the Client Tax Claimants (with the possible exception of the Jenkins Tax Claimants addressed further below) in the amount of 65% of the fees actually paid to Heritage in connection with the strategies that were, without exception, disallowed by the IRS falls within the range of reasonableness given the circumstances in the Case.

While the facts of each particular Client Tax Claimant's relationship with Heritage differ in some respects (related largely to the timing of the signing and implementation of the strategies), the legal and factual contentions regarding their fraudulent inducement claims, their unauthorized

practice of law claims, and their subsequent oral agreement claims, as applicable, are strikingly similar. And, while the Court agrees that the factual differences that do exist must be taken into consideration, particularly as they relate to the fraudulent inducement claims, the Court has done so, and concludes that the settlement meets the standard set forth by the Fifth Circuit in *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997). In other words, while some of the Client Tax Claimants may have stronger claims than others given the factual differences between them – *i.e.*, the Skinner Trusts' and Love's fraudulent inducement claims are among the strongest given the timing of their agreements with Heritage, each of the Client Tax Claimants (with the possible exception of the Jenkins' Tax Claimants) have other strong claims against the estate – *i.e.*, the unauthorized practice of law claim. From this Court's perspective, allowing all of them unsecured claims in the Case of 65% of the fees actually paid to Heritage is fair and equitable and in the best interest of the estate. Some claimants might be at the low end of what the Court may view as a reasonable settlement range, while other claimants might be at the upper end of that reasonable settlement range, but all fall within the range of a fair and equitable settlement which is in the best interest of the estate.[65]

Contrary to another of the Kornman Parties' objections, the fact that this Court will have to proceed to trial on the remaining claims in the Jenkins/Meralex Adversary, which resolution may serve to liquidate more of Kornman's alleged indemnity claims against the estate, and may have to determine Heritage's solvency at various points in time (implicating the validity and amount of any

---

[65] The Court is mindful that the phrase "range of reasonableness" originated in the Second Circuit, not the Fifth Circuit, and that the Fifth Circuit uses somewhat different verbiage to describe the standard for approval of a compromise. However, even under the Fifth Circuit's "fair and equitable and in the best interest of the estate" analysis, the Court believes that a range of values may properly satisfy this standard. In other words, the Court does not believe that the Fifth Circuit is looking for a solitary "magic number" which alone will make a settlement fair and equitable and in the best interest of the estate.

**Memorandum Opinion** **Page 76**

contingent client claims) in connection with the avoidance claims pending in the Kornman Adversary Proceeding, does not change the Court's view of the appropriateness of the settlement. The Trustee should not be held hostage to continued litigation just because the proposed settlement does not resolve the Jenkins Tax Claimants' claims against Kornman, GMK, Ahrens, and A&D.

Moreover, the fact that the Court may be required to determine whether Heritage was insolvent at the time of various transfers which are alleged to be avoidable in the Kornman Adversary Proceeding does not mean that the Court will be required to actually liquidate the Client Claimants' claims in the context of that adversary proceeding. The case law is clear that in determining the value of contingent assets or liabilities for purposes of a solvency analysis, a bankruptcy court should not use their face value. *In re WRT Energy Corp.*, 282 B.R. 343, 399 (Bankr. W.D. La. 2001); *In re Join-In Int'l USA, Ltd.*, 56 B.R. 555 (Bankr. S.D.N.Y. 1986); *In re Carousel Candy Co., Inc.*, 38 B.R. 927 (Bankr. E.D.N.Y. 1984). Rather, the court should multiply the face amount of the asset or liability times the probability that the contingency will occur. *Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d 657 (7th Cir. 1992); *In re Taylor*, 228 B.R. 491 (Bankr. M.D. Ga. 1998). In other words, the court must determine the "likelihood that the contingency will occur and the liability will become real." *WRT Energy*, 282 B.R. at 399 (*quoting FDIC v. Bell*, 106 F.3d 258, 264 (8th Cir. 1997)). A contingent liability is assessed from the debtor's perspective, rather than the creditor's. *Covey,* 960 F.2d at 660; *In re Davis*, 148 B.R. 165 (Bankr. E.D.N.Y. 1992). Further, the court values contingent assets and liabilities based on information known or knowable as of the date of the challenged transfer, without the benefit of hindsight. *In re Commercial Fin. Svcs., Inc.*, 350 BR 520 (Bankr ND Okla. 2005); *In re WRT Energy Corp*., 282 B.R. 343, 407 (Bankr. W.D. La. 2001); *but see In re Pilavis*, 233 B.R. 1 (Bankr. D. Mass. 1999) (court may use hindsight as a guide to valuation where

a judgment is entered in the interim).

Thus, while the Court will be required to conduct a solvency analysis in the context of the Kornman Adversary Proceeding (assuming the avoidance claims are pursued), the Court will employ a specific valuation method which considers different factors than those the Court has considered here in connection with assessing whether this settlement is fair and equitable and in the best interest of the estate.[66]

The Kornman Parties also claim that the Trustee lacks the authority to settle the claim objections lodged by the Kornman Parties. Specifically, the Kornman Parties argue that they are 'parties in interest' under 11 U.S.C. § 1109 with standing to object to a proof of claim under 11 U.S.C. § 502(a). Thus far, the Court agrees. The Kornman Parties further argue, however, that when a party in interest objects to a claim, then § 502(b), by virtue of its use of the word "shall," *requires* that the court rule upon the objection. Section 502(b) provides

> [I]f such objection to a claim is [made], the court, after notice and a hearing, shall determine the amount of such claim . . . and shall allow such claim in such amount, except to the extent that . . . (1) such claim is unenforceable against the debtor and property of the debtor under any agreement or applicable law for a reason other than because such claim is contingent or unmatured . . . ."

Recognizing that Rule 9019 of the Federal Rules of Bankruptcy Procedure[67] would appear to permit the Trustee to compromise claim objections, the Kornman Parties assert that Rule 9019, as a rule of procedure, cannot be read to abridge, enlarge, or modify their substantive statutory right to object

---

[66] The Court therefore notes that its finding that this settlement is fair and equitable and in the best interest of the estate does not constitute a finding that the Client Claimants' claims should be valued, in any future litigation, in the amounts reflected in this settlement.

[67] In addition, 11 U.S.C. § 323 clothes the Trustee with authority to represent the estate and sue and be sued on its behalf.

**Memorandum Opinion**                                                                                            **Page 78**

to a claim under § 502. *See* 28 U.S.C. § 2075 ("The Supreme Court shall have the power to prescribe by general rules . . . the practice and procedure in cases under title 11 . . . [such] rules shall not abridge, enlarge or modify any substantive right."). Therefore, according to the Kornman Parties, the Trustee cannot settle their claims objections and this Court must actually determine the claims through continued litigation.

The Court rejects the Kornman Parties' legal contention for two reasons. First, this argument was soundly rejected in *In re Kaiser Alumium Corp.*, 339 B.R. 91 (D. Del. 2006). The facts in *Kaiser* are on all fours with the Case at bar. One creditor objected to a second creditor's claim, and the debtor sought to settle with the second creditor. The first creditor was not a party to the settlement and objected to the compromise. The bankruptcy court approved the settlement over the first creditor's objection, thus mooting the first creditor's claim objection. The first creditor appealed, contending that (i) the bankruptcy court was required to rule upon the first creditor's claim objection before considering the settlement, and (ii) allowing the compromise under Rule 9019 would abridge its statutory substantive right under § 502 to object to claims. The District Court rejected these arguments, finding that (i) there is no direct conflict between § 502 and Rule 9019, (ii) the rules do not dictate that claim objections be heard before settlement motions, (iii) requiring litigation on the merits would undermine the policy of promoting settlements in bankruptcy, and (iv) the debtor, as a fiduciary under the Code, has the duty to all creditors to resolve claims in the best interest of the estate. *Id.* at 94-95. This Court agrees with the *Kaiser* court's analysis.

Second, the Kornman Parties' interpretation of § 502 and Rule 9019 makes no sense. Taken to its logical conclusion, the Kornman Parties' argument that § 502 confers not only a right to object to a claim but also a right to a ruling would mean that the Court could *never* permit a settlement of

a claim objection – the Court would be required to deny the compromise and rule upon the merits, even though both the claimant and the objectant desired a different result. In other words, if the Kornman Parties' interpretation is correct, the Trustee could not, even in the absence of opposition, compromise *his own* claim objection. Yet courts routinely permit settlements of claim objections.

Like the *Kaiser* court, this Court believes that the better way to harmonize § 502 and Rule 9019 is to read the "notice and a hearing" requirement of Rule 9019 as satisfying the right to be heard with respect to a claim objection. *See id.* at 95. While any party in interest has a statutory right to object to a claim, the Trustee, as the representative of the estate, has the ability to compromise that objection, as long as the objectant is given notice and an opportunity to be heard with respect to the fairness and wisdom of the compromise. *In re Texaco, Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988) (citing *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968)) ("[A] compromise between parties in the context of a bankruptcy reorganization may be accomplished in a bankruptcy case with the court's approval."). Rule 9019's requirement of court approval of a compromise after notice and a hearing provides protection to the party whose claim objection is being compromised. Thus, this Court disagrees with the Kornman Parties' legal contention that the Trustee lacks authority to settle objections to claims filed against the estate.

Lastly, the Court has considered whether this settlement is the product of arm's-length bargaining between the Trustee on the one hand and the Client Claimants and Mikron on the other hand and concludes that it is. This factor also militates in favor of the settlement.

As the above analysis demonstrates, the Court is well satisfied that approval of the settlement is appropriate if the fact that the Jenkins Tax Claimants' claims appear to be significantly weaker than the other Client Tax Claimants' claims does not preclude that approval. As noted previously, the

**Memorandum Opinion** **Page 80**

Jenkins Tax Claimants do not assert an unauthorized practice of law claim or a subsequent oral agreement claim. After the District Court's dismissal of various claims (while the lawsuit was pending there), the only claims remaining for trial in the Jenkins/Meralex Adversary are the fraud/fraudulent inducement and breach of fiduciary duty claims. On the current record, the Court believes that the Trustee stands a much greater chance of prevailing in the Jenkins/Meralex Adversary than he does in any of the other Client Claimant litigation. However, even recognizing this fact, the Court still finds that the settlement can, and should, be approved. This is so for several reasons.

First, as noted previously, the Heritage estate is administratively insolvent. While the Court has approved the Berg settlement by Memorandum Opinion and Order entered concurrently with this Memorandum Opinion, which approval will temporarily make the estate solvent,[68] the fees and expenses to be incurred in connection with the Kornman Adversary Proceeding will render the estate administratively insolvent once again.[69] The Trustee believes that the claims pending in the Kornman Adversary Proceeding are the most valuable of Heritage's remaining assets and that those claims should be pursued. The Client Claimants agree with the Trustee's assessment. In order to have the funds to continue to pursue the Kornman Adversary Proceeding, the Trustee needs to realize on other client note receivables. For the reasons discussed above, it is unlikely that the Trustee could

___

[68] The Court has also recently approved, without objection from any party, settlements with (i) Kroney-Mincey, Inc. and Robert H. Kroney, which has resulted in a payment to the estate of $300,000, and (ii) the Koshland Family Partnership, LP, Koshland Investment Corp. and Koshland PAST Trust, which has resulted in a payment to the estate of $400,000.

[69] As noted previously, the Trustee has retained Cox Smith Matthews, Inc. as special counsel to prosecute the Kornman Adversary Proceeding on a 1/2 hourly rate/20% contingency basis. In its first application for compensation covering the period between April 6, 2006 and August 31, 2006, that firm sought legal fees of $360,493 and expenses of $28,364.71. As of August 31, 2006, the Kornman Adversary Proceeding was in its infancy – the pleadings had not even closed. In response to several motions pursuant to Fed. R. Civ. P. 12(b)(6), the Trustee filed an Amended Complaint on October 16, 2006.

negotiate a materially better settlement with either the Skinner Trusts or Love on an individual basis given the apparent relative strength of their respective cases. That leaves only the Mikron Note and/or the Schuler note. As noted previously, the Schuler note only recently matured, and Schuler has not come forward to pay that note, suggesting that the Trustee will have to institute litigation (yet again) against Schuler to collect the note.[70] The funds provided by the compromise of the Mikron Adversary – *i.e.*, $2,750,000, will provide the necessary resources for the estate to attempt to realize on what is believed to be its most valuable remaining asset – *i.e.*, the litigation claims pending against the Kornman Parties, among others, in the Kornman Adversary Proceeding.

Second, the estate needs closure on the litigation pending with the Client Claimants, as continued litigation will cost an already insolvent estate more money than it either has, or is likely to collect through continued litigation with these claimants. The Trustee has sought to achieve a delicate balance in the Case to date, attempting to deal fairly with the Client Claimants, Canada, and the Kornman Parties for over three years. At this point in the factual development of the Case, it appears that the Trustee has concluded that the Client Claimants' claims against Heritage are stronger than he thought initially.[71] Based on the current record, the Court understands the Trustee's conclusion. To date, the only settlement that the Trustee has been able to negotiate that will bring closure to all of the Client Claimant litigation is the settlement contained in the Second Amended Plan and the stand-alone motion for approval of the settlement. The Trustee testified that the settlement negotiations were hard-fought and difficult, taking over a year to come to fruition, *see*

---

[70]Given the recent maturity of this note, the Court assumes that the Schuler client agreement, like the Skinner Trusts' Agreements and the Love Agreement, was executed after May 2001. The Schuler note was dated March 29, 2002 and matured on March 29, 2007. Ex. P 2, p. 69; Docket No. 1091, p. 69.

[71]As noted previously, the Trustee's initial conclusions may have been skewed by the Kornman Parties' failure to turn over all of Heritage's assets, books, and other records on a timely basis. *See supra* at pp. 28-30.

Audiotape: Hearing conducted 06/12/07 at 12:26:20 - 12:37:27 p.m. (on file with the Court), and that it was the best settlement that he was able to negotiate with the Client Claimant group as a whole. While perhaps not "perfect" or even one the Court would prefer – particularly as it relates to the Jenkins Tax Claimants' claims – the Trustee's proposed settlement will bring closure to the estate's continued involvement in the Client Claimant litigation, which has no meaningful economic upside to the estate greater than that realized pursuant to the settlement. In other words, from the Court's perspective, while a "better" settlement with the Jenkins Tax Claimants would result in the allowance of a lesser unsecured claim against the estate, the Trustee has no affirmative claims against the Jenkins Tax Claimants which would generate any affirmative recovery by the estate even if this settlement is not approved.

Third, while it is possible that Mikron might be willing to settle on these economic terms on a stand-alone basis, the Trustee would then either have to negotiate stand-alone settlements with all of the other Client Claimants, which may or may not be possible, or continue to litigate their claims and defenses. That continued litigation would be expensive as discussed above, and would divert monies needed in connection with the Trustee's attempt to realize on what he, and the other creditors, believe to be the estate's most valuable remaining asset – i.e., the litigation claims pending against the Kornman Parties, among others, in the Kornman Adversary Proceeding.

Fourth, the Trustee will be able to "cap" the estate's exposure to Jenkins and his affiliates in another litigation matter involving the acquisition of the Maxim Hotel in Las Vegas, Nevada (the "Casino Litigation"). In the Casino Litigation, Jenkins and several affiliates assert damages in excess of $50 million against various parties, including Heritage, and Jenkins and his affiliates have filed proofs of claim against the estate. While the extent of Heritage's exposure in the Casino Litigation

**Memorandum Opinion** **Page 83**

is hotly contested,[72] if the settlement is approved, the Jenkins entities have agreed to "cap" this claim against Heritage at $2.34 million, irrespective of the outcome at trial.[73] While the extent of the benefit to be realized by the estate from this claim cap is uncertain, the estate's exposure is significantly reduced.

Fifth, at the end of the day, the only parties likely affected by the allowance of what the Kornman Parties would call an "excessive" claim to the Jenkins Tax Claimants are the other Client Claimants and, to a lesser extent, Canada, and they have agreed to the allowance of such a claim. Specifically, the Client Claimants and Canada have come to terms on Canada's economic treatment in the Case. As a result, Canada is no longer objecting to the settlement. Moreover, the Client Claimants and Canada are prepared to pay the holders of Small General Unsecured Claims in full and prior to their receipt of any distributions on their allowed claims through the "Intraclass Distribution Priority" agreement proposed in the Second Amended Plan. *See* Second Amended Plan, ¶ 4.4.3. The IRS claim has been filed as a priority unsecured claim and, unless it is objected to, which the Trustee has testified is unlikely, the IRS is entitled to a priority in payment to any unsecured creditor. *Id*. at ¶ 4.4.1; 11 U.S.C. § 507(a)(8). That leaves only the so-called "Insiders," as defined in the Second Amended Plan, and none of them have objected to the settlement other than the Kornman Parties. Moreover, the claims of the other "Insiders" (other than the Kornman Parties) aggregate

---

[72] The Kornman Parties argue that the Jenkins claimants' agreement to limit their claims against Heritage is worthless, because the claims against Heritage are speculative, since Heritage had limited involvement in the acquisition of the casino.

[73] The Casino Litigation was originally filed in Texas state court. It was removed to this Court when the Case was filed. On February 16, 2007, Kornman and certain other plaintiffs filed an unopposed motion to withdraw the reference. On May 15, 2007, the United States District Court for the Northern District of Texas adopted this Court's report and recommendation that the reference be withdrawn, and the Casino Litigation is now pending in the District Court. Civil Action No. 3:07-CV-0321-K is currently scheduled for trial in October, 2008.

**Memorandum Opinion** **Page 84**

$3,232,076.99.[74] The Trustee has objected to these claims. Even if these claims are allowed, however, the dilutive effect of the "excessive" Jenkins Tax Claimants' claim is of little significance, and is certainly not worth the continued cost of further litigation to the estate.

Finally, as the settlement relates to the Kornman Parties' claims against the estate, it is unlikely that their claims will survive the Trustee's pending claim objections. Specifically, the Trustee has objected to the allowance of the claims asserted by the Kornman Parties in accordance with § 502(d) of the Bankruptcy Code. *See* Docket Nos. 1131, 1135 in Case No. 04-35574-BJH. It is undisputed that avoidance claims currently pend against each of the Kornman Parties in the Kornman Adversary Proceeding. As a result, § 502(d) appears to require the disallowance of those claims as a matter of law, as counsel for the Kornman Parties admitted during closing argument. 11 U.S.C. § 502(d);[75] *In re Lambert Oil Co.*, 347 B.R. 508, 522 n. 6 (W.D. Va. 2006) (a court order avoiding a transfer is not a prerequisite to disallowance of a claim); *In re Enron Corp.*, 340 B.R. 180, 191 (Bankr. S.D.N.Y. 2006); 4 Alan N. Resnick, Collier on Bankruptcy ¶ 502.05[2][a] (15th ed. Rev. 2006); Audiotape: Hearing conducted 06/15/07 at 5:22:42 - 5:24:02 p.m. (on file with the Court). So, it appears that as soon as the Trustee's claim objection is heard, the Kornman Parties' claims will be

---

[74] The plan defines 26 persons or entities as "Insiders." Of that amount, only 8 filed claims, two of which are Kornman and GMK, the objectants. Vickie Walker's and Claudia McElwee's claims are filed as unliquidated indemnity claims. However, in connection with the confirmation hearing, Claudia McElweee filed a "Notice of 3018 Statement" indicating that the maximum amount of her claim is $25,770. Michael Kornman filed a liquidated indemnity claim for $257,238.99. Steadfast Investments, L.P. filed a liquidated claim for $861,597.26; Strategic Leasing, L.P. filed a liquidated claim for $346,293.53; Valiant Leasing, LLC filed a liquidated claim for $1,766,947.21. The Trustee has objected to all of these claims.

[75] Section 502(d) provides that "the court *shall disallow* any claim of any entity from which property is *recoverable* under section . . . 550 . . . of this title or that is a transferee of a transfer *avoidable* under section . . . 544 . . . 547, 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property . . . ."

**Memorandum Opinion**                                                                                           **Page 85**

disallowed in the Case.[76]

Balancing all of these considerations with the one potential shortcoming of the settlement –
*i.e.*, that it allows the Jenkins Tax Claimants a larger unsecured claim in the Case than continued
litigation might determine to be allowable, the Court concludes that the Trustee's proposed
settlement with the Client Claimants and Mikron is fair and equitable and in the best interest of the
estate.

### C.    Application of the Legal Standard to the Canada Settlement

As noted previously, the Court must evaluate the Canada settlement in light of the probability
of success in the litigation, with due consideration for the uncertainty in fact and law, the complexity
and likely duration of the litigation, and other factors which bear upon the wisdom of the
compromise. *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 355-56 (5th Cir. 1997). Under the
third prong, the Court must consider, among other things, the best interests of the creditors, "with
proper deference to their reasonable views," and whether the settlement is the product of arms-length
bargaining. *Id.* at 356 (internal quotations omitted).

As is relevant to the Kornman Parties' objections to the settlement with Canada, the
settlement provides that Canada's $6,218,679.40 claim is bifurcated into two parts. The first part
consists of 65% of the claim, or approximately $4.04 million, which is treated as an allowed general
unsecured claim in Class 4 under the Second Amended Plan. The remaining 35% of the claim, or
approximately $2.18 million, is treated as an allowed subordinated claim in Class 6 under the Second

---

[76] In fairness, depending on the outcome of the avoidance litigation, the Kornman Parties may be entitled to
seek the reconsideration of any such disallowance in accordance with § 502(j) of the Bankruptcy Code. However,
such a reconsideration is potentially years away, depending on the timing of trial (the Kornman Adversary Proceeding
is not currently set for trial), the ultimate outcome of that trial, and any appeals which result thereafter.

**Memorandum Opinion**                                                                                    **Page 86**

Amended Plan, subordinated in payment to all creditors with allowed claims in Classes 4 and 5. In addition, the Second Amended Plan provides that the Trustee, Heritage, the bankruptcy estate and all of the Client Claimants, except the Jenkins Tax Claimants, will release Canada from all claims arising out of, based upon, or involving the tax strategies. Similarly, the Second Amended Plan requires that Canada provide a mirror image release to those same parties.[77]

### 1. Probability of Success

The Kornman Parties argue that the settlement with Canada is not fair and equitable and in the best interest of the estate because the Trustee has admitted that the estate has potential claims against Canada under the Employment Agreement, but the Trustee has not properly evaluated the validity or amount of those claims. Specifically, the Kornman Parties argue that the estate may be able to (i) "claw back" millions of dollars of bonus payments Heritage made to Canada in connection with Canada's work with certain of the Client Claimants to the extent that Heritage refunds fees to those Client Claimants, and (ii) pursue Canada for alleged violations of covenants not to compete and not to disclose confidential information, both of which are contained in the Employment Agreement. Moreover, the Kornman Parties assert that the Trustee has not adequately evaluated the estate's ability to fully subordinate Canada's claim in the Case.

The Trustee testified that he was aware long ago of the Kornman Parties' assertion that bonus payments Heritage made to Canada may be recoverable under the provisions of the Employment Agreement. In fact, the Plan Proponents' original disclosure statement discloses the existence of

---

[77] Other terms of the Canada settlement, while relevant to the Kornman Parties' objections to confirmation, are not material to the Kornman Parties' objections to the settlement itself, and thus will be discussed more fully in connection with the Court's analysis of the Second Amended Plan's compliance with 11 U.S.C. § 1129. *See infra* at pp. 96-126.

**Memorandum Opinion** **Page 87**

such potential claims. The disclosure statement describes the potential "bonus repayment" claim as follows:

> Each employee agreed [in an employment agreement] that the Debtor reserved the right, in its sole, unlimited and absolute discretion, to refund to any client all or part of the monies paid by that client. Each employee further agreed that the employee would reimburse the Debtor for any expenses incurred in connection therewith, and repay to the Debtor all bonus compensation derived from or attributable to any moneys refunded to the client.

*See* Docket No. 1021, p. 63.

The Trustee essentially testified, however, that the potential recovery on this claim is not worth the costs of pursuit, in light of the settlement terms, for several reasons. First, according to the Trustee, Heritage has not voluntarily refunded any monies to any of its clients. Second, to the extent that the allowance of unsecured claims in the Case to the Client Tax Claimants can be considered a "refund" of monies within the meaning of the Employment Agreement, according to the Trustee, Canada is voluntarily agreeing to subordinate more of his claim than he would likely be required to "repay"[78] to Heritage even if the Trustee elected to pursue this claim. By way of further explanation, the Trustee testified that Canada received aggregate bonus payments from 1999 through 2002 (when Canada's Employment Agreement was not renewed) of approximately $3 million. And, while it is difficult to tie specific bonus payments to specific clients based on the Heritage books and records in his possession, the Trustee testified further that other Heritage clients – *i.e.*, former clients who did not file claims in the Case and thus are not receiving a "refund" of monies through the claim allowance process – paid fees to Heritage during this time period too; and thus, some of Canada's

---

[78] Of course, unless the Trustee's "clawback" claim was worth in excess of $6,218,679.40, no monies would actually be repaid by Canada. Rather, any judgment in the Trustee's favor would simply be offset against Canada's claim, thereby reducing his allowed unsecured claim in Class 4.

**Memorandum Opinion**                                                                 **Page 88**

bonus payments are likely attributable to these other former Heritage clients. Moreover, the Trustee testified that during this time frame, the most significant fee paid to Heritage was paid by the so-called "Connecticut Client" – who is not a claimant in the Case at all and thus is not receiving any "refund" of fees under the Second Amended Plan (thereby potentially triggering a right to "claw back" bonus payments to Canada). In addition, even as to the fees paid to Heritage by the Client Claimants, whose claims are being partially allowed under the Second Amended Plan (thereby potentially triggering a right to "claw back" bonus payments from Canada attributable to those clients), Canada was only involved as a "Principal" with some of them. Specifically, Canada was involved as a "Principal" in the transactions with Skinner, Woodruff, Patterson, Troutt, Fluharty, and Jenkins. He was not involved in the transactions with Love, Powell, Rainwater, or the Sandwiths, and thus presumably did not receive any bonus payments attributable to the latter. At most, the Trustee testified that he believes that the fees attributable to the Client Claimants with whom Canada was involved total no more than $1.2 to $1.5 million.[79]

Third, the Trustee testified that a further discount of the alleged right to "claw back" this $1.2 to $1.5 million of bonus payments would likely be justified because under the terms of the Second Amended Plan, the estate is proposing to "refund," at most, only 65% of the fees paid to Heritage

---

[79] The Kornman Parties argue that the Trustee's potential "clawback" claim is potentially much larger if the Case is converted to one under Chapter 7, and that the Trustee has failed to properly evaluate the potential value of the estate's "clawback" claim in the event of conversion. If the Case is converted to one under Chapter 7, the bar date for the filing of proofs of claim will re-open. Certain other creditors (including the Connecticut Client) may file proofs of claim, in which case, the estate may end up "refunding" a portion of the fees paid to the Connecticut Client, thus triggering a right to claw back bonus payments to Canada which are attributable to fees paid by the Connecticut Client. The Trustee testified, however, that at most, the bonus payments to Canada between 1999 and 2002 totaled $3 million, and the amount recoverable by the estate would still have to be discounted by the other factors discussed in the text. The Korman Parties also argue that in reaching a conclusion about the fairness of the settlement with Canada, the Trustee (and presumably the Court) should conduct an analysis of the estate's potential defenses to other, as-yet-unfiled proofs of claim. While the Court is mindful of its obligation to educate itself on the wisdom of the proposed release of claims against Canada, the Court does not believe that it is required to analyze hypothetical defenses to proofs of claim not yet on file.

by those clients. And, this proposed 65% "refund" is subject to the availability of funds. In other words, the Client Claimants may never in fact receive the full "refund" the Second Amended Plan proposes to pay them because their allowed claims may not be paid in full – further limiting the value of any potential "clawback" claim against Canada.

Finally, the Trustee testified that he also considered Canada's potential defenses to a bonus repayment claim, including the fact that the arbitration panel already found a breach by Heritage of at least the oral modification to the Employment Agreement. Generally, when one party to a contract commits a material breach, the other party is excused from any obligation to perform. *Long Trusts v. Griffin*, 222 S.W.3d 412, 415 (Tex. 2006).

The Court finds the Trustee's analysis of the "clawback" claim persuasive. Accordingly, the Court concludes that (i) the Trustee faces significant risk with respect to the pursuit of this claim, and (ii) the value of this claim against Canada is worth less to the estate than the agreed subordination of approximately $2.2 million of Canada's claim if the settlement is approved.

Next, the Kornman Parties assert that the Trustee is releasing, without proper evaluation, potential claims for Canada's alleged breach of covenants not to compete and not to disclose confidential information, both of which are contained in the Employment Agreement. *See* Def's Ex. 1, Arts. 4 & 5. The Trustee testified that he considered the following facts in his evaluation of the likelihood of success on these claims. First, on May 16, 2006, Kornman filed a motion for authority to pursue such claims on the estate's behalf. *See* Docket No. 779. Canada and the Trustee objected. *See* Docket Nos. 801 and 855. Canada opposed the motion on several grounds and raised the defenses of res judicata, collateral estoppel, arbitration and award, unlawful restriction on the practice of law, and unenforceability of those portions of the Employment Agreement as a penalty and/or

forfeiture. For his part, the Trustee responded to Kornman's motion stating that he had considered the alleged claims and defenses likely to be asserted, and had determined that it was not in the best interest of the estate to expend its resources in the pursuit of such claims. Nevertheless, the Trustee stated in his response that he did not oppose Kornman's motion provided that (i) the Court determined that the claims were "colorable," (ii) Kornman alone bore the costs of the litigation (without prejudice to a request for a "substantial contribution claim" if Kornman was successful), (iii) any settlement was subject to notice and hearing and Court approval, and (iv) Kornman and Kornman's counsel agreed to indemnify the estate against any claims that might be asserted against it as a result of the pursuit of the claims. After receipt of the Trustee's response, Kornman withdrew the motion. Withdrawal of the motion apparently caused the Trustee to conclude that Kornman did not believe in the merits of the claims.

Second, the Trustee testified that based upon his review of Heritage's books and records, he does not believe that Canada is engaged in a competing business (since Canada is attacking, and not promoting, tax shelters in his current law practice) and he is unaware of any confidential information which has been disclosed, further leading him to conclude that the claims were of questionable value.

Finally, the Trustee testified that he consulted with counsel in evaluating the risks of pursuing these claims against Canada and in assessing his likelihood of success in obtaining a recovery for the estate. And, that after such consultation, he has concluded that the claims are not worth the cost of pursuit.

Based upon the evidentiary record made at the Supplemental Hearing, the Court is satisfied that the Trustee has properly considered pursuit of these claims, and chose not to pursue them because of the low likelihood of any affirmative recovery – *i.e.*, a net recovery of funds in excess of

**Memorandum Opinion**                                                                                                   **Page 91**

the costs incurred in pursuing the claims. Again, however, even assuming a judgment in the Trustee's favor, unless that judgment exceeded $6.2 million, it would simply be offset against Canada's allowed Class 4 claim.

Finally, the Kornman Parties contend that the estate may be able to fully subordinate Canada's claim through litigation, as opposed to only one-third of it pursuant to the Canada settlement. However, the Trustee testified that pursuit of an equitable subordination claim against Canada may be problematic for several reasons. First, Canada was not an "insider" of Heritage, as that term is defined in the Bankruptcy Code, for several years prior to its bankruptcy filing. Second, while Canada was a "Principal" of Heritage and dealt with some of the Client Claimants, Kornman (and not Canada) appears to have controlled both Heritage and the information flowing from Heritage to its clients. For example, Bird, another Heritage "Principal," testified that he was "stymied to think of even a mundane task within Heritage that could be completed without Gary Kornman's approval first. Every communication, every decision, ran through his office." Ex. P 196-1 (Depo. of Anthony Bird, 11/17/06), at p. 172:9-12.

Finally, while the Trustee believes that he has meritorious equitable subordination claims against Canada and the claimants in Class 5, there is a further factual distinction relating to Canada that the Trustee believes could pose further risk to the estate. Specifically, according to the Trustee, unlike his potential subordination claims against the Class 5 claimants, the inequitable conduct that would form the basis for his pursuit of an equitable subordination claim against Canada does not relate at all to the basis of Canada's claim against the estate (which the Trustee would be seeking to

subordinate).[80] All of the Client Claimants' allegations of inequitable conduct relate to Heritage's dealings with them – yet Canada's allowed $6.2 million claim relates to the Connecticut Client, who did not file a claim in the Case and is not participating in the proposed distribution under the Second Amended Plan. Moreover, Canada's claim arises from Heritage's breach of Canada's Employment Agreement and not from any misuse of his position at Heritage to the detriment of other creditors (as may be the case with the Class 5 claimants' indemnity claims). According to the Trustee, these facts, when considered in light of the case law which counsels courts to subordinate only that portion of a claim as is necessary to remedy the harm caused by the conduct, might cause this Court to conclude that subordination of Canada's claim was improper. *See, e.g.*, *In re Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 357 (5th Cir. 1997); *Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 130 (5th Cir. 1993); *In re Imperial Tooling and Mfg., Inc.*, 314 B.R. 340 (Bankr. N.D. Tex. 2004). *But see In re Racing Services, Inc.*, 340 B.R. 73, 76 (8th Cir. B.A.P. 2006) (misconduct by corporate Chapter 7 debtor's principal was sufficient to warrant equitable subordination of principal's rent claim).

The Court finds the Trustee's analysis of the potential equitable subordination claim against Canada persuasive. Accordingly, the Court concludes that (i) the Trustee faces significant risk with respect to the pursuit of his equitable subordination claim against Canada, and (ii) the agreed subordination of approximately $2.2 million of Canada's claim if the settlement is approved is a reasonable compromise of that claim.

---

[80] The Court notes that at this point, the Client Claimants' allegations of inequitable conduct are directed at Heritage and Kornman, and not at Canada. While Canada is a third-party defendant in the Jenkins/Meralex Adversary, he was brought in as a third-party defendant by *Heritage and the Kornman Parties* (based upon an indemnification claim) and not by the Jenkins plaintiffs. Moreover, the "Connecticut Client" who paid the fee to Heritage which generated the commission to Canada (and therefore resulted in Canada's allowed claim against Heritage) has sued Kornman and others in state court, but did not name Canada as a defendant. Ex. P 267A.

**Memorandum Opinion** **Page 93**

For all of these reasons, the Court concludes that the Trustee's decision to settle the estate's potential claims against Canada is a reasonable one. Pursuit of the claims is unlikely to provide a greater benefit to the estate than the benefit to be realized under the proposed settlement. Therefore, consideration of this factor militates in favor of approval of the settlement.

### 2.    Complexity and Duration

The potential litigation with Canada would raise a myriad of legal issues – among them, the facial question of whether allowance of proofs of claim in the Case constitutes a "refund" under the terms of the Employment Agreement and whether the Trustee can subordinate a claim based upon conduct unrelated to the claim that the Trustee seeks to subordinate, and where the claim arises from a claimant's dealings with a client who is not a claimant in the Case. A review of the limited pleadings on file with respect to potential claims against Canada under the Employment Agreement establishes that Canada will raise a variety of defenses to the assertion of those claims. Based upon the Court's analysis of those legal issues to date, the Court concludes that they are both novel and complex.

Moreover, the pursuit of this potential litigation with Canada, if it were filed, would take years to finally determine. Here, history is an appropriate predictor of the future. The existing litigation (arbitration) with Canada has been ongoing since 2002. The allowance of Canada's claim by this Court (after years of arbitration/litigation), as modified by the District Court, has now been appealed to the Fifth Circuit, where it remains pending. As the District Court noted on appeal, its ruling was "the decision of the seventh judge to hear this four-year-old case, for which speedy resolution by alternative means was intended." *In re The Heritage Organization, LLC*, No. 3:06-CV-0578-H, 2006 WL 2642204 at *4 (N.D. Tex. Sept. 14, 2006).

**Memorandum Opinion**                                                                                      **Page 94**

Canada has been an active participant in the Case and, until recently, an active objector. As a result of Canada's actions in the arbitration proceeding prior to the filing of the Case, and his actions in the Case to date, Canada can be expected to aggressively defend against any claims brought against him by the Trustee.

Finally, the Trustee testified that if the estate were to pursue its potential claims against Canada, all parties can be expected to "continue to vigorously support the positions that they've asserted and if the estate happened to be successful in litigation, once again we would be facing the possibility of an appeal and ongoing litigation in this matter which could mean hundreds of thousands of dollars in costs to the estate." Audiotape: hearing conducted 07/31/07, 10:45:15-10:45:39 a.m. (on file with the Court).

Based upon the evidence offered in support of the Canada settlement, the Court concludes that further litigation with Canada would be complex and expensive to an already insolvent estate. *See supra* at p. 71. Accordingly, this factor militates in favor of approval of the settlement.

### 3. Other factors

The settlement with Canada is the product of arm's length negotiation. The Trustee testified that settlement discussions began months before the Original Hearing, and the terms of the settlement were "negotiated aggressively by both sides." Audiotape: hearing conducted 07/31/07 at 11:26:16-11:26:24 a.m. (on file with the Court).

Moreover, the Court has considered the interests of the other creditors of the estate and has given deference to their *reasonable* views. The Court notes that, once again, the only creditors objecting to the proposed settlement with Canada are the Kornman Parties, who are the potential

targets of the remaining litigation. For the reasons otherwise stated in this Memorandum Opinion, *see supra* at pp.73-74 and *infra* at p. 112, the Court concludes that the Kornman Parties have a non-creditor interest in opposing the settlement which skews their view of its merits.

Finally, the Court also notes that Canada has agreed to subordinate 35% of his claim, which has already been allowed in the Case, to permit a priority in payment not only to the Client Claimants, but also to the Kornman Parties (and the other Insiders) if their claims become allowed Class 5 claims.

Consideration of these other factors also militates in favor of approval of the Canada settlement.

After carefully considering the Trustee's probability of success in litigation with Canada, the complexity and likely duration of that litigation, and the other relevant considerations, the Court concludes that the Plan Proponents' proposed settlement with Canada is fair and equitable and in the best interest of the estate.

### D.      Technical Objections to Confirmation of the Second Amended Plan

To put the Kornman Parties' technical objections to confirmation into context, a summary of the history of the classification of, and the treatment afforded to, claims and interests under the Second Amended Plan and the predecessor plans is appropriate. The Amended Plan, filed on May 1, 2007 and set for consideration at the Original Hearing, created seven classes of claims and equity interests.[81]  Classes 1 and 2 consisted of secured claims and priority non-tax claims, respectively. Class 3 consisted of "Allowed Convenience Claims," which were defined  by Art. 1.6 and 1.38 of

_____

[81] "Allowed Administrative Claims" and "Allowed Priority Tax Claims" (as those terms were defined in the Amended Plan) were unclassified claims in the Amended Plan.  Docket No. 1090 in Case No. 04-35574-BJH-11.

**Memorandum Opinion**                                                                                          **Page 96**

the Amended Plan as unsecured claims (not falling within any of the other classes) in the face amount of $30,000 or less. Class 4 consisted of the Client Claimants.[82] Class 5 consisted of the Insiders (as defined in the Amended Plan), which essentially included the Kornman Parties, various affiliates, and various employees and affiliates of Heritage, along with Canada. Class 6 consisted of "Allowed Subordinated Claims," defined by the Amended Plan to include a claim by an Insider Claimant "to the extent that such Insider Claim is ordered by the Bankruptcy Court to be subordinated in payment to Class 4 claims under the plan." Class 7 consisted of equity interests in Heritage.

As is relevant to the Kornman Parties' objections, the Amended Plan proposed that on the plan's effective date, all estate assets (including the settlement payment from Mikron and all remaining causes of action) would be transferred to a creditor trust, with all claims to be satisfied from the trust *res*. In effect, the trust *res* would include: (i) all cash currently on hand, (ii) the settlement payments from Mikron and Berg (if approved), (iii) various judgments held by the estate (and any recoveries received on those judgments), (iv) the contingent and unliquidated claims pending in the Kornman Adversary Proceeding (and any recoveries received in that litigation), and (v) certain contingent and unliquidated avoidance claims (and any recoveries received on those claims).

Under the Amended Plan, Classes 1 and 2 were unimpaired by virtue of the proposed treatment of their claims, and thus were deemed to accept the Amended Plan. The Amended Plan proposed to pay the Class 3 Allowed Convenience Claims in full, in cash, within 15 days of the effective date or allowance (whichever was later), and Class 3 was therefore also unimpaired and

---

[82] *See* Art. 2.3 of the Amended Plan and the definitions contained in Art. 1.8, 1.59, and 1.116.

deemed to have accepted the Amended Plan. The Amended Plan proposed to pay (without interest) Class 4 claims (the Client Claimants), if and when Classes 1, 2, and 3 had been fully satisfied and there remained available funds in the creditor trust for distribution to creditors, their pro rata share of available funds calculated in relation to all other claims in Class 4 and claims in Class 5 that were not ordered to be subordinated. Class 4 creditors were impaired and entitled to vote. The Amended Plan proposed that a Class 5 claim which was finally determined to be a subordinated claim would be treated as a Class 6 claim, and a Class 5 claim which was not subordinated would be treated in the same manner as a Class 4 claim. Class 5 creditors were impaired and therefore entitled to vote. The Amended Plan proposed to pay Class 6 claims, if and when all prior classes had been paid and there remained funds available in the creditor trust for distribution, their pro rata share of remaining funds without interest. Class 6 creditors were impaired and therefore entitled to vote, although there were no known Class 6 creditors at that time. Finally, the Amended Plan called for the cancellation and extinguishment of all equity interests in Heritage, and for Class 7 interest holders to be satisfied from any funds remaining in the creditor trust after distributions to prior classes were completed.

The Kornman Parties and Canada both filed lengthy objections to confirmation of the Amended Plan on various grounds. Significantly, Canada objected to his treatment as a Class 5 "Insider," since it is undisputed that on the petition date, he did not meet the Bankruptcy Code's definition of an "insider." *See* 11 U.S.C. § 101(31); P 290 at ¶¶ 4-5.[83] As noted previously, on the eve of the Original Hearing, the Plan Proponents and Canada reached an agreement as to the classification and treatment of Canada's claim, resulting in the filing of the Modified Plan on June

---

[83] The Court did find, in its Memorandum Opinion and Order with respect to the objection to Canada's claim, that Canada was an insider at the time he rendered the services giving rise to the amount set forth in his proof of claim (which was in 2000 and 2001). *See* Docket No. 186 in the Canada Adversary, at p. 12.

**Memorandum Opinion** **Page 98**

12, 2007. As is relevant to the Kornman Parties' continuing confirmation objections, the Modified Plan provided that 65% of the Canada claim (approximately $4 million) would be allowed and treated in Class 4, and 35% of the Canada claim (approximately $2.2 million) would be allowed and treated in Class 6. *See* Modified Plan, Docket No. 1189, p. 2, Art. 7.8. In addition, as to the Class 4 portion of Canada's allowed claim, the Modified Plan provided that Canada would be entitled to the first $500,000 of distributable cash prior to distributions to any other Class 4 claimant. Thereafter, Canada and the Client Claimants would each receive 50% of the distributable cash from the proceeds of (i) the Kornman Adversary Proceeding, and (ii) a to-be-filed avoidance action against Lynn Tillotson & Pinker, LLP (the "LTP Action"), until Canada received an additional $500,000; thereafter, the Client Claimants would receive the next $5 million from any source, and thereafter, Canada and the Client Claimants would share pro rata in any remaining distribution to Class 4 claimants. In essence, the Modified Plan gave Canada a $500,000 priority in payment to the Client Claimants, then a 50/50 split as to the proceeds of the Kornman Adversary Proceeding and the LTP Action only, up to another $500,000 in distributions to Canada.[84] The Modified Plan also provided for mutual releases as between the Trustee, the estate, all of the Client Claimants (except the Jenkins Tax Claimants), and Canada of all claims that "arise out of or are based upon, or involve the Client Tax Agreements, the Tax Strategies, the Client Tax Claimant Notes, the Client Tax Claims, the Sandwith Note, the Sandwith Estate Strategies, or the Sandwith Claims" (as those terms were defined in the Amended Plan).

Also as noted previously, at the conclusion of the Original Hearing (at which the Modified

---

[84] The Court's statements are a summary only, for the purpose of background in discussing the Kornman Parties' objection - the actual terms of the settlement are more specific and more clearly defined in the Plan Modification.

Plan was considered), the Court expressed concerns about its ability to confirm the Modified Plan

for at least two reasons. First, the Court expressed concern that the evidentiary record failed to

support the creation, pursuant to 11 U.S.C. § 1122(b), of an administrative convenience class of

creditors – *i.e.*, Class 3. Second, the Court expressed its concern that if Class 3 was not a legally

proper class of administrative convenience creditors, then there appeared to be unfair discrimination

between the treatment proposed to those creditors and the Class 5 "Insiders." *See* 11 U.S.C. §

1129(b)(1).

Thereafter, the Plan Proponents filed the Second Amended Plan, which, among other things,

(i) deleted Class 3 (the convenience class); (ii) moved the claims of creditors formerly treated in Class

3 to Class 4; (iii) changed the definition of "Insider" to exclude Canada, thereby causing Canada to

become a Class 4 creditor (at least to the extent of approximately $4 million of his claim); and (iv)

provided for a new, consensual,[85] intraclass distribution agreement among the Class 4 claimants. The

terms of the "Intraclass Distribution Priority" set forth in Section 4.4.3 of the Second Amended Plan

provides for the payment in full of what were formerly the Class 3 administrative convenience

creditors under the Amended Plan (and the Modified Plan) and then essentially embodies the terms

of the settlement with Canada, which will be discussed more fully below. In other words, under the

Intraclass Distribution Priority, the holders of Small General Unsecured Claims as defined in the

---

[85] Section 7.9 of the Second Amended Plan, entitled "Less Favorable Treatment Agreement," provides that
the "Client Claimants and Canada hereby expressly agree to the intraclass distribution priority provisions of Section
4.4.3 of the Plan, including, without limitation: (a) the Client Claimants and Canada hereby expressly agree to the
redistribution of distributions that would otherwise be payable to them on account of their respective Allowed
General Unsecured Claims consistent with the provisions of Section 4.4.3(a) of the Plan; (b) the Client Claimants
hereby expressly agree to the redistribution of distributions that would otherwise be payable to them on account of
their respective Allowed General Unsecured Claims consistent with the provisions of Section 4.4.3(b) of the Plan;
and (c) Canada hereby expressly agrees to the redistribution of distributions that would otherwise be payable to him
on account of his Allowed Canada Non-Subordinated Claim consistent with the provisions of Section 4.4.3(c) of the
Plan."

Second Amended Plan (former Class 3 creditors under the Amended Plan and the Modified Plan) get paid in full first, and then the remaining Class 4 creditors – *i.e.*, Canada and the Client Claimants – share in distributions as provided in the Canada settlement.

With this background firmly in mind, the Court turns to the Kornman Parties' specific, technical objections to confirmation of the Second Amended Plan.

## 1.     Separate Classification of Unsecured Creditors

The Kornman Parties first argue that the Second Amended Plan does not comply with "the applicable provisions of" the Bankruptcy Code as required by 11 U.S.C. § 1129(a)(1), because it violates 11 U.S.C. § 1122(a), which states that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class. Although § 1122(a) by its terms "only governs permissible *inclusions* of claims in a class rather than requiring that all similar claims be grouped together," *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1991) (emphasis in original), it is nevertheless settled law in this Circuit and elsewhere that "ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class." *Id*.; *In re Premiere Network Svcs., Inc.*, 333 B.R. 130, 133 (Bankr. N.D. Tex. 2005).

The Kornman Parties argue that the creditors in Class 4 (holders of Small General Unsecured Claims, Canada, and the Client Claimants), Class 5 (Insiders), and Class 6 (subordinated claims) all hold unsecured, non-priority claims against the estate, which are of equal rank and priority and thus are substantially similar such that their separation into three separate classes is an improper effort to gerrymander the votes in order to obtain an impaired, consenting class for the purpose of compliance

with 11 U.S.C. § 1129(a)(10). To support their improper classification/vote gerrymandering argument, the Kornman Parties point to the fact that Canada was initially treated as an "Insider" in Class 5, but under the Second Amended Plan, Canada is absolved of his "Insider" status and $4 million of his claim is now not only treated in Class 4, but is given a priority in distribution (*i.e.,* Canada receives the first $500,000 of distributions to Class 4 creditors after the holders of Small General Unsecured Claims are paid). The Kornman Parties argue that there is no basis to separately classify the Class 5 creditors solely on the basis of their "Insider" status. The Kornman Parties further argue that classification of the Insiders separately in Class 5 is improper because if those claims are not subordinated, they are treated in the same manner as the claims in Class 4, and there are no subordination actions currently pending.

From the Court's perspective, the law in this Circuit is clear. Substantially similar claims must be classified together unless some reason, other than gerrymandering, exists for separating them. *In re Greystone III Joint Venture*, 995 F.2d 1274, 1277 (5th Cir. 1991). "A debtor's motives must be scrutinized to prevent the possibility of vote manipulation." *One Times Square Assocs. Ltd. Partnership v. Banque Nationale De Paris*, 165 B.R. 773, 778 (S.D.N.Y. 1996). Whether the motive for separate classification is gerrymandering is a question of fact. *In re Northwest Timberline Enters., Inc.*, 348 B.R. 412, 438 (Bankr. N.D. Tex. 2006).

The Plan Proponents offer several reasons for the separate classification of unsecured creditors into Classes 4 and 5 under the Second Amended Plan.[86] First, the Plan Proponents argue

---

[86] The Kornman Parties' objection to the separate classification of the convenience class (Class 3) in the Amended Plan is now moot, as Class 3 has been deleted in the Second Amended Plan. Moreover, while the Kornman Parties include Class 6 in one sentence of their written objection, they do not devote any time to explaining how the nature of subordinated unsecured creditors' claims (Class 6) is substantially similar to non-subordinated unsecured creditors' claims (Classes 4 and 5), either in their written submissions or their oral arguments at trial. The Court is satisfied that Class 6 claims are different from Class 4 and 5 claims and are properly classified separately from Class

that the bankruptcy court, as a court of equity, can permit exceptions to any strict rule of classification when the facts justify it. *Brinkley v. Chase Manhattan Mortgage & Realty Trust (In re LeBlanc),* 622 F.2d 872 (5th Cir. 1980) (decided under the Bankruptcy Act). The Plan Proponents argue that the Insiders engaged in inequitable conduct to the detriment of creditors so as to justify separate classification, relying on *LeBlanc*. The *LeBlanc* court permitted separate classification of unsecured trade creditors (who were to receive 40% of their claims) and insiders holding unsecured claims (who were to receive nothing on their claims), focusing on three factors: (1) there was no equity in the debtor's property for distribution to unsecured creditors, such that the insiders who took nothing under the plan would have taken nothing in Chapter 7; (2) the majority of insiders did not object to the classification scheme; and (3) the classification was not arbitrary and discriminatory. In elaborating on the third factor, the Fifth Circuit stated:

> The trade creditors advanced goods and services to the debtor in the ordinary course of business, frequently without any knowledge of the debtor's financially perilous condition and without any real opportunity to protect themselves. Furthermore, the proponents of the plan who were to operate the hotel under the plan may well have needed to maintain good relations with trade creditors upon whom they would have to rely to furnish additional goods and services to the hotel. In contrast, the insiders made loans to the debtor when they were in a position to know of the debtor's financial condition and the risks involved with those loans. Also, the insiders were not going to have any ongoing relationship with the hotel after confirmation of the plan.

---

4 and 5 creditors under the Second Amended Plan. This is so because the Court will have to find those creditors to be different – *i.e.*, that they have engaged in inequitable conduct – in order to equitably subordinate their claims. In this Circuit, equitable subordination under § 510(c) is permitted when "(1) the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code." *In re Cajun Elec. Power Coop, Inc.*, 119 F.3d 349, 357 (5th Cir. 1997); *In re U.S. Abatement Corp.*, 39 F.3d 556, 561 (5th Cir. 1994) (same); *In re Imperial Tooling & Mfg., Inc.*, 314 B.R. 340, 345 (Bankr. N.D. Tex. 2004) (same). If the Court concludes that equitable subordination is appropriate, the Court's conclusion will mean, of necessity, that Class 6 creditors will come *behind* creditors in Classes 4 and 5, such that their legal rights against the estate will differ, and those subordinated claims will no longer be of equal rank and priority as the claims in Classes 4 and 5.

**Memorandum Opinion**                                                                                                    **Page 103**

*Id.* at 879.

The Plan Proponents argue that factors similar to those in *LeBlanc* support separate classification of the Insiders here. First, if the Case were converted to one under Chapter 7, the bar date would re-open, and it is likely that significant new claims would be filed against the estate by, among others, the Connecticut Client and Berg.[87] Therefore, the Plan Proponents argue that just as the insiders in *LeBlanc* would have received nothing in Chapter 7, the Insiders here would recover significantly less in a Chapter 7 liquidation when these other client claims are likely considered. The Plan Proponents also point out that only two of the twenty-six plan-defined "Insiders" have lodged an objection to the Second Amended Plan's proposed classification. Most significantly, although the Plan Proponents acknowledge that the Second Amended Plan does not contemplate ongoing operations, as was the case in *LeBlanc*, the Plan Proponents assert that the Insiders had knowledge superior to that of the Client Claimants about the risk involved in using the tax strategies, and also had the ability to try to protect themselves from liability to the Client Claimants by either causing Heritage to indemnify them or by asking for and receiving indemnification agreements from Heritage. *See also In re 11,111, Inc.*, 117 B.R. 471 (Bankr. D. Minn. 1990) (permitting separate classification of trade creditors holding general unsecured claims and insiders holding unsecured claims for loans

---

[87] Berg filed a proof of claim in the Case, which, upon the Trustee's objection to the claim, was disallowed by agreement because it was filed after the bar date. The Connecticut Client did not file a proof of claim in the Case, and, because of the confidentiality provisions of his client agreement with Heritage, has been referred to in the Case publically as only the "Connecticut Client." However, the Connecticut Client has now come forward, publicly identified himself, and filed suit against Kornman and others for fraud, etc. in the 44th Judicial District of Dallas County, Texas. Ex. P 267A. Because the Connecticut Client has "gone public," the Plan Proponents argue that it is likely that he would file a proof of claim in the Case if the bar date reopened upon conversion to Chapter 7. The Court agrees that it is likely that Lawrence Flinn, Jr., f/k/a the "Connecticut Client" is likely to file a claim in the Case if the bar date reopens because his state court counsel also represents a number of other Client Claimants in the Case.

to the debtor where insiders were aware of the financial condition of the debtor at the time of the loans and were in a position to influence the debtor's business operations).

Second, the Plan Proponents argue that the Client Claimants and the Insiders have different interests in the Second Amended Plan and the Case that justify their separate classification. The Plan Proponents assert that the Insiders have a "non-creditor" interest that can be expected to taint their votes, and point out that all of the Insiders are litigation targets in either (i) the Kornman Adversary Proceeding (which seeks to recover in excess of $40 million in avoidable transfers and damages), or (ii) other litigation to recover damages for breach of contract and to avoid pre-petition releases under Chapter 5 of the Bankruptcy Code.[88] The Plan Proponents assert that this "litigation exposure" serves as a valid basis for the separate classification of the Insiders' claims. Specifically, the Plan Proponents argue that:

> [t]he Insiders realize that approval of the reasonable settlements under the Plan will enable the Trustee to pursue these causes of action. The Insiders have a significant interest in making sure this litigation against Insiders does not continue . . . . [T]he Kornman parties' efforts to thwart the estate's litigation against Insiders manifests itself most clearly in the Kornman parties' repeated efforts to obstruct the discovery efforts of the Client Claimants . . . .

*Plan Proponents' Mem. of Law in Supp. Of Confirmation . . . and Joint Reply to Objections to Confirmation . . .* (Docket No. 1169), p. 10. The Plan Proponents assert that separate classification of unsecured creditors can be appropriate where the separately classified creditor is involved in ongoing litigation with the debtor. *In re Cornwall Personal Ins. Agency, Inc.*, No. 02-50463-RLJ

---

[88] *See Faulkner v. International Restaurant Group, LLC*, Adv. Pro. No. 06-3371-BJH and *Faulkner v. Premier Interval Resorts, Inc.,* Adv. Pro. No. 06-3372-BJH.

**Memorandum Opinion** **Page 105**

(Bankr. N.D. Tex. Feb. 28, 2003) (unpublished decision available at http://www.txnb.uscourts.gov/opinions).

Third, the Plan Proponents assert that the Kornman Parties and the Client Claimants have different legal rights against the estate that justify their separate classification. Specifically, if the settlement is approved, the Client Claimants will have fixed, liquidated claims against the estate, while the Kornman Parties' claims are contingent indemnification claims. And, according to the Plan Proponents, the Client Claimants are contractually limiting their claims against the estate by virtue of confirmation of the Second Amended Plan, while the Insiders are not.

Fourth, the Plan Proponents assert that the prohibition on separately classifying similar claims exists to prevent "gerrymandering" – *i.e.*, "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan." *In re Greystone III Joint Venture*, 995 F.2d at 1279. The Trustee testified unequivocally that the separate classification of claims in Classes 4 and 5 was not proposed in order to gerrymander an affirmative vote and that if the claimants in Classes 4 and 5 had voted together in a class, then based upon the votes actually cast on the Second Amended Plan, that single class would have voted to accept the Second Amended Plan. Ex. P 292.

Finally, the Plan Proponents assert that even Heritage (acting through its sole managing member, GMK) recognized that separate classification of the insider creditors was appropriate, pointing to Heritage's own Chapter 11 plan (filed literally the day before the scheduled hearing on the motion to appoint a Chapter 11 trustee), which classified "insiders" (as defined by 11 U.S.C. § 101(31)) separately from both general, unsecured claims and from "Litigation Claims" (which was

**Memorandum Opinion**                                                                                          **Page 106**

defined to include lawsuits filed by Canada and some of the Client Claimants). *See* Docket. No. 138, §§ 1.35, 1.39 and 2.2.[89]

In response, the Kornman Parties continue to assert that separate classification is improper for several reasons. First, the Kornman Parties argue that separate classification solely on the basis of "insider" status is improper. *In re Frascella Enters., Inc.*, 360 B.R. 435 (Bankr. E.D. Pa. 2007).[90] Next, the Kornman Parties assert that separate classification cannot be justified by alleged inequitable conduct, where no action to subordinate the Insiders' claims pursuant to 11 U.S.C.

§ 510(c) has even been filed. Third, the Kornman Parties assert that the cases that have found a legitimate business justification for separate classification are all distinguishable, because they involve debtors with ongoing business operations, and the separate classification (and often better treatment) of trade creditors can be justified on the basis that those creditors are needed for the future operations of the debtor. Fourth, the Kornman Parties assert that none of the claims of Insiders arise from loans to Heritage, made at a time when the Insiders knew or should have known of Heritage's precarious financial condition. Finally, the Kornman Parties argue that the cases that have found a "non-creditor interest" to be sufficient to justify separate classification have required a "virtually unique interest" in the future viability of the debtor, *see, e.g., Teamsters Nat'l Freight Indus. Negotiating*

---

[89] The Plan Proponents also argue that a legitimate *business* reason can justify separate classification. In most cases in which a legitimate business reason has been found sufficient to justify separate classification, however, the debtor is engaged in ongoing operations. *See, e.g., in re Briscoe Enters., Ltd.*, 994 F.2d 1160 (5th Cir. 1993). The Plan Proponents conceded that Heritage has no ongoing operations, but argue that the Trustee has the obligation under the Second Amended Plan to wind up Heritage's affairs pursuant to Heritage's formation documents, and therefore has a "business justification" for proposing a settlement which concludes substantial litigation. The cases which find a business justification for separate classification, however, generally focus on actual ongoing business operations, and thus the Court is not persuaded by the Plan Proponents' analogy to that line of cases.

[90] The Court agrees with the Kornman Parties that insider status alone is insufficient to support separate classification. However, the Plan Proponents concede that they are not relying solely upon insider status to serve as the basis for separate classification and have proffered several other bases for separate classification.

**Memorandum Opinion** **Page 107**

*Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581 (6th Cir. 1986), and that those cases are distinguishable because the Insiders here do not possess such a "unique interest" in the ongoing viability of Heritage, which has not operated since before the Case was filed.

Notwithstanding the Kornman Parties' arguments, the Court concludes that the separate classification of claims in Classes 4 and 5 is legally permissible for several reasons. First and foremost, the evidence at the Supplemental Hearing establishes that separate classification would not have been necessary to obtain an impaired, accepting class. Even if the creditors in Classes 4 and 5[91] were combined into a single class, that class would have voted to accept the Second Amended Plan by nearly 69% in number and 74% in amount of claims of voting creditors.[92] Ex. P 292; *see Beal Bank, S.S.B. v. Way Apts., D.T.* (*In re Way Apts., D.T.*), 201 B.R. 444, 451 & n.6 (N.D. Tex. 1996) (finding that separation of claims of large trade creditors and small trade creditors into two separate classes did not constitute gerrymandering because the "votes of the combined class would

---

[91] If Classes 4, 5, and 6 were combined into a single class, that class would also have constituted an accepting class.

[92] Because the validity and amount of the claims of the Client Claimants and the Kornman Parties are so hotly contested, the Court notes that all parties initially anticipated the need, prior to confirmation, for motion practice pursuant to Fed. R. Bankr. P. 3018, which provides that the court, after notice and hearing, may temporarily allow claims "in an amount which the court deems proper for the purpose of accepting or rejecting a plan." However, instead of contested Rule 3018 hearings, all parties agreed to a procedure by which their claims would be temporarily allowed in certain amounts for voting purposes in connection with confirmation. Specifically, the parties agreed that the Client Claimants' claims would be temporarily allowed for voting purposes in the amounts proposed by the Client Claimant settlement, for the limited purpose of making a determination of whether Class 4 (as defined in the Amended Plan) had voted to accept the Amended Plan. The parties also agreed that the Class 5 Kornman affiliates' claims would be temporarily allowed in the amounts set forth in amended claims filed by May 10, 2007. *See* Docket No. 1092 (the order approving the initial disclosure statement) for the specifics of the parties' agreement. The Trustee's calculation of the acceptances and rejections in the event that Classes 4, 5, and 6 were collapsed as set forth in Ex. P 292 uses these agreed-upon amounts to conclude that a collapse of those three classes would still result in a combined acceptance of the collapsed class. Even if the Court had been required to rule upon contested motions under Fed. R. Bankr. P. 3018, it is highly likely that the Court would have temporarily allowed the Client Claimants' claims in the amounts those claims were proposed to be liquidated at under the Client Claimants' proposed settlement with the Trustee, and it is highly likely that the Court would have temporarily allowed the Kornman affiliates' claims (the Insiders in Class 5) at the current, liquidated amounts of their claims. And, as the Trustee's calculations establish, the collapsed unsecured creditor class would have voted to accept the Second Amended Plan.

**Memorandum Opinion** **Page 108**

have resulted in acceptance"); *In re New Midland Plaza Assoc.*, 247 B.R. 877 (Bankr. S.D. Fla. 2000) (classification objection held moot where classes, if collapsed, would result in an impaired, accepting class); *In re Dow Corning Corp.*, 244 B.R. 634, 645 n.5 (Bankr. E.D. Mich. 1999) (noting that a conclusion of gerrymandering would be counterintuitive where 24 of 33 classes had voted to accept a plan, most by overwhelming margins).

Second, the Fifth Circuit has recognized that separate classification of claims of equal rank and priority may, in certain circumstances, be justified; the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan. Here, gerrymandering did not occur. Moreover, in the *LeBlanc* case, the Fifth Circuit used language suggesting that an insider's superior knowledge of the risks involved in doing business with the debtor, along with the opportunity to protect himself, could suffice as a basis for separate classification. *In re LeBlanc*, 622 F.2d at 879. Although the *LeBlanc* case was decided under the Bankruptcy Act, that distinction should be of no consequence because the Act also required that the division of creditors into classes under a plan of arrangement be according to the nature of the creditors' respective claims, and the general rule then was the same as it is today:

> Generally, claims of the same legal character and effect will be classified together. Creditors of a kind and of equal rank, with claims against the same property, should be placed in the same class, while creditors of a kind but of different ranks, and creditors of the same kind and rank but with claims against different properties, should be separately classified.

9 Lawrence P. King, Collier on Bankruptcy, ¶ 7.02 (14th ed. Rev. 1988) (discussing the section of the Act which preceded 11 U.S.C. § 1122).

Since the Code's enactment, the Fifth Circuit has continued to recognize the existence of valid business justifications for separate classification of claims of equal rank and priority and, in fact, has recognized that a "non-creditor interest" can also justify separate classification of like claims. For example, in *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160 (5th Cir. 1993), the debtor owned an apartment complex, and 25% of its residents received rental assistance from either the federal government or the city of Fort Worth (the "City"). Construction of the complex was financed by Heartland Federal Savings and Loan Association ("Heartland") and the City. When the debtor sought protection under Chapter 11, Heartland held a deficiency claim of approximately $10 million, and the City, which had a lien junior to Heartland, held an unsecured deficiency claim for approximately $7 million. The debtor's plan placed the City's unsecured deficiency claim in Class 3, Heartland's unsecured deficiency claim in Class 4, and general unsecured claims in Class 5. Heartland's deficiency claim was to be treated the same as the City's deficiency claim and the claims of the general unsecured creditors. Heartland objected to this classification scheme and contended that it was proposed in order to gerrymander votes. The Fifth Circuit noted that the City's claim was distinct from that of both Heartland and the general unsecured creditors, because the City had a "non-creditor interest" relating to its urban housing program and the City provided monthly rental assistance to the tenants, thus suggesting that the City was essential to the continued operation of the complex. The Fifth Circuit stated that the City's "contributions *and interests* make it distinct from Heartland and the trade creditors," *id.* at 1167 (emphasis added), and thus separate classification was justified.

Other courts have permitted separate classification of claims where a particular group of claimants holds a "non-creditor" interest that may affect its voting on a plan. *Teamsters Nat'l*

*Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581 (6th Cir. 1986) (permitting separate classification of union claims arising from collective bargaining process); *In re Lafayette Hotel P'Ship*, 227 B.R. 445 (S.D.N.Y. 1998), *aff'd* 198 F.3d 234 (2nd Cir. 1999) (permitting separate classification of tenant's unsecured claim where tenant had non-creditor interest in keeping its lease); *In re Way Apts., D.T.*, 201 B.R. 444 (N.D. Tex. 1996) (permitting separate classification where Department of Housing and Urban Development had public interest under the National Housing Act); *FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd.*, 155 B.R. 93 (D.N.J. 1993) (permitting separate classification of rejection claims of union employees where union had a non-creditor interest arising from its members' employment); *In re Premiere Network Svcs, Inc.*, 333 B.R. 130 (Bankr. N.D. Tex. 2005) (permitting separate classification of unsecured claim of direct competitor of the debtor who would benefit if the reorganization failed); *In re New Midland Plaza Assoc.*, 247 B.R. 877 (Bankr. S.D. Fla. 2000) (permitting separate classification where city, as a taxing authority, had a direct interest in the profitability of the debtor and an interest in preserving the property for the benefit of citizens); *In re Foxridge L.P.*, 238 B.R. 810 (Bankr. W.D. Mo. 1999) (permitting classification of two limited partners separately from other limited partners where the two separately classified partners had been engaged in a battle for control of the debtor); *In re HRC Joint Venture*, 187 B.R. 202 (Bankr. S.D. Ohio 1995) (permitting separate classification of city's claim where city had an interest in maintaining the debtor's hotel property for the benefit of its citizens).

The Kornman Parties point out that most of these cases are distinguishable, because the plans there at issue contemplated the continued business operation of the debtor, and most of the separately classified creditors were necessary for the debtor's continuing viability. The Court concedes that most of the non-creditor interest cases involve plans of reorganization, not liquidation.

The Court also concedes that the Plan Proponents have not cited, and the Court's research has not located, any case in which "litigation exposure" was considered as a basis for separate classification of a claim.

Nevertheless, a careful reading of many of the non-creditor interest cases cited above suggests that the courts were not focused on the facts, but on the voting motivation flowing from those facts. In other words, courts have permitted separate classification of a claimant holding a non-creditor interest where there is evidence that the claimant will vote its claim based upon its non-creditor interest in the case, rather than based upon its economic interest as a creditor. *See, e.g., U.S. Truck*, 800 F.2d at 587 ("The Teamsters Committee may choose to reject the plan not because the plan is less than optimal to it as a creditor, but because . . . rejection will benefit its members in the ongoing employment relationship."); *In re Premiere Network Svc., Inc.*, 333 B.R. at 135 ("SBC competes directly with the debtor and will likely continue to compete with the successor to the Debtor under the Plan . . . . [It] will benefit from rejection of the plan and failure of the Debtor's reorganization because these will decrease competition."). While in some cases, the non-creditor interest arises as a result of ongoing business operations, the Court concludes that an ongoing business is not a prerequisite to a finding of a non-creditor interest sufficient to justify separate classification.

Here, the Plan Proponents have sufficiently established that the Kornman Parties: (i) hold a non-creditor interest by virtue of their litigation exposure and their status as targets in the Kornman Adversary Proceeding and other litigation, and (ii) have every motivation to block approval of the settlements and confirmation of the Second Amended Plan for reasons having little to do with their status as contingent, indemnification creditors. Their non-creditor interest has manifested itself in the form of conduct designed to thwart the ongoing litigation effort by engaging in dilatory and

obstructive conduct during discovery in connection with the Case generally and in connection with the Kornman Adversary Proceeding specifically. *See supra* at pp. 28-31. The Kornman Parties have a "virtually unique interest" in ensuring that the Heritage estate remains administratively insolvent and unable to fund the high cost of continued litigation against them.[93]

While the Court understands why the Kornman Parties have objected to the Trustee's proposed settlement with the Client Claimants – *i.e.*, the Kornman Parties believe that the client agreements preclude the assertion of those claims – if that settlement satisfies the relevant legal test for approval of settlements in this Circuit, as this Court has concluded it does, *see supra* at pp. 37-84, the Court cannot think of a legitimate reason why a Heritage creditor would oppose confirmation of a simple plan of liquidation for Heritage, which is what is proposed by the Second Amended Plan. If the Second Amended Plan cannot be confirmed, the Court will have little alternative but to convert the Case to a case under Chapter 7 of the Bankruptcy Code. The Case has been pending for over three years in Chapter 11, Heritage has no ongoing business to reorganize, and if this plan of liquidation cannot be confirmed, it is unlikely that any other plan of liquidation can be confirmed. Accordingly, a liquidation of Heritage's remaining assets under Chapter 7 will be the only remaining alternative. And, from this Court's perspective, conversion to Chapter 7 is not in the interest of any Heritage creditor. This is so because upon conversion, a new bar date for the assertion of claims must be provided. Fed. R. Bankr. P. 1019 ("When a chapter 11 . . . case has been converted to a chapter 7 case . . . [a] new time period for filing . . . [claims] . . . shall commence."). And, it is likely that other former Heritage clients (who have now come forward and identified themselves publicly

---

[93] The Court also notes that the Kornman Parties oppose the settlement with Canada notwithstanding the fact that Canada has agreed to subordinate over $2 million of his allowed claim to payment to the Kornman Parties, if their claims become allowed Class 5 claims.

**Memorandum Opinion**                                                                                  **Page 113**

as former Heritage clients) would file claims in the Chapter 7 case, requiring even more litigation over the validity of those claims and, if allowed, diluting any potential distributions to creditors even further.

The Court agrees with the Kornman Parties that where all unsecured claims receive the same treatment despite their separate classification, their separate classification bears special scrutiny, as it may suggest an improper motive to gerrymander affirmative votes. *See In re Main Line Corp.*, 335 B.R. 476 (Bankr. S.D. Fla. 2005). However, on the unique facts of this Case, the Court concludes that after such special scrutiny, the separate classification of creditors in Classes 4 and 5 still passes muster, because the Court is persuaded that the Plan Proponents have not gerrymandered an accepting class.

Here, the evidence establishes valid reasons for the separate classification of unsecured creditors' claims into Classes 4, 5, and 6 (to the extent the Kornman Parties' objection truly includes Class 6). The evidence to date suggests that Kornman was the actor responsible for most of the representations claimed by the Client Claimants to be fraudulent, and it appears that Heritage had possession of the IRS letter, yet failed to disclose its existence to the Client Claimants who implemented the strategies after Heritage received such letter. That conduct, while not constituting knowledge of the precarious financial condition of the debtor that was found to exist in *LeBlanc*, is analogous. At least after May, 2001, the Insiders[94] were in a position to have superior knowledge that the Heritage tax strategies were extremely likely to be challenged by the IRS; in contrast, the Client Claimants did business with Heritage without that knowledge. The Client Claimants' claims against

---

[94] While Canada was an "insider" at that time, he testified that he was unaware of the IRS notification letter. In fact, Canada testified that he first saw the May, 2001 letter from the IRS during his deposition in the Case. Ex. P 291(Depo. of Ralph W. Canada, 11/13/06), p. 49:9-51:20.

**Memorandum Opinion** **Page 114**

Heritage are inherently different than the claims of the Kornman Parties, who not only held superior knowledge but who also tried to protect themselves from personal liability to the Client Claimants by causing Heritage to indemnify them against claims which might be asserted against them.

For these reasons, the Court concludes that the separate classification of unsecured claims into Classes 4, 5, and 6 under the Second Amended Plan is legally permissible and the Kornman Parties' objection to confirmation of the Second Amended Plan on this ground is overruled.

## 2. The "Best Interests" Test

The Kornman Parties argue that the Second Amended Plan does not satisfy the "best interests of creditors" test embodied in 11 U.S.C. § 1129(a)(7) because the Plan Proponents have structured payments (by virtue of their Intraclass Distribution Priority) in such a manner as to ensure that all available cash remaining in the estate for distribution to unsecured creditors will be distributed to the holders of Small General Unsecured Claims and Canada. The Kornman Parties argue that the effect of the Intraclass Distribution Priority is to ensure that Class 5 creditors will *not* receive the same pro rata distribution that they would get if the debtor were liquidated under Chapter 7. Specifically, the Kornman Parties argue that pursuant to the Intraclass Distribution Priority set forth in Section 4.4.3 of the Second Amended Plan, creditors holding Small General Unsecured Claims will receive 100 cents on the dollar without interest, yet holders of Class 5 claims will share ratably with the remaining Class 4 claims in whatever residual value remains after the creditor trust has completed the remaining litigation. The Kornman Parties also argue that the non-subordinated portion of the Canada claim will get the first $500,000 (after payment to the holders of Small General Unsecured Claims), while other claimants in Class 5, who are also not subordinated, will only receive a pro-rata share of a speculative distribution at some future date.

This objection to confirmation must be overruled because the Kornman Parties simply misapprehend the terms of the Second Amended Plan and the effect of the Intraclass Distribution Priority. First, the Court notes that the Bankruptcy Code specifically permits holders of claims within a particular class to agree to a less favorable treatment than that being received by other claimants within the same class. *See* 11 U.S.C. § 1123(a)(4). That is exactly what is happening here – *i.e.,* Canada and the Client Claimants have agreed to favor the claims of certain of their classmates (the holders of Small General Unsecured Claims), and the Client Claimants have also agreed to favor payment of Canada's claim to the extent of the next $500,000 of available distributions. *See* Second Amended Plan, Art. 7.9 (entitled "Less Favorable Treatment Agreement"). This agreement among Class 4 claimants is expressly permitted by the Bankruptcy Code.

But, more importantly, the Intraclass Distribution Priority does not affect Class 5 claimants at all – a fact which, if not made clear by the terms of the Second Amended Plan itself (and the Court finds that it *is* made clear in the Second Amended Plan) – was made clear by the Trustee's testimony and other evidence introduced during the Supplemental Hearing. The Second Amended Plan proposes that creditors in Classes 4 and 5 share pro rata in the funds remaining for distribution from the creditor trust after the payment of "senior" creditors. It is only that portion of the pro rata share allocable to Class 4 creditors that will be "re-distributed" under the terms of the Intraclass Distribution Priority among Class 4 creditors. Section 4.5.3 of the Second Amended Plan, which details the treatment of Class 5 claims that are not ordered to be subordinated, specifically provides that the "Pro Rata Share of the Net Available Funds from the Creditor Trust distributable on account of Allowed Insider Claims within Class 5 shall not be diminished or reduced in any way by virtue of the intraclass distribution priority provisions established for Class 4 pursuant to Section 4.4.3 of

the Plan." In short, Class 4 and 5 creditors will receive a pro rata share of the funds remaining in the creditor trust for distribution; the Intraclass Distribution Priority has absolutely no effect on Class 5 creditors.

The Trustee also testified at the Supplemental Hearing that when a distribution is made to any Class 4 creditor in accordance with the Intraclass Distribution Priority, the trustee of the creditor trust[95] is required to "reserve" an appropriate amount of cash to ensure a pro rata distribution to the holders of allowed Class 5 claims. Ex. P 293. Therefore, the Class 5 creditors whose claims are not subordinated will get under the Second Amended Plan exactly what they would get in a Chapter 7 liquidation – *i.e.*, they will share pro rata with creditors of equal rank and priority. Because the Class 5 creditors are receiving at least as much under the Second Amended Plan as they would receive in a Chapter 7 liquidation of Heritage, the Kornman Parties' objection on this ground is overruled. The Second Amended Plan satisfies the requirements of § 1129(a)(7).

### 3. Settlement of claims *against* the Estate - 11 U.S.C. § 1123(b)

The Kornman Parties contend that the Second Amended Plan fails to comply with 11 U.S.C. § 1129(a)(1) because it provides for the settlement of claims *against* the estate (*i.e.*, the settlement with the Client Claimants resolving the objections to their proofs of claim), which the Kornman Parties assert is not authorized by 11 U.S.C. § 1123(b)(3)(A). Section 1123(b)(3) states that "a plan may . . . provide for – (A) the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*." The Kornman Parties argue that because § 1123(b)(3) explicitly allows for a plan to include the settlement of claims that belong *to the debtor or to the estate*, that section

---

[95]The Second Amended Plan provides that the Trustee will serve as the trustee of the creditor trust.

prevents a plan from including the settlement of claims *against* the estate. For the following reasons, the Court disagrees.

The Court begins its analysis by acknowledging that the plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims *belonging to the debtor or to the estate*, but does not expressly provide for the inclusion in a plan of a settlement of claims *against* the estate. The Kornman Parties therefore argue that Congress' inclusion of the phrase *belonging to the debtor or to the estate* requires the exclusion of claims *against* the estate, relying on the statutory construction doctrine of *expressio unius est exclusio alterius* (the inclusion of one is the exclusion of another).

The Kornman Parties' argument might have more force had Congress not expressly stated, three sub-sections later in § 1123, that "a plan may include any other appropriate provision not inconsistent with the applicable provisions of this title." *See* 11 U.S.C. § 1123(b)(6). The Court therefore concludes that § 1123(b)(3) is not the sole source of a bankruptcy court's power to confirm a plan of reorganization that contains a settlement.[96] Rather, the Court concludes that a settlement that satisfies the standards for approval under Federal Rule of Bankruptcy Procedure 9019(a) is a settlement that is "not inconsistent with the applicable provisions" of title 11, and its terms may therefore be included in a plan under § 1123(b)(6).

---

[96] The Kornman Parties inappropriately rely on *Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 489, 496 (9th Cir. B.A.P. 2003). The court in *Dynamic Brokers* addressed the issue of whether a plan of reorganization could be used to object to a claim that had been "deemed allowed" under § 502 of the Code, thereby circumventing the claim objection procedures defined by Bankruptcy Rule 3007. *Id.* at 493. The court concluded that a plan of reorganization could not be used to circumvent the claim objection procedures defined by Federal Rule of Bankruptcy Procedure 3007. *Id.* at 497. The court discussed various sections of the Code in support of this conclusion, including relying on the fact that the language of § 1123(b)(3) permitted the settlement of claims *belonging to the debtor or to the estate* and not *against* the estate. *Id.* at 496. Because the facts and legal issues in *Dynamic Brokers* differ from those here, the Court finds that the Korman Parties' reliance on *Dynamic Brokers* is misplaced.

**Memorandum Opinion** **Page 118**

Pursuant to Federal Rule of Bankruptcy Procedure 9019(a), it is within a bankruptcy court's

discretion to approve a settlement of claims, which includes the ability to approve a settlement of

claims *against* the estate. *In re Texaco, Inc.*, 84 B.R.893, 901 (Bankr. S.D.N.Y. 1988) (citations

omitted). Moreover, approval of a settlement "may be effected separately during reorganization

proceedings or in the body of the reorganization plan itself." *Id.* Thus, a bankruptcy court may

confirm a plan that contains a compromise and settlement of a claim *against* the estate. *See, e.g. In

re Quay Corp.*, No. 05B63146, 2007 WL 2088673 (Bankr. N.D. Ill. July 17, 2007) (overruling a

creditor's objection to inclusion of a Rule 9019 settlement in a plan).

To the extent the Kornman Parties are objecting to confirmation of the Second Amended

Plan as it relates to the Canada settlement on this ground, the Court notes that the Trustee's proposed

settlement with Canada resolves potential claims against Canada *belonging to the estate,* which the

plan may unquestionably do under the express authority of § 1123(b)(3).

Under § 1126(b)(6), the Second Amended Plan may include a provision for the settlement

of claims against the estate, where that settlement satisfies the standards for approval under Federal

Rule of Bankruptcy Procedure 9019. Since the Court has concluded that the settlements with the

Client Claimants and Canada are fair and equitable and in the best interest of the estate, approval of

those settlements is "not inconsistent" with the Bankruptcy Code, and the Kornman Parties'

objection to confirmation of the Second Amended Plan on this ground is overruled.

### 4. Improper Solicitation of Votes

The Kornman Parties argue that the Trustee improperly solicited votes prior to the

transmission of a court-approved disclosure statement, in violation of § 1125(b), which provides that

a vote "may not be solicited afer the commencement of the case . . . unless, at the time of or before such solicitation, there is transmitted . . . a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." The Kornman Parties thus argue that the Second Amended Plan does not satisfy the requirements of § 1129(a)(2) and § 1129(a)(3) that the proponent of the plan comply with the Code and that the plan not be proposed by any means forbidden by law.

For the reasons stated in the Court's Memorandum Opinion and Order dated August 31, 2007 with respect to the Kornman Parties' "Motion . . . Pursuant to 11 U.S.C. §§ 1125(b) and 1126(e) for an Order Designating and Disallowing Votes of Client Claimants" (the "Designation Motion") filed on June 1, 2007, the Court concludes that the Trustee did not improperly solicit acceptances or rejections of a plan prior to court approval of a disclosure statement. Thus, the Kornman Parties' objection to confirmation of the Second Amended Plan on this ground is overruled.

The Court also rejects the Kornman Parties' argument that the same defect applies to the "term sheet" executed between the Plan Proponents and Canada. *See* Docket No. 1189, Ex. 1. Paragraph 2 of that term sheet, which was signed on June 11, 2007, states that "Canada shall withdraw his objection to confirmation of the Plan and the 9019 settlement motion and shall vote for the Plan." *Id*. A copy of the Court-approved disclosure statement was mailed to Canada on May 4, 2007. Accordingly, by the time he agreed to vote in favor of the Modified Plan, he was fully informed with respect to the Case and the terms of the Amended Plan. The fact that Canada negotiated for certain modifications to the Amended Plan in exchange for his support of the Modified Plan does not taint his vote on the Modified Plan. *Century Glove v. First. Am. Bank of N.Y.*, 860 F.2d 94, 101-02 (3rd Cir. 1988) (stating that "[w]e therefore reject any definition of

**Memorandum Opinion**                                                                                   **Page 120**

solicitation which might cause creditors to limit their negotiations"); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 Bankr. LEXIS 2192 at *34-35 (Bankr. S.D.N.Y. May 16, 2003) (stating that a narrow reading of § 1125(b) "avoids a chill on debtors' postpetition negotiations with their creditors, one which otherwise might prove devastating to the reorganization process" and quoting *In re Kellogg Square P'Ship*, 160 B.R. 336, 340 (Bankr. D. Minn. 1993)); *In re Snyder*, 51 B.R. 432, 437 (Bankr. D. Utah 1985). To hold otherwise would preclude fully informed creditors from negotiating changes to a plan that would otherwise make it acceptable to them, a result contrary to the purpose of § 1125(b).

Accordingly, the Kornman Parties' objection to confirmation of the Second Amended Plan on this ground is overruled, and the court concludes that the Second Amended Plan satisfies the requirements of §§ 1129(a)(2) and (a)(3).

## 5. Failure to Satisfy the Requirement of an Impaired, Consenting Class - § 1129(a)(10)

The Kornman Parties argue that upon the designation of the Client Claimants' votes, the Second Amended Plan will fail to satisfy the requirement that there be an impaired, consenting class of creditors who vote to accept the Second Amended Plan; thus, the Second Amended Plan fails to satisfy § 1129(a)(10). However, for the reasons set forth in the Court's Memorandum Opinion and Order dated August 31, 2007 with respect to the Designation Motion, the Court concludes that the Trustee did not improperly solicit acceptances or rejections of a plan prior to court approval of a disclosure statement. Thus, the Kornman Parties' objection to confirmation on this ground is

overruled, as the Client Claimants' votes have not been designated, and therefore at least one class

of claims that is impaired under the plan (Class 4) has voted to accept the Second Amended Plan.

Moreover, there is no motion pending to designate Canada's vote or the votes of the Small

General Unsecured Creditors on the Second Amended Plan.[97] Therefore, even if the Court were to

designate the votes of the Client Claimants in Class 4, Class 4 would still be an impaired, accepting

class, because Class 4 voted unanimously to accept the Second Amended Plan.

In addition, Class 6 voted to accept the Second Amended Plan.[98] Canada, as the sole member

of Class 6, voted to accept the Second Amended Plan. As a result, Class 6 also satisfies the

requirement of § 1129(a)(10).

For all of these reasons, the Kornman Parties' objection is overruled.

### 6. Feasibility

The Kornman Parties argue that the Second Amended Plan is not feasible since the Plan

Proponents failed to establish[99] that there will be sufficient funds to make distribution to

administrative expense creditors, priority creditors, and to pay post-effective date expenses (such as

---

[97] The Kornman Parties stated an intention "to move under section 1126(e) of the Code to designate the vote of each of the Client Claimants *and Canada*, on the grounds that such votes were solicited prior to transmittal to the Client Claimants and Canada of a court-approved Disclosure Statement . . . ." *See* Docket No. 1247 at p. 13 (emphasis added). However, no such motion has ever been filed with respect to Canada.

[98] The Kornman Parties argue, without citation to authority, that "[c]ertainly, the sole vote of Mr. Canada in Class 6 should not be sufficient to meet the requirements of Section 1129(a)(10)." *See* Docket No. 1247 at p. 8, n.2. The Court is at a loss to say why not, since the Court concludes that the separate classification of subordinated claims is legally appropriate. *See supra* at p. 102, n.86.

The Court also notes that on June 12, 2007, Canada filed a "Motion . . . to Change Vote Rejecting First Amended Joint Plan of Liquidation . . .Due to Acceptable Plan Modifications filed by Plan Proponents." *See* Docket No. 1187. The Court concludes that Canada's motion to change his vote is now moot, since the Plan Proponents have filed the Second Amended Plan and have re-solicited the votes of all creditors in Classes 4 and 6.

[99] The burden of proof to establish feasibility is on the Plan Proponents, and they must do so by a preponderance of the evidence. *In re Gen. Electrodynamics Corp.*, 368 B.R. 543 (Bankr. N.D. Tex. 2007).

**Memorandum Opinion** **Page 122**

those involved in prosecuting the Kornman Adversary Proceeding). The Kornman Parties point out that the Trustee did not prepare a budget for the litigation, and argue that "[s]ince the admitted purpose of the [Second] Amended Plan is to establish a litigation trust to pursue the estate's claims, the Plan Proponents have failed to meet their burden to demonstrate feasibility . . . . " *See* Docket No. 1247, p. 15.

For the following reasons, this Court disagrees. First, the feasibility test arises out of § 1129(a)(11), which states that the court shall confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, *unless such liquidation* or reorganization *is proposed in the plan*" (emphasis added). The relevant issue here is the application of §1129(a)(11) to a plan of liquidation.[100]

Several courts take a narrow approach and interpret the plain language of § 1129(a)(11) to say that feasibility need not be established when liquidation is proposed in the plan. *See, e.g., In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo.1988); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988). Or, to put it differently, courts find that § 1129(a)(11) is satisfied where "such liquidation . . . is proposed in the plan." 11 U.S.C. § 1129(a)(11). *In re Cellular Info. Sys., Inc.*, 171 B.R. 926 (Bankr. S.D.N.Y. 1994).

Other courts take a broader approach and apply the feasibility test to plans of liquidation, focusing their analysis on whether the liquidation itself, as proposed in the plan, is feasible. *In re*

---

[100] The Kornman Parties failed to distinguish between feasibility of a plan of reorganization and feasibility of a plan of liquidation, inappropriately relying on the legal test for feasability of a plan of reorganization in their Objection to the Second Amended Plan. Therefore, the Court does not find the Kornman Parties' arguments respecting feasibility to be persuasive.

**Memorandum Opinion** **Page 123**

*Holmes*, 301 B.R. 911, 914 (Bankr. M.D. Ga. 2003) (finding a liquidation plan not feasible where the success of the liquidation depended upon the IRS's acceptance, which had not yet occurred, of a proposed compromise of the debtor's tax obligation); *In re Yates Development, Inc.*, 258 B.R. 36, 42-44 (Bankr. M.D. Fla. 2000) (holding liquidation plan was not feasible where plan could not be effectuated absent a future, favorable appellate ruling).

Even if the broader approach is correct and the feasibility test applies to plans of liquidation, the Court concludes that the Second Amended Plan is feasible because the successful performance of its terms is not dependent or contingent upon any future, uncertain event. Rather, the creditor trust can be created, assets and claims can be transferred to it, the *res* will consist of whatever cash the estate has (including the funds to be realized from Mikron under the plan's settlement with the Client Claimants) plus the proceeds of any future successful litigation, and the governance mechanism for the trust is fixed.

Moreover, the evidence at the Supplemental Hearing established that with the approval of the proposed settlements with Berg and the Client Claimants, there will be sufficient funds to pay administrative and priority creditors, and to make an initial distribution to certain Class 4 creditors (and a corresponding initial reserve for Class 5 creditors), and that approximately $1.7 million will be left as "seed money" to fund the Kornman Adversary Proceeding and whatever other litigation the trust chooses to pursue. *See* Ex. P 293. The Trustee testified that he believes, after conversations with his counsel, that this sum will be sufficient to fund the remaining litigation. Audiotape: hearing conducted 07/31/07, at 11:04:25-11:06:01 a.m. (on file with the Court).

The Plan Proponents need not establish that success in pursuing the litigation is guaranteed, or that the creditor trust's funds will never run out. *In re T-H New Orleans L.P.*, 116 F.3d 790, 801

(5th Cir. 1997) (the court "need not require a guarantee of success"). The Plan Proponents need only establish that the Second Amended Plan is "feasible." The Second Amended Plan does not propose to pay all creditors, no matter what, 100 cents on the dollar; instead, the Second Amended Plan contemplates that all assets (including causes of action ) will be transferred to a trust, the trust will pursue certain litigation, and creditors will receive their pro rata share of whatever money the trust recovers, if any. That course of action is unquestionably feasible, given that the creditor's trust will have approximately $1.7 million with which to pursue recovery of further assets for the benefit of creditors. Ex. P 293.

Accordingly, the Kornman Parties' feasibility objection is overruled.

### 7. Unfair discrimination – § 1129(b)(1)

The Kornman Parties argue that the Second Amended Plan cannot be crammed down over their objection pursuant to 11 U.S.C. §§ 1129(a)(8) and (b)(1) because the Second Amended Plan discriminates unfairly against Class 5 (Insiders who are not ultimately subordinated). The Kornman Parties argue that Class 5 claims are of equal rank and priority with Class 4 claims – *i.e.*, both are unsecured, non-priority claims – yet Class 5 creditors will receive worse treatment, because under the terms of the Intraclass Distribution Priority set forth in Section 4.4.3 of the Second Amended Plan, creditors holding Small General Unsecured Claims will receive 100 cents on the dollar without interest, yet holders of Class 5 claims will share ratably with the remaining Class 4 claims in whatever residual value remains after the creditor trust has completed the contemplated litigation. The Kornman Parties also point out that the non-subordinated portion of the Canada claim will get the first $500,000 of distributions (after payment to the holders of Small General Unsecured Claims),

while other claimants in Class 5, who are also not subordinated, will only receive a pro rata share of a speculative distribution at some future date.

Like their "best interest of creditors" objection, *see supra* at pp. 114-16, this objection must be overruled because the Kornman Parties simply misapprehend the terms of the Second Amended Plan and the effect of the Intraclass Distribution Priority. For the reasons stated previously, the Court concludes that the Bankruptcy Code specifically permits Canada and the Client Claimants to agree to less favorable treatment of their claims than is offered the holders of Small General Unsecured Claims within Class 4. *See supra* at p. 115. Similarly, for the reasons stated previously, the Intraclass Distribution Priority does not affect Class 5 creditors at all. *See supra* at pp. 115-16.

In short, Class 4 and 5 creditors together will receive a pro rata share of the funds remaining in the creditor trust for distribution to creditors. They are treated identically, and in making an initial distribution to both the Small General Unsecured Claims and the Canada non-subordinated claim, the creditor trust's trustee will "reserve" for a pro rata distribution to the holders of Class 5 claims. Ex. P 293. There is nothing unfair about identical treatment, and Classes 4 and 5, *as classes*, are treated the same. To the extent there is a disparity in treatment as between the holders of Class 5 claims and the holders of *certain* claims in Class 4, the Kornman Parties (and other potential Class 5 claimants) are not affected by that disparity, and the parties who *are* affected (the Client Claimants and Canada) have agreed to it.

As the Code expressly permits the holders of Class 4 claims to agree as to distributions of *their* pro rata share amongst themselves, *see* 11 U.S.C. § 1123(a)(4), the Court concludes that the

Kornman Parties' objection is without merit and that the Second Amended Plan does not discriminate unfairly as between Class 4 and 5 creditors.[101]

After considering all of the Kornman Parties' technical objections to confirmation of the Second Amended Plan, the Court concludes that the Second Amended Plan satisfies all of the legal requirements for confirmation in accordance with 11 U.S.C. § 1129(a) and (b). Therefore, the Second Amended Plan shall be confirmed.

### E.    The Stand-Alone Settlement Motion

As noted previously, the Trustee also sought approval of his settlement with the Client Claimants and Mikron pursuant to a motion for approval of that settlement in accordance with Federal Rule of Bankruptcy Procedure 9019(a) (the "Stand-Alone Settlement Motion"). The Court heard the Stand-Alone Settlement Motion during the Original Hearing. If confirmation of the Second Amended Plan is granted, further consideration of the Stand-Alone Settlement Motion is unnecessary. If, however, confirmation of the Second Amended Plan is denied, consideration of the Stand-Alone Settlement Motion is necessary.

This Court has concluded that the Second Amended Plan can, and will, be confirmed, rendering the Stand-Alone Settlement Motion unnecessary. However, because the Court anticipates an appeal from its decision confirming the Second Amended Plan, this Court will proceed to

---

[101] While the Kornman Parties point to the alleged unequal treatment of creditors within Class 4 to support several of their objections to the Second Amended Plan, the Kornman Parties have not specifically argued that the Second Amended Plan violates § 1123(a)(4). Nevertheless, the Court has a "mandatory independent duty to determine whether the plan has met all of the requirements necessary for confirmation." *In re Williams*, 850 F.2d 250, 253 (5th Cir. 1988). Even if the Kornman Parties have standing to raise such an objection, *see In re Briscoe Enters., Ltd. II*, 138 B.R. 795, 807 (N.D. Tex. 1992), rev'd on other grounds 994 F.2d 1160 (5th Cir. 1993) (rejecting an unequal treatment objection because "[n]o other unsecured claimants have complained of less favorable treatment and [the objecting party] does not have standing to assert a complaint on their behalf in this regard"), the Court concludes that the requirements of § 1123(a)(4) have been satisfied because the creditors in Class 4 that are afforded less favorable treatment under the Second Amended Plan have agreed to it.

**Memorandum Opinion**                                                                                    **Page 127**

announce an alternative ruling on the Stand-Alone Settlement Motion to facilitate appellate review of both matters heard during the Original Hearing and the Supplemental Hearing. Accordingly, if this Court's decision confirming the Second Amended Plan is erroneous, and confirmation of the Second Amended Plan should have been denied, this Court would grant the Stand-Alone Settlement Motion and approve the Trustee's proposed settlement with the Client Claimants and Mikron for the reasons set forth *supra* at pp. 37-85.

## III.    CONCLUSION

There is no doubt that the litigation matters involving Mikron and the Client Claimants are complex. The Trustee has expended enormous resources, both financially and otherwise, in dealing with the disputed claims of the Client Claimants and in attempting to collect the client notes receivable. The Heritage estate is administratively insolvent and all of the remaining estate assets are illiquid. A settlement of the disputes that exist regarding the Client Claimants' claims, the Mikron Note, and certain of the remaining client notes is in the best interest of the estate. The settlement proposed by the Trustee is, on balance, a reasonable settlement of these complex litigations. The only parties in the Case that disagree with the Court's assessment of the settlement are the Kornman Parties, who are named defendants in what the Trustee believes to be the estate's most valuable remaining asset – *i.e.*, the litigation claims pending in the Kornman Adversary Proceeding. The proceeds realized from the settlement will provide the estate with the funds necessary to attempt to realize on this unliquidated, but potentially valuable asset. If the settlement is not approved and these funds are not realized, the estate will be without the financial resources necessary to continue the Kornman Adversary Proceeding to conclusion. Obviously, the Kornman Parties have a non-creditor interest in blocking approval of the settlement for this reason. This non-creditor interest causes the

**Memorandum Opinion**                                                                                          **Page 128**

Court to discount their objections to some extent. However, after carefully considering all of their objections, the Court concludes that the settlement negotiated by the Trustee with the Client Claimants and Mikron is within the range of reasonableness, is fair and equitable, and its approval is in the best interest of the estate.

Similarly, the Court is satisfied that the settlement negotiated by the Plan Proponents with Canada is within the range of reasonableness, is fair and equitable, and its approval is in the best interest of the estate. Other than the holders of Small General Unsecured Claims, Canada is the only party who holds, to date, an allowed unsecured claim in the Case, although that allowance remains on appeal to the Fifth Circuit by the Kornman Parties. As a result of this settlement, Canada has agreed to subordinate 35% of his allowed claim (some $2.18 million) to all allowed claims in Classes 4 and 5. This proposed settlement avoids the expense of continued subordination litigation with Canada and the risks associated with that litigation. While the estate is giving up claims against Canada under the Employment Agreement, the Court is satisfied that those claims are of questionable value.

Finally, the technical objections to confirmation of the Second Amended Plan raised by the Kornman Parties are without merit. The Second Amended Plan satisfies the requirements for confirmation in accordance with 11 U.S.C. § 1129 (a) and (b). Accordingly, the Second Amended Plan shall be confirmed.

## IV.     STAY PENDING APPEAL

The Korman Parties' "Objection . . . to Confirmation" includes a request that, in the event that the Court confirms the Second Amended Plan, the Court stay the confirmation order pending appeal. The Court will deny the requested stay without prejudice for the following reasons.

First, the request is procedurally deficient because it is contained in a pleading objecting to the Second Amended Plan, and is not made by motion. Federal Rule of Bankruptcy Procedure 9013 provides that a "request for an order, except when an application is authorized by these rules, shall be by written motion, unless made during a hearing."

Second, the requested stay is unnecessary at this time in light of Federal Rule of Bankruptcy Procedure 3020(e), which states that "[a]n order confirming a plan is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."[102] Thus, the confirmation order, once entered, will be automatically stayed for 10 days because this Court has not ordered otherwise, and that 10-day period will permit the Kornman Parties sufficient time to file a procedurally appropriate motion and request for expedited hearing.[103] The Kornman Parties' request for a stay is premature because at the time it was filed, the Court had not yet ruled on confirmation or issued an order confirming the Second Amended Plan. *In re Pac. Gas & Elec. Co.*, No. C-02-1550-VRW, 2002 U.S. Dist. LEXIS 27549, at *11-12 (N.D. Cal. Nov. 14, 2002).

---

[102] Rule 3020(e) applies to liquidation plans. *See, e.g., RNI Wind Down Corp.*, No. 06-10110(CSS), 2007 Bankr. LEXIS 982 (Bankr. D. Del. March 29, 2007) (citing order confirming liquidating plan ); *In re Mid-Am. Waste Sys.*, 274 B.R. 111 (Bankr. D. Del. 2001) (same).

[103] The 1999 Advisory Committee Note to Rule 3020(e) makes clear that subdivision (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under . . . chapter 11 of the Code before the plan is implemented and an appeal becomes moot."

**Memorandum Opinion**                                                          **Page 130**

Finally, even if the Court considered the request for a stay on the merits, Court would deny the request without prejudice. According to the Fifth Circuit, a bankruptcy court must consider the following factors when deciding whether to grant a stay pending appeal:

> (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest.

*Arnold v. Garlock, Inc.,* 278 F.3d 426, 438-39 (5th Cir. 2001); *In re Tex. Equip. Co., Inc.*, 283 B.R. 222, 227 (Bankr. N.D. Tex. 2002). The Kornman Parties failed to adduce any evidence with respect to any of the above four factors at the Supplemental Hearing. Therefore, this Court must deny the Kornman Parties' requested stay, without prejudice to the filing of a proper motion for a stay pending appeal once a confirmation order has been entered and a notice of appeal has been filed.

The Plan Proponents are directed to confer with counsel for Canada and the Kornman Parties as to the form of order confirming the Second Amended Plan and, in the alternative, granting the Stand-Alone Settlement Motion. To the extent the parties are able to reach agreement as to the form of the order, the Plan Proponents are directed to submit an agreed (as to form only) order to the Court. To the extent no agreement can be reached, the Plan Proponents shall contact the Court within ten days of the entry of this Memorandum Opinion and a further hearing will be held to consider the appropriate form of the order.

### ### End of Memorandum Opinion ###