U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed August 31, 2007**

*Barbara J. Houser*

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE HERITAGE ORGANIZATION, | § | CASE NO. 04-35574-BJH-11 |
| L.L.C., | § | |
| Debtor. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Trustee's Motion for Approval of Compromise and Settlement with

Carl E. Berg (the "Motion"). Gary M. Kornman ("Kornman"), Michael M. Kornman, and GMK

Family Holdings, LLC ("GMK") (collectively, the "Kornman Parties") have objected to the Motion.[1]

The Court has jurisdiction over the Motion, which was heard on June 15, 2007, in accordance with

28 U.S.C. §§ 1334 and 157. This Memorandum Opinion and Order contains the Court's findings

---

[1] The original objection to the Motion was filed on May 16, 2007 by Kornman and his son, Michael M. Kornman. On June 1, 2007, Kornman and GMK filed a supplement to the objection.

**Memorandum Opinion and Order**

of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

The Heritage Organization, L.L.C. ("Heritage") is a Delaware limited liability company that was formed in 1994. Prior to Heritage's bankruptcy filing, Heritage provided various estate and tax planning strategies to extremely high net-worth individuals for a fee. One of those individuals was Carl E. Berg ("Berg").

To put the parties' relationship into perspective, a brief background of Heritage and its "typical" relationships with its clients will be helpful.[2] In a typical Heritage scenario, Heritage cold-called the prospective client. The Heritage employees who made these cold-calls were referred to as "Initiators."[3] If the prospective client was interested in learning more about Heritage's tax and estate planning strategies, another Heritage employee, referred to as a "Contractor," would meet with the prospective client, either in person or over the telephone. If the prospective client continued to express interest in learning more about Heritage's tax savings strategies, a "Principal" would then make the sales pitch to the prospect and try to close the deal.

Heritage's sales process had several common themes. First, Heritage provided a training manual to its employees, which contained scripts to be used in making cold-calls and other contacts

---

[2]The facts contained herein that relate to Heritage's "typical" client relationships, general historical operations, and certain administrative problems encountered by the Trustee in administering the Heritage bankruptcy estate are either matters the Court is aware of from presiding over the Heritage bankruptcy case or are supported by evidence introduced in connection with contested hearings on a joint plan of liquidation filed by the Trustee and the Client Claimants (as defined in the Second Amended Joint Plan of Liquidation for Heritage) and the Trustee's motion for approval of a compromise and settlement with the Client Claimants, both of which were also opposed by the Kornman Parties. These other hearings shall be referred to herein as the "Other Settlement/Plan Hearings." The Court does not believe that these facts are disputed by the Kornman Parties.

[3]Heritage had a relatively large research department. The employees who worked within this department were responsible for identifying high net-worth individuals who might be interested in implementing Heritage's strategies. Once identified, the name of the prospective client was turned over to an "Initiator" for further contact.

with prospective clients. These scripts were to be used by employees when responding to difficult questions posed by prospective clients, and many of the scripts taught employees to use a diverting answer which sounded good, but which was truly unresponsive to the question.[4]

Second, the agreement which was ultimately executed between Heritage and its clients was very one-sided in Heritage's favor. It was, for all practical purposes, a form contract that Heritage had developed over the years, and it was presented to the prospective clients on a take-it-or-leave-it basis. While some prospective clients were able to negotiate modifications to the agreement, most were not.

Third, a key component of the Heritage sales strategy was to separate the prospective client from his/her traditional legal and/or financial advisors, as is evident from the training manual itself.[5] Once a "Principal" of Heritage was involved in the discussions, prospective clients were told that they would have to maintain strict confidentiality of Heritage's tax and/or estate planning strategies

---

[4] For example, Heritage's "Contractor Training Manual" contains a section which provides sample answers to prospective clients' "frequently asked questions." When a prospective Heritage client tells the Heritage employee – "My advisors say the [tax] problem is taken care of. Is it?" – the manual provides the following response for the employee to use: "What have they done to eliminate the tax? Well, what have they told you that your estate taxes will end up being? Well, if they haven't told you, then chances are they don't know, and that is half the problem. We have a department in our firm that does nothing but economic modeling of 'what if's' for our clients. We want to know exactly what will occur with every dollar in the estate given every possible scenario. By going through the first few steps of the process with us, and it not even costing you one dollar, we can tell you exactly what you could do to make sure the problem is solved. Call it a second opinion if you will." Ex. P 68-92, at APP 2132-33.

[5] The manual provided to Heritage's "Initiators" advises Heritage employees that "Initial meetings with outside advisors are **not permitted** under any circumstances. Outside advisors are attorneys, accountants, life insurance agents, and estate planners who have other clients besides Mr. [Prospective Client]. We will not provide an initial consultation with such advisors present. The reasons for this are relatively simple. First, most outside advisors perceive us as potential competitors. It is in their best interest to make us look as bad as possible. For this reason, many attorneys falsely tell our [prospective clients] that either [Heritage] cannot do what is promised or that the same results can be achieved at a reduced cost. Second, these outside advisors could potentially steal and/or corrupt our ideas for the benefit of their other clients. Third, most outside advisors are insistent on learning the nature of our ideas up front, and we are not willing to provide details until we are further into the process. Consult the 'Loops' section of this manual for appropriate responses to a [prospective client] who wishes to either redirect you or have such an advisor present in the initial meeting. **Again, we will not provide an initial consultation with an outside advisor present**." Ex. P 68-93 at APP 2307 (emphasis in original).

if an agreement was signed and the strategies were revealed to the client.[6]  Under the terms of the client agreements, only "Authorized Advisors" or "Authorized Persons" could see the "Strategies," without the client becoming obligated to pay Heritage an additional fee of at least $2 million.  To become an "Authorized Advisor" or an "Authorized Person," a separate agreement had to be signed with Heritage pursuant to which the "advisor" or "person" would agree to keep the "Strategies" confidential and would itself agree to pay Heritage a substantial fee for any breach of that agreement.[7]  The term "Strategies" was defined very broadly in the client agreements and typically included "the securities, contracts, Persons identified, facts, data, knowledge, documentation, opinions, combinations of concepts, ideas, techniques, methods, transactions, combinations, sequences of events, timing, financial models, diagrams, illustrations, and procedures divulged, described, communicated, detailed, arranged or identified by [Heritage], and all variations, modifications, sequences, rearrangements and recombinations thereof."  *See, e.g*., Ex. P 275 at ¶ 10.17.[8]  The combined effect of these provisions was to discourage traditional advisors from getting involved in

---

[6]These strict confidentiality provisions are interesting, given that the clients were required to acknowledge in the client agreements that "the Strategies are not necessarily composed of information which is proprietary, trade secrets or exclusively known to [Heritage]." Ex. P 275, ¶ 4.3. According to Heritage, it was the "timing, sequencing, and combinations of the various non-proprietary components of the Strategies" or the fact that "the Strategies may not be known to the [clients] even though they may be known to others" that made them so confidential. *Id*.

[7] *See, e.g.*, Ex. P 68-72.  The agreement between Heritage and Michael Mulligan, Esq. of the Lewis, Rice & Fingersh, L.C. firm ("Lewis Rice"), for example, provides in section 3.3 that if the "Advisor Reveals the Strategies to any Person other than Authorized Advisors, the Advisor agrees to pay to [Heritage] the following fees: (i) Two Million Dollars ($2,000,000) for each Person to whom the Strategies are Revealed, directly or indirectly, by the Advisor himself or through any Persons, which fees shall be due and payable, with respect to each such Person, ten (10) days after the Strategies are Revealed to such Person and (ii) if any of the Strategies are Implemented by any Person to whom the Strategies are Revealed, directly or indirectly, by the Advisor himself or though any Persons, six percent (6%) of the Value of all Property used to Implement any of the Strategies or attempt to obtain a result using the Strategies . . . ." Ex. P 68-72, § 3.3, at APP 1894.

[8]The Motion was heard during the course of the Other Settlement/Plan Hearings.  The Trustee marked his exhibits in a consecutive numbering sequence for all of these hearings.  The Trustee's exhibits relevant to the Motion were marked for identification purposes as Exhibits P 274 – P 278.

their client's relationship with Heritage.[9]

Because the client's receipt of a legal opinion from an independent advisor was a necessary component of the implementation process for any of Heritage's estate planning or tax strategies,[10] Heritage would recommend certain "Authorized Advisors" to the prospective clients.[11] Heritage told clients that these recommended lawyers were experienced, knowledgeable estate planning and/or tax specialists, who could give the independent advice about the validity of Heritage's strategies that the clients desired. However, neither Heritage nor the law firms serving as "Authorized Advisors" disclosed the extent of the prior and ongoing relationships between them.[12]

---

[9]Or, if the client's traditional advisor(s) was willing to sign its own agreement with Heritage such that it could be provided access to the strategies, the complexity of those strategies could cause the advisor to conclude that he could be of little help in analyzing the strategies, as appears to be the case with L. Ross Love, Jr. *See* Ex. P 270, Tab 7 (Excerpts of 6/7/07 Depo. of Luther Ross Love, Jr.,) at 101:10-102:24 (stating that after his advisors viewed the Heritage presentation of the strategies, the advisors said "[t]hey didn't feel that they had sufficient experience with those type [sic] of transactions to be able to provide advice . . . . They really weren't in a position to offer advice one way or the other.").

[10]The receipt of a legal opinion from an independent law firm opining that it was "more likely than not" that the Heritage strategies as implemented by the client were lawful may have served to protect the client from being liable for penalties if the IRS audited the client's tax returns and disallowed the strategy. Broadly speaking, the IRS will not penalize a taxpayer for an underpayment of taxes if the taxpayer can show that the taxpayer acted in good faith and there is reasonable cause for the underpayment, which may be shown by reasonable reliance on the advice of a professional tax advisor who concludes that there is a greater than 50% likelihood that the tax treatment will survive an IRS challenge. *See generally Santa Monica Pictures, LLC v. Comm'r,* 89 T.C.M. (CCH) 1157 (2005) (applying 26 U.S.C. § 6664(c)(1) and 26 C.F.R. 1.6662-4(g)(4)(B)).

[11]Some clients have provided affidavits in opposition to the Trustee's motion for summary judgment in connection with their contested claim objections or adversary proceedings, and have sworn there that they were (i) simply told that Lewis Rice would prepare all the implementation documents, along with the required legal opinion, and (ii) not permitted a choice in the selection of the law firm who would represent them in connection with the implementation of the Heritage strategies. *See, e.g.,* Ex. P 87, ¶ 16, at APP 6 (Affidavit of L. Ross Love, Jr.).

[12]In fact, a principal of one of the law firms, Ed Ahrens ("Ahrens") of Ahrens and DeAngeli ("A&D"), had an undisclosed override interest in Heritage's success in selling the strategies to prospective clients. Apparently, Ahrens and/or A&D itself actually developed the capital gains strategy Heritage was selling to Berg and most of the Client Claimants. For every Heritage client that implemented the strategies, Ahrens received a 5% royalty payment, indirectly through an entity set up for that purpose, FWP Technologies. Not surprisingly, the Heritage clients who relied upon Ahrens and A&D as their "independent counsel" have filed claims against Heritage in the Case seeking to recover, among other things, the fees they paid to Heritage for strategies which have generally been disallowed by the Internal Revenue Service, for, among other things, fraud and fraudulent inducement into entering into the client agreements.

Once the client agreement was signed, the client typically owed Heritage $22,500, which served to reimburse Heritage for its travel expenses in connection with meetings with the client. The client agreement did not obligate the client to use the Heritage strategies, but if the client elected to use the Heritage strategies, it owed a substantial fee to Heritage. Although the client agreement contained a detailed formula for calculating Heritage's fee, an oversimplified statement is that the client would owe Heritage 25% of the anticipated tax savings. Because of the high net-worth of the clients and the extent of the anticipated tax savings, Heritage's fee was usually several million dollars.[13] Under the client agreement, a portion of the fee, usually one-half, was due shortly after the client orally advised Heritage that it intended to implement the strategies, with the balance of the fee due ten business days after implementing the strategies. However, it was not uncommon for Heritage to agree to accept a portion of the fee in cash and to accept a note, with varying terms, for the balance of the fee.

After having sold its tax and estate planning strategies to a number of wealthy clients, Heritage filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 17, 2004, thereby initiating the underlying bankruptcy case (the "Case"). On August 13, 2004, the Court entered an order for the appointment of a Chapter 11 trustee in the Case, and on August 16, 2004, Dennis S. Faulkner was appointed as that Chapter 11 trustee (the "Trustee").

While Heritage had ceased operations prior to the filing of the Case, the Trustee, an experienced bankruptcy professional, has had a difficult time administering the Heritage estate, in large part due to the lack of cooperation in, if not outright obstruction of, that administration by

---

[13]Of the Client Claimants, the smallest fee Heritage received was $356,297 and the highest fee Heritage received was $15,096,930.

Heritage's former principals (including the Kornman Parties). Stated most simply, the persons in control of Heritage pre-petition have frustrated the Trustee's efforts to administer the estate at virtually every turn. At a minimum, they (i) failed to turn over all of the books and records of Heritage upon the Trustee's appointment, (ii) have not been candid with the Trustee throughout his administration of the estate to date,[14] and (iii) have meted out information to the Trustee as it suited their purposes. It is only after the Trustee was forced to file a motion for turn-over, which was ultimately resolved by the entry of an agreed order after a hearing before this Court, and later after a motion for contempt and sanctions was filed (for those parties' failure to comply with the earlier agreed turn-over order) and a series of hearings before this Court, that significant volumes of documents were finally disclosed and produced. In fact, the motion for contempt is still pending and was supplemented as recently as April, 2007, with the Trustee alleging that since the filing of the contempt motion, he has received "hundreds of boxes" of documents and tapes that had not previously been turned over. Moreover, the Kornman Parties are engaging in these same tactics in an adversary proceeding pending against them. *See* Adv. Pro. No. 06-3377-BJH (the "Kornman Adversary Proceeding"). The Trustee has also been forced to file a motion for turn-over, a motion to compel initial disclosures under Rule 26, and a motion for sanctions in the Kornman Adversary Proceeding. As a result of the continuing problems with the turn-over of assets, documents, and records to the Trustee, the Court directed the turn-over and production of all such assets, documents,

---

[14]By way of example only, the Trustee testified in connection with the Other Settlement/Plan Hearings that he was told early on in the Case that Heritage had leased all of its computers, and that the lessors had "confiscated" this equipment prior to his appointment. The Trustee further testified that he was told that the lessors, Strategic Leasing, L.P. and Valiant Leasing, L.L.C., were independent companies. The Trustee later learned that these entities are controlled, indirectly, by Kornman, members of his immediate family, or his long-time employees. *See* Joint Pre-Hearing Order (Docket No. 1155) at ¶¶ 16-29.

and records in the Case no later than May 17, 2006 and, in the Kornman Adversary Proceeding, directed each of the defendants to file a certification under penalty of perjury detailing the diligence of their search for responsive documents and the completeness of their production.[15] *See* Transcript of Hearing held 5/2/07 (Docket No. 128 in 06-3377-BJH). However, notwithstanding these procedures, and certain of the former principals' certifications of diligent compliance, significant amounts of documents continue to be turned over to the Trustee on a time-table that appears only to suit Heritage's former principals.[16] It is not surprising that the Trustee continues to testify that he has no confidence that he either has, or has access to, all of Heritage's assets, business records, and

---

[15]The Court has reserved for later determination the question of appropriate sanctions for these ongoing problems for at least two reasons. First, the Court was most concerned about getting the documents produced so that discovery in the myriad of contested matters and adversary proceedings in the Case could move forward expeditiously. Second, the Court wanted to be in a position to assess the damages caused by these parties' conduct at one time and *after* the Court had confidence that the Trustee had received all property of the estate to which he was entitled. The Court still has no confidence that the Court's prior orders have been complied with fully and anticipates further hearings regarding these matters.

[16]For example, some 5,000 audio tapes were turned over to the Trustee in March and April 2006, over 19 months after the Trustee's appointment. Of course, these tapes should have been turned over to the Trustee immediately upon his appointment. Heritage apparently taped many of its conversations with third parties, including its former clients and the lawyers representing those clients. It appears that these third parties were unaware that their conversations were being taped by Heritage. This production of audio tapes came after a series of hearings on the motion to compel and for contempt. While only a relative handful of the audio tapes have been transcribed (less than 200), many contain information that is relevant and discoverable in connection with the contested claim objections and/or adversary proceedings pending in the Case relating to the Client Claimants. Moreover, it appears that certain information from these audio tapes is inconsistent with positions taken by Kornman-related entities in those contested matters and proceedings, and the positions taken by the Trustee in those contested matters and proceedings. Of course, at the time the Trustee took his positions, he was unaware of the audio tapes and their potential content, as a direct result of the Kornman-related parties' failures to provide those tapes on a timely basis. An additional 3,000 audio tapes were turned over about a year later, over 30 months into the Trustee's administration of the Heritage bankruptcy estate. Specifically, these additional 3,000 tapes were provided to the Trustee literally only days before Kornman pled guilty to a criminal indictment pending against him in federal district court in the Northern District of Texas styled United States v. Gary M. Kornman, Criminal Action No. 3:05-CR-0298P (the "Kornman Criminal Case"). Kornman entered a plea agreement on April 9, 2007, in which he pled guilty to one count of making false statements to the Securities and Exchange Commission in violation of 18 U.S.C. § 1001. *See* Joint Pre-Hearing Order (Docket No. 1155), ¶ 9. Kornman was sentenced on July 11, 2007 to two years' probation. While there has not been time (or the financial resources) to transcribe any significant portion of these additional audio tapes, certain of the additional tapes that have been transcribed to date contain relevant and discoverable information in connection with the Client Claimants' contested matters and adversary proceedings. More significantly, it appears that certain of the information recovered from the recently produced tapes that have been transcribed is damaging to the Kornman-related entities' and the Trustee's position in those matters.

other documents.

Returning to the specific Heritage client at issue in the Motion, on or about December 19, 2000, Heritage, acting through its Chief Executive Officer, Kornman, and Berg entered into an agreement pursuant to which Heritage agreed to provide certain capital gains tax savings strategies (the "Strategies") to Berg for a fee (the "Agreement"). *See* Ex. P 275. Berg claims that prior to signing the Agreement, he told Kornman that

> [I] would have no problem paying the utilization fees with interest to Heritage on the condition that the plan proposed to me was not challenged by the Internal Revenue Service ("IRS") or the Franchise Tax Board ("FTB") on or before October 1, 2004. Kornman assured me not to worry because the plan of Heritage would not be challenged and that none of his plans had ever been challenged by the IRS or FTB. I relied on these statements by Kornman and signed the Agreement subject to my expressed condition.

Ex. P 277E at ¶ 3.[17] Under the Agreement, Berg owed Heritage $22,500 upon signing, which covered Heritage's travel expenses for meetings between Heritage representatives and Berg. *See* Ex. 275 at Article III.[18] Thereafter, Heritage revealed the Strategies to Berg. *See* Ex. P 278.

Berg elected to implement the Strategies, and the calculated fee due to Heritage was apparently in excess of $4.5 million. Under the Agreement, this fee was due before the expiration of ten business days after the implementation of the Strategies and, pursuant to a specially negotiated provision in the Agreement, after Berg had received an opinion letter from a law firm which "states that it is 'more likely than not' that the tax action taken is correct." Exhibit P 275 at ¶ 4.4.

However, Berg did not pay the fee in accordance with the written terms of the Agreement.

---

[17] The Franchise Tax Board is an agency of the State of California. Ex. P 277E at ¶ 6.

[18] Berg claims to have paid this amount to Heritage prior to any meeting with Kornman and another Heritage representative, Brian Czerwinski ("Czerwinski"). *See* Exhibit P 277E at ¶ 4.

**Memorandum Opinion and Order**                                                                 **Page 9**

According to Berg, that is because Kornman and he subsequently agreed to different payment terms.

Specifically, Berg contends that

> [i]n October 2001 in a phone call I told Kornman that I would go forward with the strategies and pay him $1.5 million immediately and sign a note for the balance plus interest which would only be valid and due if the IRS or FTB did not challenge my return on or before October 1, 2004. Kornman agreed to this condition.

Ex. P 277E at ¶ 3. Further, Berg contends that he "filed [his] federal tax returns in May 2001 and [his] State return in October 2001. On October 22, 2001, after my phone call and agreement on the terms above with Kornman, I wired Heritage $1,500,000." *Id*. at ¶ 4. Next, Berg contends that

> Kornman and Brian Czerwinski came to my office sometime between October 22, 2001 and December 2001 and wanted me to sign a note for the balance of the fees. I said I would sign a note for the balance of the fees with interest but only if it included wording that stated that no principal or interest was due unless the IRS or FTB failed to challenge the 2000 tax returns prior to October 1, 2004. Kornman in the presents [sic] of Czerwinski and Knapp told me that he did not want to include the additional terms that we had previously agreed to – because any indication the note was not valid at the time of signing would be very adverse to the plan's credibility if I were audited by the IRS or FTB. Kornman said he would honor our previous agreement on the payment terms and no attempt would be made to collect either the required annual principal or interest payments until October 1, 2004 had passed and no challenge of our 2000 tax return had occurred. Kornman stated that he didn't expect me to be audited, none of his clients had ever been audited over his tax plans and Heritage could defend the legal position with the IRS or FTB and would furnish me with attorneys and experts who could assist in case the tax strategies were ever challenged. I relied upon these representations by Kornman.

*Id*. at ¶ 5.

Thereafter, on December 7, 2001, Berg signed a promissory note payable to Heritage in the principal amount of $3,009,362 (the "Note"), which does not contain the parties' alleged understanding regarding the conditional nature of the Note. Ex. P 276. Berg contends that he made no payments on the Note and that Heritage made no effort to collect the Note prior to the commencement of the Case. Ex. P 277E at ¶ 5. Berg contends that Heritage made no effort to

collect the Note "because of the fact that Heritage and Kornman had agreed that no payment would be due and owing and the note would be invalid unless my tax returns were not challenged in any audit by the IRS or the FTB before October 1, 2004." *Id*. Finally, Berg contends that he was audited by the IRS in December 2003 and that he ended up settling with the IRS and the Franchise Tax Board in California, calculating his damages against Heritage to be $6,097,818.11.[19] *Id*. at ¶ 6.

The Note was turned over to the Trustee after his appointment. Because Berg had not paid the Note and it had matured in accordance with its terms in October 2004, the Trustee made demand upon Berg. According to the Trustee's testimony, Berg immediately responded to his demand and provided an informal declaration, which set forth Berg's version of the facts surrounding the Agreement, the subsequent oral modification of the Agreement, and his execution of the Note.[20] After receiving this informal declaration from Berg, the Trustee asked Kornman's counsel if Kornman would provide the Trustee with testimony regarding the Agreement and the Note. Because of the pendency of the Kornman Criminal Case, Kornman refused to provide the Trustee with any testimony, exercising his Fifth Amendment right against self-incrimination, although his counsel did advise the Trustee that Kornman disputed Berg's factual contentions.[21]

---

[19]According to Berg, this calculation excludes legal fees incurred in connection with the adversary proceeding filed by the Trustee to collect the Note. Ex. P 277E at ¶ 6.

[20]Apparently, Berg also provided an informal declaration of a person named Knapp, who corroborated Berg's factual contentions.

[21]Of course, Kornman's refusal to testify, and the apparently unhelpful statements of Heritage's only other potential witness, Czerwinski, has complicated the Trustee's ability to pursue collection of the Note. Moreover, as a result of the pendency of the Kornman Criminal Case, Kornman has also asserted his Fifth Amendment right against self-incrimination in connection with formal discovery propounded to him by Berg. Ex. P 277F. Although Kornman apparently revoked his Fifth Amendment assertion in connection with certain other adversary proceedings and the Other Settlement/Plan Hearings recently, he did not advise Berg of any such revocation and, to date, he has not supplemented any of his discovery responses.

Because the Note does not appear to be conditional, the Trustee decided to file suit to collect the Note. Accordingly, on June 20, 2006, the Trustee filed his Original Complaint seeking to collect the Note, thereby initiating Adversary Proceeding No. 06-3401 (the "Adversary Proceeding"). *See* Ex. P 277A. On or about August 11, 2006, Berg filed his Answer, Counterclaim and Third-Party Petition in the Adversary Proceeding, in which he makes an arbitration demand, asserts numerous defenses to the Trustee's efforts to collect the Note, and seeks to recover damages under a variety of legal theories from Heritage[22] and Kornman. *See* Ex. P 277B.

On November 14, 2006, this Court entered its Order denying Berg's motion to compel arbitration, after a hearing was held on that motion (the "Denial of Arbitration Order"). Berg appealed the Denial of Arbitration Order.

Thereafter, the Trustee and Berg reached an agreement on the terms of a settlement of the Trustee's claims against Berg on the Note and Berg's defenses and claims against Heritage. Accordingly, on April 26, 2007, the Trustee filed the Motion.

## II.    LEGAL ANALYSIS

### A.    Legal Standard for Approval of Settlements

This Court is authorized to approve settlements in accordance with Federal Rule of Bankruptcy Procedure 9019(a). According to the Fifth Circuit, "[a]pproval should only be given if the settlement is 'fair and equitable and in the best interest of the estate.'" *In re Cajun Elec. Power*

---

[22]Berg also filed a proof of claim in the Case. Pursuant to an Agreed Order entered on December 8, 2006, the Trustee and Berg agreed that because Berg filed his proof of claim after the bar date for the filing of claims in the Case, Berg's claim would be disallowed in full and Berg would obtain no affirmative recovery against the estate, "*provided, however*, that such disallowance shall not be deemed to constitute a substantive ruling on the merits of any of Berg's Defenses or Counterclaims in the Berg Adversary insofar as they are asserted solely as defensive claims in setoff to the Trustee's claims against Berg in the Berg Adversary." *See* Docket No. 958 (emphasis in original).

*Coop., Inc.*, 119 F.3d 349, 355 (5th Cir. 1997). In *Cajun*, the Fifth Circuit further stated that

> [t]he 'fair and equitable standard' is not as vague as it might appear to be. 'The words 'fair and equitable' are terms of art – they mean that senior interests are entitled to full priority over junior ones.' In deciding whether a settlement of litigation is fair and equitable, a judge in bankruptcy must make a well-informed decision,'compar[ing] the terms of the compromise with the likely rewards of litigation.' In particular, [the judge] must evaluate and set forth in a comprehensible fashion: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law, (2) the complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) all other factors bearing on the wisdom of the compromise.

*Id*. at 356 (internal citations omitted).[23] In explaining what bankruptcy courts must do to satisfy the first factor – *i.e.*, probability of success in the litigation, the Circuit further stated that "it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. 'The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision . . . .'" *Id*. at 356 (quoting *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir. 1987)). Finally, the Fifth Circuit noted in *Cajun* that

> [u]nder the rubric of the third, catch-all provision, we have specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider the best interest of the creditors, 'with proper deference to their reasonable views.' Second, the court should consider 'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'

*Id*. at 356 (internal citations omitted).

The parties agree this is the relevant legal standard to be applied. They disagree, however,

---

[23] To the extent that the phrase "fair and equitable" means simply that senior interests get full priority over junior ones, as the Fifth Circuit says it does, then arguably the language subsuming the four factors identified in *Cajun* is somewhat imprecise, and the four *Cajun* factors should be analyzed instead in light of the phrase "in the best interest of the estate." *In re Mirant Corp.*, 348 B.R. 725, 739 (Bankr. N.D. Tex. 2006) (noting that cases sometimes "appear to conflate the 'best interests of creditors' standard and the 'fair and equitable' standard"). The distinction in this Case, however, is without practical significance.

about its proper application here.

**B.      Application of the Legal Standard to the Motion**

**1.      Probability of success with consideration for uncertainty in fact or law**

The Trustee's suit against Berg is relatively straight-forward; it is a suit on the Note which appears to be unconditional on its face. Ex. P 277A. However, Berg's answer (and affirmative defenses), counterclaim and third-party claim make the Adversary Proceeding much more complex and infuse significant uncertainty into what appears to be a simple suit on the Note.

In his answer, Berg asserts 12 affirmative defenses to the Trustee's efforts to collect the Note, including (i) fraudulent misrepresentation, (ii) fraudulent inducement, (iii) fraud by non-disclosure, (iv) mutual mistake, (v) estoppel, (vi) breach of contract, (vii) breach of fiduciary duty, (viii) negligent misrepresentation, (ix) failure or lack of consideration, (x) illusory contract, (xi) unjust enrichment, and (xii) offset. Similarly, in his counterclaim against Heritage and third-party claim against Kornman, Berg pleads claims for (i) fraudulent misrepresentation, (ii) fraudulent inducement, (iii) fraud by non-disclosure, (iv) breach of fiduciary duty, (v) negligent misrepresentation, and (vi) negligence.

Based upon the Trustee's position in other litigation pending in this Court, the Trustee can be expected to argue that many of these defenses are barred by the provisions of the Agreement giving rise to the Note. As noted previously, the Agreement (which was drafted by Heritage) is very one-sided (in Heritage's favor) and contains multiple provisions which, if enforceable, will likely bar several of Berg's defenses and claims. For example, in section 5.1 of the Agreement, entitled "Uncertainty of Results," Berg acknowledged that results from the Strategies "are subject to interpretations of current Law and may be substantially impacted by changes of Law . . ." and that

the IRS "could possibly disallow or contest these large tax savings and that tax payments and court proceedings may be necessary to gain or defend any tax savings." Ex. P 275 at § 5.1. Similarly, in section 5.2 of the Agreement, entitled "No Reliance On [Heritage]," Berg acknowledged that he would

> act solely on the advice of [his] Authorized Advisors, that [he has] exercised and will at all times in the future exercise independent judgment in determining to enter into this Agreement and to Implement any of the Strategies or attempt to achieve a Result using any of the Strategies, and that [he has] not relied and will not rely upon any advice, information, representations or agreements, oral or otherwise, of [Heritage].

*Id*. at § 5.2. Moreover, in section 5.3 of the Agreement, entitled "Indemnification of [Heritage]," Berg agreed to release, hold harmless, and indemnify Heritage

> from Any and All Claims . . . arising out of or relating in any way to any Strategies implemented by [Berg], to any Results . . . including, by way of example but not limited to, any claims alleging negligence, gross negligence, error, omission or wrongful conduct by [Heritage], and extending to any and all damages, costs, attorneys' fees, experts' fees, valuation costs, accounting fees, penalties, interest and other results or outcomes of any and all tax returns, tax liabilities, tax positions, contracts, transfers, purchases, sales, investments and transactions with respect to any Property . . . whether or not related to taxes, to [Berg] or to any Strategies Implemented by [Berg].

*Id*. at § 5.3. Section 11.2 of the Agreement, entitled "No Other or Prior Agreements and/or Inducements," provides that

> [b]y signing this Agreement [Berg] acknowledge[s] that there were no promises, representation or agreements, oral, written or implied, made to [him] by any Party or other Person which induced [him] to enter into this Agreement. The Parties further Acknowledge that there are no other agreements between them, oral, written or implied, other than those stated explicitly in this written Agreement.

*Id*. at § 11.2. In addition, section 11.4 of the Agreement, entitled "Amendments and Supplemental Agreements," provides that

> [t]his Agreement embodies all understandings and all agreements between the

**Memorandum Opinion and Order**                                                          **Page 15**

Parties, supersedes all prior agreements and understandings, and may be changed, terminated, amended or supplemented only by an agreement, in writing, fully executed . . . by all the Parties affected by the Supplemental Agreement and delivered in accordance with any express terms hereof.

*Id*. at § 11.4. Finally, just above the signature block, the Agreement provides, in bold, that "[t]his written Agreement represents the final agreement between the Parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the Parties. There are no unwritten oral agreements between the Parties." *Id*. at p. 10.

The Trustee is likely to rely very heavily upon these provisions to assert that Berg's defenses (and claims to offset) are barred. Similarly, the Trustee is likely to argue that the Note is unconditional on its face, and that Berg's alleged condition to the payment obligation otherwise stated in the Note – *i.e.*, that Berg not be audited by the IRS or the FTB by October 2004 – cannot be found in the Note. Ex. P 276. In addition, the Note recites in paragraph 11 that "[t]his Note may not be changed orally but only by an agreement in writing, signed by any party against whom enforcement of any waiver, change, modification or discharge is sought." *Id*. at ¶ 11.

While these contractual provisions and the unconditional nature of the Note may defeat certain of Berg's defenses and/or counterclaims, it appears equally likely that several of those defenses and/or counterclaims would, for the reasons stated below, survive a motion for summary judgment, if the Trustee were to file one. Therefore, notwithstanding the onerous contractual provisions and unconditional nature of the Note, the Court concludes that there are complex legal and factual issues which raise serious questions about the probability of the Trustee's success in easily disposing of Berg's defenses and claims to offset.

For example, Berg contends in his breach of contract defense that there was a subsequent oral

amendment to the Agreement, pursuant to which Heritage and Kornman agreed that Berg would pay "$1,522,500 for the tax strategy and advice that was conditioned on the balance of the note not being collected if there was an audit within three years of the date that the tax returns were filed." Ex. P 277B at ¶ 43. Berg has sworn in his declaration to facts that would demonstrate such a subsequent oral amendment, and should be expected to so testify at any trial. Ex. P 277E at ¶¶ 3 & 5. Berg therefore contends that the Trustee's attempt to collect the Note breaches the Agreement, as modified by the parties after its execution. Berg further contends that his damages would be any amount he is found to owe to Heritage under the Note. Berg seeks to offset these amounts against each other, resulting, according to Berg, in no recovery by the Trustee.

There is substantial legal authority in Texas supporting Berg's ability to assert such a defense. Texas law allows parties to orally modify a written agreement, even when the written agreement purports to bar such subsequent oral modifications. *In re The Heritage Organization, LLC*, No. 3:06-CV-0578-H, 2006 WL 2642204 at *3 (N.D. Tex. Sept. 14, 2006) (stating that "[u]nder Texas law older than the undersigned senior judge, an oral agreement may supersede a written agreement not required by law to be in writing, even if the written agreement prohibits oral modification," and citing a Texas Supreme Court decision from 1887); *Am. Garment Props., Inc. v. C.B. Richard Ellis - El Paso, L.L.C.*, 155 S.W.3d 431 (Tex. App. – El Paso 2004); *Lone Star Steel Co. v. Scott*, 759 S.W.2d 144 (Tex. Civ. App. – Texarkana 1988).

Factually, the Trustee has been unable to refute Berg's contentions of a subsequent oral amendment to the Agreement because, as noted earlier, Kornman has thus far refused to testify, asserting his rights under the Fifth Amendment. However, even if Kornman agrees to testify by the time the Adversary Proceeding goes to trial and then refutes Berg's anticipated trial testimony, the

**Memorandum Opinion and Order**                                                    **Page 17**

Trustee testified that he is concerned about Kornman's credibility as a witness, in light of Kornman's recent guilty plea (to lying to the SEC) in the Kornman Criminal Case. The Trustee also testified that Berg's version of the facts has been corroborated by (i) Knapp's informal declaration, and (ii) Heritage's own records, which show that no payments were made on the Note and yet Heritage made no effort to collect the payments which came due but went unpaid. Heritage's books are thus consistent with Berg's contentions that the payment provisions of the Agreement were amended and, in light of the audit of his tax return, he does not owe Heritage any further fees.

For at least these reasons, the Court concludes that the Trustee faces substantial uncertainty, both factually and legally, in attempting to defeat Berg's breach of contract/subsequent oral modification defense. For similar reasons, the Court also concludes that there is substantial uncertainty facing the Trustee on both the facts and the law, with respect to Berg's fraudulent inducement defense to enforcement of the Note. To prevail on this defense, Berg must prove the elements of fraud as they relate to an agreement between the parties. *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001). That is, fraudulent inducement is "a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." *Id*.

As noted previously, Berg states in his declaration that he agreed to sign the Note based upon Kornman's assurances that (i) Heritage would honor its oral agreement modifying the payment terms of the Agreement, (ii) no attempt would be made to collect any payments on the Note until October 1, 2004 had passed and no challenge of Berg's 2000 tax return had occurred, (iii) Kornman did not expect Berg to be audited, (iv) none of Heritage's clients had ever been audited over its tax plans, and (v) that Heritage could and would defend the strategies if Berg was ever audited. Ex. P 277E at ¶ 5.

The Trustee will likely argue that the provisions of the Agreement bar this defense.[24] However, the general rule in Texas is that waiver/release/merger/reliance disclaimer clauses such as the ones contained in the Agreement can be avoided by proof of fraud in the inducement, and the parol evidence rule does not bar proof of such fraud. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex. 1997).

The Court anticipates that the Trustee will attempt to carve around this general rule, however, by relying upon its exception, also described in *Schlumberger*. The *Schlumberger* court held that such clauses can, in certain circumstances, negate the reliance element of a fraudulent inducement claim and bar such a claim as a matter of law. In summary, the *Schlumberger* court held

> that a release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement. We emphasize that a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim. We conclude only that on this record, the disclaimer of reliance conclusively negates as a matter of law the element of reliance . . . .

*Id*. at 181 (internal citations omitted). Both the state and federal courts in Texas since *Schlumberger* have struggled with the circumstances under which such clauses will or will not be binding, and will or will not negate the reliance element of a fraudulent inducement claim. According to the *Schlumberger* court, "[t]he contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding." *Id*. at 179.

The Trustee, the Kornman Parties, and the Client Claimants have briefed this issue extensively in other litigation in the Case, and the Court can therefore anticipate the parties' legal positions should the Adversary Proceeding continue to either summary judgment or trial. The

---

[24] The Trustee's briefing does not explain his contention that a provision in the Agreement bars a fraudulent inducement defense with respect to the later-signed Note, which does not include a "waiver of defenses" provision.

Trustee and the Kornman Parties will likely assert that the Adversary Proceeding falls within the *Schlumberger* exception and thus Berg's fraudulent inducement defense and claim of setoff are barred as a matter of law. *See, e.g.*, *Armstrong v. Am. Home Shield Corp*., 333 F.3d 566 (5th Cir. 2003); *Steinberg v. Brennan*, No. 3:03-CV-0562, 2005 WL 1837961 (N.D. Tex. July 29, 2005). Berg, on the other hand, can be expected to argue that the Adversary Proceeding is more like those post-*Schlumberger* cases which uphold the general rule that waiver/release/merger/reliance disclaimer clauses such as the ones contained in the Agreement can be avoided by proof of fraud in the inducement, and the parol evidence rule does not bar proof of such fraud. Ultimately, this Court will be called upon to decide whether the fraudulent inducement defense is barred as a matter of law under *Schlumberger* and its progeny. In assessing the probability of the Trustee's success on this issue, this Court concludes that it is more likely than not that Berg's fraudulent inducement defense would survive a motion for summary judgment if one were filed.

Briefly, the *Schlumberger* court put particular emphasis on the following facts: the parties before it were dealing at arm's length. Both were equally sophisticated in the relevant subject matter in dispute (there, diamond mining). The party asserting the fraudulent inducement claim had competent (and presumably independent) legal counsel representing it in drafting the agreement which contained the contractual language alleged to bar the subsequent fraudulent inducement claim. And, significantly, the contractual language which was alleged to preclude the fraudulent inducement claim was contained in a document (there, a settlement agreement and release), the very purpose of which was to end the parties' dispute about the (mis)representations which allegedly formed the basis of the fraudulent inducement claim. The parties had already been embroiled in the dispute at the time the release was signed, and thus the release formed a significant part of the basis of the

bargain. *See Carousel's Creamery, LLC v. Marble Slab Creamery, Inc.,* 134 S.W.3d 385 (Tex. App. – Houston [1st Dist.] 2004). The *Schlumberger* court appeared concerned about finality – "the ability of the parties to fully and finally resolve disputes between them. Parties should be able to bargain for and obtain a release barring all further dispute." *Schlumberger,* at 179. As one Texas court has summarized *Schlumberger*, when concluding that a fraudulent inducement claim was barred as a matter of law by the contractual language at issue there, the *Schlumberger* court focused on:

> the parties (1) were attempting to end their relationship, (2) were 'embroiled in a dispute,' (3) were dealing at arm's length, (4) were represented by highly competent and able legal counsel during the negotiations over the terms of the release itself, (5) were knowledgeable and sophisticated business players, and (6) the terms of the release 'in clear language . . . unequivocally disclaimed reliance' on the specific representations of the value of the project which representations were the basis for the . . . lawsuit.

*IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 125 (Tex. App. – Houston [14th Dist.] 2003) (quoting *Schlumberger*, at 179-80).

The Texas state court cases decided post-*Schlumberger* appear to require facts similar to *Schlumberger* before concluding that a fraudulent inducement claim has been contracted away. *See, e.g.*, *Coastal Bank SSB v. Chase Bank of Texas, N.A.,* 135 S.W.3d 840 (Tex. App. – Houston [1st Dist.] 2004) (fraudulent inducement claim barred by contractual disclaimer of reliance contained in a lending syndicate contract between two financial institutions); *Carousel's Creamery,* 134 S.W.3d at 393-94) (fraudulent inducement claim *not* barred by merger/integration clauses in a franchise agreement where the agreement was not intended to resolve an ongoing dispute between the parties and the franchisee was not represented by counsel in negotiating the agreement); *Woodlands Land Dev. Co., L.P. v. Jenkins*, 48 S.W.3d 415 (Tex. App. – Beaumont 2001) (fraudulent inducement claim

*not* barred by "as is" clause in real estate contract where buyer was not knowledgeable in real estate and the contract did not have the specific purpose of ending a dispute); *Yzaguirre v. KCS Res., Inc.*, 47 S.W.3d 532 (Tex. App. – Dallas 2000) (merger clause in a settlement agreement which contained terms respecting royalty payments precluded subsequent claim that lessors were fraudulently induced by promises of royalty payments); *Fletcher v. Edwards*, 26 S.W.3d 66 (Tex. App. – Waco 2000) (fraudulent inducement claim *not* barred by "as is" clause in real estate contract where contract was not resolving a dispute about the subject matter of the alleged representations, buyers were not represented by counsel and were not sophisticated in real estate).[25]

*Schlumberger* thus appears to be a fact-sensitive ruling. As should be apparent, Berg's declaration, when read in light of the case law discussed above, raises serious fact questions, and the Court concludes that there are likely to be significant impediments to an easy recovery by the Trustee. It is unlikely that the Trustee could prevail on a motion for summary judgment on the fraudulent inducement defense.

The Trustee faces factual hurdles as well. As noted earlier, the Trustee can be expected to argue that the waiver provisions of the Agreement preclude Berg's fraud/fraudulent inducement

---

[25] The federal district court in *Steinberg v. Brennan*, No. 3:03-CV-0562, 2005 WL 1837961 (N.D. Tex. July 29, 2005) noted that *Schlumberger* is "open to different interpretations." *Steinberg*, at *4. The *Steinberg* court then analyzed decisions from the *federal* courts within the Fifth Circuit which purported to interpret Texas state law, and concluded that "Fifth Circuit authority contradicts [the] assertion that *Schlumberger* was specific to the facts of that particular situation. The Fifth Circuit has routinely enforced disclaimers of reliance on the basis of contractually evident intent, without requiring the particular constellation of facts that appeared in *Schlumberger*." *Steinberg*, at *5. However, as noted earlier, Texas state courts have not been quite as forgiving, and continue to look at the factual similarity of the cases pending before them to those of *Schlumberger* – likely because the *Schlumberger* court itself emphasized that "a disclaimer of reliance or merger clause will not always bar a fraudulent inducement claim. We conclude only that on this record, the disclaimer of reliance conclusively negates as a matter of law the element of reliance . . . ." *Schlumberger*, at 181. This Court concludes that a narrower interpretation of the circumstances under which a prospective reliance disclaimer is enforced is appropriate. Otherwise, courts are encouraging parties to make material misrepresentations to another contracting party while denying any opportunity for redress to the party who had no ability to know of the misrepresentations being made to induce it to enter into the contract.

defense and counterclaims. Ex. P 275 at § 5.3. However, waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right, *In re Gen. Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006), and the record, as it currently stands, suggests that Berg had no way of knowing about the false statements made by Heritage at the time that he signed the Note. Specifically, the evidence is undisputed that Heritage was notified by the IRS by hand-delivered letter[26] that the IRS was "concerned" that Heritage's tax strategies "lack economic substance and that investors in such transactions may claim artificial tax losses." *See* Ex. P 68-80 at APP 1976. Moreover, the IRS asked Heritage to identify all of its clients who had entered into any of the transactions described in the letter within fourteen days. Berg was one such client. The IRS also asked Heritage to provide all memoranda, correspondence, and any other documents related to any transaction described in the letter, including promotional and marketing material, and other, similar documents. *Id.* at APP 1977, 1979. Accordingly, at the time Berg signed the Note several months later, Heritage knew that it was extremely likely that Berg would be audited by the IRS. Yet, Berg's declaration states that Kornman assured him that Kornman did not expect Berg to be audited and that no Heritage client had ever been audited. Moreover, Kornman failed to disclose the IRS notification. Berg should be expected to testify at trial that he would have never signed the Note in December 2001, if he had known that Heritage was under investigation by the IRS and that the IRS

---

[26]It appears a similar letter from the IRS was sent to Heritage by certified mail on February 21, 2001. Ex. P 68-30 at APP 879 (Decl. of Anthony Ellis dated 12/21/06). Heritage disputes receiving this letter. Notwithstanding this dispute, the Court notes that an IRS letter dated February 21, 2001, which bears the same certified mail number as the one identified in the Ellis declaration, *was produced during discovery by Heritage,* Ex. P 291, Depo. of Ralph Canada 11/13/06 at p. 50:1-52:2, and the Trustee testified that Heritage had not turned over the letter to the Trustee upon his appointment or at any time thereafter. Audiotape: hearing conducted 07/31/07 at 10:26:46-10:27:59. It appears that the IRS elected to hand-deliver the May letter because the IRS never received the return receipt for the February letter, despite submitting two "trace requests" to the post office. *See* Ex. P 68-30 at APP 880 (Decl. Of Anthony Ellis dated 12/12/06).

had asked Heritage to identify him as a user of the allegedly invalid strategy. As the Adversary Proceeding currently stands, the Trustee has no ability to refute these factual contentions.

For at least these reasons, the Court concludes that the Trustee faces substantial impediments to a greater recovery than the one proposed in the settlement.

### 2.  Complexity, duration and expense of the litigation

The factual and legal issues as recited above are complex, and there is evidence that the Adversary Proceeding may not be quickly resolved.[27] First, Berg would prefer to arbitrate this dispute. Although the Agreement contains an arbitration clause, the Note does not – a fact which caused this Court to conclude that it could not compel arbitration here. The Denial of Arbitration Order is currently on appeal. If Berg is ultimately successful in compelling arbitration of these claims, a forum the Trustee opposes would be the only available forum, with an unknown delay in an ultimate resolution. Nor does arbitration necessarily signal the end to litigation. *See, e.g., In re The Heritage Organization, LLC*, No. 3:06-CV-0578-H, 2006 WL 2642204 at *4 (N.D. Tex. Sept. 14, 2006) ("The following is the decision of the seventh judge to hear this four-year-old case, for which speedy resolution by alternative means was intended."). Second, it appears likely (given Berg's prior appeal of the Denial of Arbitration Order) that an appeal will be taken from this Court's final decision at trial, which would delay the finality of any judgment in the Trustee's favor. Depending on the appellate outcome, it is even possible that a retrial of some issue or issues would

---

[27] While the Trustee did not provide the Court with a specific estimate of the likely duration of the litigation, he did recite the relevant facts that will affect that length.

be required.[28]

The Trustee testified that the cost of litigating this Adversary Proceeding would be "significant," and that resolution of the Adversary Proceeding "would take an extensive amount of time and would require an extensive amount of legal cost."[29] This testimony militates in favor of approval of the settlement, despite the absence of a specific budget of projected legal fees, for several reasons. First, the Court need only "form an educated estimate" of the expense of the potential litigation. *Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). This "educated estimate" has been described as an analysis of "the likelihood of complex and protracted litigation, with its attendant expense, inconvenience and delay," *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2nd Cir. 2007) (internal quotations omitted), suggesting that expense and delay is inevitable once the Court determines, as it has in this Adversary Proceeding, that complex and protracted litigation will ensue if the settlement is not approved. Moreover, a proper consideration in evaluating a settlement is the "experience and knowledge of the

---

[28]The good news, if there is any in this scenario, is that collection of a final judgment, assuming a judgment in the Trustee's favor becomes final, should be easy – either because Berg superceded the judgment with a bond and/or because of Berg's substantial wealth – *i.e.*, the Trustee testified that Berg was a Forbes 400 individual.

[29] The Trustee did not provide the Court with a budget of fees and expenses for these trial or appellate contingencies. However, a review of the Fifth Interim Application of [Trustee's counsel] for the Allowance of Fees and Expenses for the Period February 2006 through August 2006 ("Fifth Fee Application," of which this Court may take judicial notice) shows that between the date of the filing of the Adversary Proceeding on June 20, 2006 and the Trustee's filing of an answer to Berg's counterclaim on September 1, 2006, Trustee's counsel has expended 15.3 hours at a cost of approximately $5,000. Since that time, the Trustee's counsel has not filed another interim fee application, but has performed significant work in connection with the Adversary Proceeding. Specifically, the Trustee (i) has defended Berg's motion to compel arbitration, and is currently defending the appeal of the Denial of Arbitration Order, (ii) moved to consolidate the Adversary Proceeding with the objection to the Berg proof of claim, (iii) negotiated an agreed resolution of the claim objection, (iv) negotiated an agreement to supplement the protective orders entered in the Case to include materials produced in connection with the Adversary Proceeding, and (v) has successfully defended Berg's motion to withdraw the reference. None of the time expended in connection with these services was accounted for in the Fifth Fee Application. Moreover, it appears there is much left to do, should the Adversary Proceeding continue to trial, as discovery is in its infancy and, for the reasons noted earlier, is likely to be a time-consuming and expensive process in light of the recent production of thousands of tapes, the vast majority of which are not identified or transcribed.

bankruptcy court judge reviewing the settlement." *Id*. This Court regularly considers fee applications which include requests for fees in connection with appeals from complex litigation matters like the Adversary Proceeding. Second, this Court is intimately familiar with the Case and all of the contested matters and adversary proceedings pending in the Case, including all of the difficulties the Trustee has encountered in trying to gather Heritage's assets and records, and in attempting to collect on Heritage's assets, including the client notes receivable and other litigation claims which comprise Heritage's remaining assets. For these reasons, this Court knows the typical range of legal fees incurred in complex, protracted litigation and that knowledge, coupled with the Trustee's testimony that the cost of litigation will be "significant" and "extensive," forms a sufficient basis upon which this Court may form an "educated estimate" that the Berg litigation, if it continues through discovery (which, as noted earlier, has not occurred easily in the Case), trial, and the appellate process, will likely be expensive and take years to finally determine.

### 3.    Other factors bearing on the wisdom of the compromise

The Court has considered two other factors to be of particular significance, both of which militate in favor of approval of this settlement. First, on the date of the hearing on the Motion, the Heritage bankruptcy estate was administratively insolvent,[30] and the Trustee needs the proceeds of

---

[30]The Trustee testified that he has about $940,000 of cash on hand and unpaid administrative expenses through April 30, 2007 of slightly in excess of $1,000,000 (professional fee hold backs from prior approved fee applications and un-billed time and expenses of estate professionals). While not technically part of the evidence admitted in connection with the Motion, the Court has heard evidence elsewhere which leads it to believe that the estate is administratively insolvent even after receipt of the proceeds of certain other settlements which the Court has recently approved (settlements with Kroney-Mincey, Inc. and Robert Kroney which has resulted in a payment to the estate of $300,000 and with the Koshland Family Partnership, *et al*., which has resulted in a payment to the estate of $400,000) are taken into account. Specifically, after the conclusion of the Other Settlement/Plan Hearings, the Trustee and Client Claimants filed a second amended joint plan of liquidation, and a hearing was held on July 31, 2007 to consider its confirmation (the "Supplemental Hearing"). The evidence introduced at the Supplemental Hearing establishes that without approval of the settlements with Berg and the Client Claimants, the estate will have cash on hand as of June 30, 2007 in the amount of $1,652,407. *See* Ex. P 293. Administrative expenses as of June 30, 2007 total $1,942,474. *Id*. Since the parties agreed that the evidence introduced at the Other Settlement/Plan

this settlement to fund the collection of assets which he deems to be more valuable. The remaining Heritage assets are all illiquid. Some assets are unliquidated claims with litigation already on file in this Court, which the Trustee values at a maximum of approximately $41.5 million.[31] Other Heritage assets are unliquidated claims without any litigation yet pending but with tolling agreements with the potential defendants to prevent the running of statutes of limitations.[32] Still other assets are liquidated in amount, but will likely require collection litigation and are perhaps uncollectible.[33] Finally, there are the five other client notes. The Trustee proposes to forgive three of these notes – *i.e.*, the two Skinner trust notes and the Love note, and to settle the Mikron note for a cash payment of $2,750,000 in connection with the Other Settlement/Plan Hearings. The final client note – *i.e.*, the Schuler note (valued at a range of $0 – $5,119,208) – only recently matured, and although demand has been made no payment has been received, suggesting that litigation will also be required to collect this note.

Obviously, the common denominator with all of Heritage's remaining assets is that the Trustee must have funds in order to attempt to realize on these assets either through the commencement of litigation in which contests can be expected, the continuation of existing and

---

Hearings would also be admitted with respect to the Motion, the Court believes that the parties also intend that the evidence introduced at the Supplemental Hearing be considered with respect to the Motion, although no party has made such specific request.

[31] The Trustee values the claims pending in the Kornman Adversary Proceeding at a range of $0 – $40,747,512; the Premier receivable claims (a Kornman-related entity) at a range of $0 – $470,000; and the International Restaurant receivable claims (a Kornman-related entity) at a range of $0 – $270,000. Ex. P 2, Ex. B-2.

[32] The Trustee testified that he has potential avoidance claims against (i) Ahrens and FWP Technologies (the entity Ahrens apparently created to receive the 5% royalty payments from Heritage's sale of the strategies to its clients) valued at a range of $0 – $3,048,196; and (ii) Lynn, Tillotson & Pinker, LLP (one of the firms representing the Kornman Parties in connection with the Motion) valued at a range of $0 – $2,559,758. On August 13, 2007, while this Memorandum Opinion and Order was being finalized, the Trustee sued Lynn, Tillotson & Pinker LLP and certain of its partners to avoid certain transfers of Heritage assets to them. *See* Adv. Pro. No. 07-3247.

[33] The Trustee testified that he holds two judgments against Kornman-related entities (Einstein's Pad and Southwest Security) that he does not expect to be able to collect.

**Memorandum Opinion and Order**                                                                 **Page 27**

contested litigation, or the commencement of collection efforts against recalcitrant Kornman-related entities. Stated most simply, without approval of this settlement and the settlement proposed in the Trustee's motion to approve a compromise with the Client Claimants (which will result in a payment to the estate of another $2,750,000),[34] the Trustee will not have sufficient funds to pursue what the Trustee and the other creditors believe are the estate's most valuable remaining assets – *i.e.,* the claims pending in the Kornman Adversary Proceeding against Kornman and his affiliates. Not surprisingly, the Kornman Parties oppose both settlements.

The Trustee, without opposition from anyone but the Kornman Parties, has chosen to liquidate the Berg Note in order to have the funds to attempt to realize on the claims pending in the Kornman Adversary Proceeding and in other litigation. The $975,000 that the estate will receive upon the approval of this settlement will assist the Trustee in his efforts to collect on those assets. The Trustee's decision to settle with Berg is a rational one, made by him in the exercise of his reasonable business judgment, and the Court finds, after comparing the terms of the compromise with the likely rewards of litigation, that the compromise is fair and equitable and in the best interest of the estate.

In addition, the Court has considered the best interests of the creditors, with proper deference to their *reasonable* views. *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) (emphasis added). The creditor body in the Case can be divided into five groups: (1) the IRS, a priority creditor who has not been active in the Case and who has not opposed the settlement; (2) sixteen small, non-client creditors, none of whom has been active in the Case or has opposed the

---

[34] The Trustee's motion to approve the compromise with the Client Claimants, filed as a stand-alone motion, is unnecessary if the Trustee and Client Claimants' second amended joint plan of liquidation (which embodies the terms of the settlement with the Client Claimants) is confirmed.

settlement;[35] (3) the Client Claimants, whose filed proofs of claim aggregate some $109 million and whose claims the Trustee has proposed to settle for about $20 million, all of whom have been active in the Case and none of whom opposes the settlement; (4) Ralph Canada, the former President of Heritage (who sold the strategies to several of the Client Claimants), whose allowed claim in the Case is approximately $6.2 million, who has been active in the Case and who has not opposed the settlement,[36] and (5) Kornman, various Kornman-related entities, and certain other Heritage/Kornman employees and/or former employees, most (in dollar amount) of whose claims are contingent and/or unliquidated indemnity claims.[37]

With the exception of the IRS and the sixteen small creditors, it is a significant

---

[35] The sixteen small claims aggregate some $45,000; two of the claimants hold $40,000 of the $45,000 of aggregate claims. One of those two claimants (holding a claim for approximately $13,000) withdrew its proof of claim on July 30, 2007. *See* Docket No. 1252.

[36] The claim arises from Canada's entitlement to a commission on the fee paid to Heritage by a particular client. Allowance of the Canada claim is currently on appeal to the Fifth Circuit by Heritage (out of possession), Kornman, and GMK. Canada initially joined (but later withdrew that joinder) in the Kornman Parties' objections to confirmation and to the settlement with the Client Claimants, but his joinder specifically states that "Canada is not joining or adopting any objections . . . as to the settlement with Carl E. Berg." *See* Docket No. 1146, ¶ 4.

[37] For example, Heritage's formation documents contain a very broad indemnity provision covering its officers and employees and giving Heritage discretion to indemnify others in certain circumstances. Kornman has filed a proof of claim in the Case claiming a right to indemnity. As part of the contested confirmation hearings, both the Client Claimants and Kornman and his entities/employees had to provide statements of the amounts of their claims and the theories upon which those claims are asserted. Kornman's statement alleges that his indemnity claim is more than $64 million. In addition, on May 10, 2007, Kornman filed an amendment to his proof of claim, clarifying what amounts of his indemnity claim are currently liquidated. Kornman claims some $6 million of liquidated indemnity claim, nearly all of which are reimbursement for the legal fees and costs he has incurred in defending himself against suits brought against him by unhappy former Heritage clients and, surprisingly, for defending himself in the Kornman Criminal Case, which, as previously noted, resulted in his plea of guilty to a charge of lying to the Securities and Exchange Commission. Kornman's lawyers assure the Court that Kornman's indemnity agreement with Heritage is broad enough to include the Kornman Criminal Case fees and expenses. The Kornman claim has been objected to by the Trustee, but no hearing has yet been held on the claim objection. It appears likely, as Kornman's lawyer admitted during closing argument in connection with the Other Settlement/Plan Hearings, that Kornman's claim will be disallowed pursuant to § 502(d) of the Bankruptcy Code once the Trustee's objection is heard, given that avoidance claims currently pend against him in the Kornman Adversary Proceeding. Of course, that possible disallowance could be subject to reconsideration by the Court under § 502(j) of the Bankruptcy Code, depending upon the outcome of the avoidance litigation.

understatement to say that the other creditor groups do not care for each other. The Client Claimants, who dealt primarily with Kornman or Canada, believe that they were defrauded by Heritage.[38] None of the tax strategies that these Client Claimants "bought" from Heritage withstood IRS scrutiny, and all of the Client Claimants have incurred substantial fees undoing the strategies. They have not only paid the taxes that the Heritage strategies were supposed to save them, but have also paid interest on the taxes and, in most cases, penalties. Kornman's lawyers argue that the Client Claimants understood that the agreements they signed bar the claims they now make, and that the Client Claimants simply feel stupid for having bought into inherently risky tax strategies. As for Canada, a Harvard lawyer, the Client Claimants point out that after leaving Heritage, Canada "switched sides" and began suing other tax promoters like Heritage for defrauding clients[39] – an irony not lost on the Client Claimants.

With this background of who the creditors are, the Court notes that the only creditors objecting to the Berg settlement are Kornman, his company, and his son. As the targets of much of the Trustee's remaining litigation efforts, it is in the Kornman Parties' interest to block any settlements that the Trustee proposes, since the Kornman Parties would presumably like the estate to remain financially unable to pursue the litigation against them.[40] The only objectants to the

---

[38] Some of the Client Claimants also dealt with another Heritage principal, Anthony Bird.

[39] The Court understands that Canada's firm has been quite successful in these suits, including a significant participation in the litigation that resulted in the financial demise of a well-regarded Dallas law firm, Jenkens & Gilchrist.

[40] The Trustee's main counsel has been retained by Court order on an hourly basis. Special counsel has been retained by Court order to handle the Kornman Adversary Proceeding (valued at $0 – $40,747,512) on a ½ hourly rate/20% contingency fee basis. And, while the Court holds the firm of Lynn, Tillotson & Pinker, LLP, one the firms representing the Kornman Parties in connection with their opposition to the Motion, in very high regard, the Court notes that the firm also possesses an interest in the Trustee lacking the funds necessary to pursue the avoidance claims pending against it to conclusion.

settlement therefore have a non-creditor interest in opposing any settlement by which the estate will receive funds, and the Court must therefore discount their opposition and conclude that their views of the merits of the settlement may be skewed. However, the stated thrust of their opposition is that the Trustee is settling his claims against Berg too cheaply.[41] For the reasons set forth above, the Court disagrees. The proposed settlement is a reasonable one.

Contrary to another of the Kornman Parties' assertions, the fact that this Court may have to proceed to resolve Berg's third-party claims against Kornman, which resolution will serve to liquidate more of Kornman's alleged indemnity claims against the estate, does not change the Court's view of the reasonableness of the Berg settlement. The Trustee should not be held hostage to continued litigation just because the proposed settlement does not resolve Berg's claims against Kornman.

Lastly, the Court has considered whether this settlement is the product of arm's-length bargaining between the Trustee and Berg, and concludes that it is. This factor also militates in favor of the settlement.

## III.    CONCLUSION

While the Court has not expressly addressed all of Berg's defenses and/or counterclaims in this Memorandum Opinion and Order, in coming to its conclusion that the settlement is reasonable and satisfies the legal standard previously articulated by the Fifth Circuit, the Court has evaluated

---

[41] Kornman's original objection to the Motion was filed on May 16, 2007. However, on June 1, 2007, the Kornman Parties filed a combined objection to both this Motion *and* the Trustee's motion to compromise with the Client Claimants. In the combined objection the Kornman Parties objected to the Berg compromise on many of the same grounds stated in their objection to the Trustee's motion to compromise with the Client Claimants. To the extent the Court has not addressed the Kornman Parties' objections in this Memorandum Opinion and Order, it believes it has done so in the context of its Memorandum Opinion which considers confirmation of the second amended joint plan of liquidation filed by the Trustee and the Client Claimants, which was issued concurrently with this Memorandum Opinion and Order. That joint plan embodies the terms of the settlement between the Trustee and the Client Claimants.

each of the claims and defenses to the Trustee's suit on the Note. The litigation is complex, expensive, and may take years to resolve if the settlement is not approved. There is a significant risk to the Heritage estate that Berg will prevail in that litigation, resulting in no recovery on the Note. The Heritage bankruptcy estate is insolvent, and the Trustee needs the settlement proceeds to fund the high cost of attempting to collect what he believes to be more valuable litigation assets of the estate.

The only creditors objecting to the settlement are the third-party defendant in the Adversary Proceeding, his company and his son. While they have objected, they have not given either the Trustee or the Court any evidence to support an outcome better than this one if the Trustee was to proceed to trial. The Client Claimants, who also dealt with Heritage and make strikingly similar factual contentions as to their dealings with Heritage, think this settlement is appropriate and in their best interest. Canada does not oppose it.

The settlement is the product of arm's-length negotiations between Berg and the Trustee. There is no suggestion that the settlement is the product of fraud or collusion.

Given Berg's expected trial testimony, the fact that Kornman still stands mute regarding Heritage's dealings with Berg, which means that, like the Trustee, this Court has no information regarding Heritage's version of the facts, and the current state of the law, the proposed settlement with Berg is fair and equitable and in the best interests of creditors and the estate. Accordingly, the Motion is granted and the settlement is approved.

**SO ORDERED**.

**### End of Opinion and Order ###**