Case 04-35574-bjh11 Doc 1274 Filed 09/04/07 Entered 09/04/07 08:52:59 Page 1 of 18

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described**.

Signed August 31, 2007        **United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE HERITAGE ORGANIZATION, | § | CASE NO. 04-35574-BJH-11 |
| L.L.C., | § | |
| Debtor. | § | |

### MEMORANDUM OPINION AND ORDER

On June 1, 2007, Gary M. Kornman ("Kornman") and GMK Family Holdings, LLC ("GMK") (collectively, the "Kornman Parties") filed a "Motion . . . Pursuant to 11 U.S.C. §§ 1125(b) and 1126(e) for an Order Designating and Disallowing Votes of Client Claimants" (the "Designation Motion") on the ground that those votes were solicited prior to transmittal of a court-approved disclosure statement in violation of 11 U.S.C. § 1125(b). This Court has core jurisdiction over the Designation Motion in accordance with 28 U.S.C. §§ 1334 and 157(b). This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law.

**Memorandum Opinion and Order**

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

  A.    **General Facts**

An extremely abbreviated history of The Heritage Organization, L.L.C. ("Heritage") and its bankruptcy case will be helpful to an understanding of the issues raised by the Designation Motion. More detailed facts about Heritage, the disputes leading up to the filing of the Designation Motion, and the Kornman Parties' objections to confirmation of the plan proponents' second amended joint plan of liquidation for Heritage are contained in a separate Memorandum Opinion addressing those objections issued concurrently with this Memorandum Opinion and Order.

As relevant here, Heritage filed a voluntary petition for relief under Chapter 11 on May 17, 2004 (the "Case"). Prior to its bankruptcy filing, Heritage provided capital gains tax planning strategies to extremely high net-worth individuals for a fee, pursuant to written agreements between Heritage and its clients. In some cases, Heritage's clients paid the fee owed for Heritage's services when that fee was due under their written agreements. In others cases, a client may have paid only a portion of the fee when due under the terms of the agreement, and Heritage subsequently agreed to accept a promissory note for the balance of the fee.

Heritage also provided estate tax planning services to W. Ronald Sandwith ("Sandwith") and his family pursuant to a written agreement. Sandwith (who has since died) and the Sandwith family owned a closely-held corporation, Mikron Industries, Inc. ("Mikron"). Sandwith paid a portion of the fee owed to Heritage for these services under the parties' agreement, and caused himself and Mikron to issue a promissory note to Heritage for what Heritage alleges is the balance of the fee. The Sandwith family and Mikron dispute that any further fee is owed, and members of the Sandwith family (and Sandwith's probate estate) have filed proofs of claim in the Case asserting that they are

**Memorandum Opinion and Order**                                                                                     **Page 2**

entitled to a refund of a portion of the fee already paid.

Heritage employed Ralph W. Canada ("Canada") as President and Chief Operating Officer from 1995 until 2002 pursuant to the terms of an employment agreement. Sometime in 2001, a dispute arose between Canada and Kornman over Canada's compensation, which resulted in Canada filing an arbitration demand against Heritage and Kornman. After quite a few procedural machinations, the result of the arbitration, as it currently stands,[1] is that Canada holds an allowed, unsecured claim for approximately $6.2 million in the Case. That claim arises from a finding that Heritage breached an oral promise to pay Canada a commission from his work with a particular Heritage client (who is not a claimant in the Case).

The capital gains and estate tax planning strategies that Heritage sold to its clients were ineffective and did not result in the tax savings that Heritage allegedly promised. In most cases, the Internal Revenue Service disallowed the clients' use of the Heritage strategies, which resulted in the clients' payment of not only the taxes they were supposed to save by using the Heritage strategies, but penalties and interest as well. Many of those clients allege that Heritage knew or should have known that the IRS considered Heritage's tax strategies to be abusive tax shelters, yet Heritage failed to disclose that information to its clients.

Shortly after Heritage filed the Case, some of its former clients moved for the appointment of a Chapter 11 trustee, and an order appointing Dennis S. Faulkner as Chapter 11 trustee (the "Trustee") was entered on August 16, 2004. Many of Heritage's former clients filed proofs of claim in the Case, asserting various theories for recovery against Heritage – *i.e.*, fraud, fraudulent

---

[1]The Kornman Parties and the debtor (out of possession) have appealed this allowance to the Fifth Circuit.

inducement, breach of contract, breach of fiduciary duty, and the unauthorized practice of law, to name just a few. In many cases, these former clients sought not only a refund of the fees they had paid to Heritage, but they also sought reimbursement for the penalties and interest they paid to the IRS and damages on contract and tort theories. The former Heritage clients who assert claims in the Case are referred to herein as the "Client Claimants."

During the Case, the Trustee filed litigation against some of the Client Claimants to recover on promissory notes they had executed in Heritage's favor for fees they owed to Heritage as a result of their use of the tax strategies. The Trustee also filed an adversary proceeding against Mikron, seeking to collect the balance of the promissory note that Sandwith had caused Mikron to sign. Further, the Trustee, Heritage (out of possession), and GMK (as an "interested party") also objected to the Client Claimants' proofs of claim, primarily on the ground that the terms of the agreements between Heritage and the Client Claimants barred any recovery by the Client Claimants. Hotly contested litigation ensued, in which the parties filed no less than nineteen motions for summary judgment, of which seventeen remain pending.

After years of litigation in the Case, the Trustee was able to negotiate a comprehensive settlement with the Client Claimants and Mikron. On February 20, 2007, the Trustee and the Client Claimants signed a Liquidating Plan Term Sheet (the "Term Sheet") with respect to the terms of a Chapter 11 plan of liquidation to be proposed. Paragraph 15 of the Term Sheet provides that "[t]he Client Claimants and the Sandwith Claimants will vote to accept the Plan and, along with the Trustee, will support and take all reasonable and necessary steps to pursue confirmation of the Plan."

Thereafter, on March 10, 2007, the Trustee and the Client Claimants, as joint proponents, filed a Joint Disclosure Statement Pursuant to 11 U.S.C. § 1125 in Support of Trustee's and Client

Claimants' Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code (the "Disclosure Statement"), *see* Docket No. 1021, and the Trustee's and Client Claimants' Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code" (the "Plan"), *see* Docket No. 1020.

To address certain objections to approval of the Disclosure Statement and certain concerns raised by the Court at the hearing to consider approval of the Disclosure Statement, the Trustee and the Client Claimants filed their "Joint Disclosure Statement Pursuant to 11 U.S.C. § 1125 in Support of Trustee's and Client Claimants' First Amended Joint Plan of Liquidation . . . " (the "Amended Disclosure Statement"), *see* Docket No. 1091, and the "Trustee's and Client Claimants' First Amended Joint Plan of Liquidation . . . " (the "Amended Plan"), *see* Docket No. 1090. The Amended Disclosure Statement was approved by Order entered on May 3, 2007, *see* Docket No. 1092; it was transmitted to creditors on May 4, 2007, *see* Docket No. 1117; and the hearing to consider confirmation of the Amended Plan was set for June 11 - 15, 2007 (the "Original Hearing").

Canada and the Kornman Parties objected to confirmation of the Amended Plan on a variety of grounds, the details of which are not material here, and the Kornman Parties filed the Designation Motion.

### B. Contentions of the Parties

In general, the Kornman Parties argue that § 1125 of the Bankruptcy Code was violated because on February 20, 2007, before a disclosure statement was even on file (much less approved), the Trustee and the Client Claimants signed the Term Sheet which, among other things, provided that

the Client Claimants[2] would vote to accept the plan and would take all reasonable steps necessary to pursue confirmation of the plan. Accordingly, the Kornman Parties argue that the votes cast by the Client Claimants on the Amended Plan should be designated pursuant to 11 U.S.C. § 1126(e),[3] because their votes were not solicited in accordance with title 11.

The Kornman Parties, citing *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989), first argue that the language of § 1125(b)[4] is plain and unambiguous. Accordingly, the Court must enforce it according to its terms.

Second, the Kornman Parties argue that under the plan structure in existence at the time the Designation Motion was filed,[5] the Client Claimants were the only members of Class 4, and Class 4 was the only impaired class of claims likely to vote to accept the Amended Plan. The Kornman Parties thus assert that the Trustee improperly solicited the Client Claimants' acceptances by agreeing to allow their disputed claims, and that "Chapter 11 of the Bankruptcy Code was never intended to

---

[2] The Court has defined "Client Claimants" in this Memorandum Opinion and Order to include the Sandwith claimants.

[3] Section 1126(e) of the Bankruptcy Code provides, in pertinent part, that "on request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."

[4] Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."

[5] As noted elsewhere in this Memorandum Opinion and Order, on June 12, 2007, the Trustee and the Client Claimants filed the Plan Modification, which resolved Canada's objection to confirmation. *See* Docket No. 1189. The Modified Plan provided, among other things, that 65% of Canada's allowed claim would be included in Class 4 (and 35% of it would be included in Class 6). Thus, while it remained true that Class 4 would be the only impaired class likely to vote to accept the Modified Plan, Class 4 was no longer comprised solely of the Client Claimants. Moreover, on June 22, 2007, the Trustee and the Client Claimants filed the Second Amended Plan. *See* Docket No. 1201. Among other things, the Second Amended Plan moved what was formerly an administrative convenience class of small, unsecured claims from Class 3 to Class 4. A hearing to consider confirmation of the Second Amended Plan was held and concluded on July 31, 2007.

create a marketplace for holders of disputed claims to sell their votes to the highest bidder . . ." *Designation Motion* at ¶ 4. The Kornman Parties further argue that unless the Court designates the votes of the Client Claimants, holders of disputed claims will have incentive to seek the allowance of their claims in inflated amounts in return for their agreement to accept a plan, and that designation of their votes pursuant to § 1126(e) is the appropriate remedy, *TransWorld Airlines, Inc. v. Texaco Inc. (In re Texaco, Inc.)*, 81 B.R. 813 (Bankr. S.D.N.Y. 1988), because it will prevent the proliferation of such "hold-up" tactics and encourage legitimate settlement activity.

Third, the Kornman Parties argue that § 1125(b) prohibits a party from using a post-petition "lock-up" agreement to solicit votes prior to court approval of a disclosure statement, citing two unreported bench rulings from Delaware. *See In re Stations Holding Co., Inc.,* No. 02-10882 (MFW) (Bankr. D. Del. Sept. 25, 2002), *available to ECF users at* https://ecf.deb.uscourts.gov; *In re NII Holdings, Inc.*, No. 02-11505 (MFW) (Bankr. D. Del. Oct. 22, 2002), *available to ECF users at* https://ecf.deb.uscourts.gov. *See also* De Franseschi, *Delaware Bankruptcy Court Announces Bright-Line Rule for Use of Lock-up Agreements in Chapter 11 Cases*, 22 A.B.I.J. 16 (Feb. 2003) (discussing rulings in *Stations Holding* and *NII Holdings*).

In contrast, the Plan Proponents first argue that the term "solicitation" as used in § 1125(b) must be construed narrowly to avoid chilling negotiations between the debtor and its creditor constituencies aimed at achieving a consensual resolution of a Chapter 11 case. The Plan Proponents argue that the conduct in this Case is more appropriately characterized as "negotiation" than as "solicitation." The Plan Proponents further argue that to the extent there was any solicitation, the Client Claimants solicited the Trustee, but the Trustee does not hold a vote to designate.

In addition, the Plan Proponents argue that § 1125(b) should not be construed to require that

**Memorandum Opinion and Order**                                                                                                         **Page 7**

a court-approved disclosure statement be transmitted to joint plan proponents before voting. Since the Client Claimants and the Trustee proposed the Amended Plan jointly, it is "illogical and unreasonable to claim that a plan proponent can be solicited to vote for its own plan. It is very difficult for a group of creditors to solicit themselves." *See Plan Proponents' Objection to Motion . . . for Order Designating and Disallowing Votes of Client Claimants*, Docket No. 1164, at ¶ 2.

The Plan Proponents also argue that the evils that § 1125 was designed to prevent do not exist in the Case because (i) the Client Claimants are more than adequately informed about the facts that would motivate their votes, and (ii) there is no danger that one creditor is soliciting other creditors' votes in violation of the debtor's exclusive right to propose and solicit acceptances of a plan under 11 U.S.C. § 1121.[6] Further, the Plan Proponents argue that paragraph 15 of the Term Sheet cannot constitute an improperly solicited vote, because at the time the Term Sheet was signed, there was no plan in existence for creditors to vote on or that would require a disclosure statement. *See TransWorld Airlines, Inc. v. Texaco Inc. (In re Texaco, Inc.)*, 81 B.R. 813, 816 (Bankr. S.D.N.Y. 1988) (explaining that "section 1125 relates to the voting process with respect to filed plans.").

The Plan Proponents distinguish the two cases heavily relied upon by the Kornman Parties, *Stations Holding* and *NII Holdings*, on the ground that the plan support agreements at issue in those cases contained provisions for specific performance which the Term Sheet does not contain, and thus those term sheets constituted improper "lock-up" agreements that were effectively votes or the transfer to the debtor of the power to force a particular vote. The Plan Proponents contend that the Term Sheet is more like the one described in a bench ruling from a different bankruptcy judge in

---

[6] Heritage's exclusive right to file a plan terminated in 2004 upon the Trustee's appointment. 11 U.S.C. § 1121(c)(1).

Delaware that post-dates the rulings in *NII* and *Stations Holding – i.e., In re Owens Corning,* No. 00-3837 (Bankr. D. Del. June 23, 2006), *available to ECF users at* https://ecf.deb.uscourts.gov. In *Owens Corning*, the court determined that a plan support agreement that provided that a plan would be drafted to incorporate a settlement and each party would vote for that plan was not a "solicitation" within the meaning of § 1125(b).

Lastly, the Plan Proponents argue that even if there was an improper solicitation, the Court has discretion under § 1126(e) to refuse to designate votes, which it should exercise in this Case.

## II.    LEGAL ANALYSIS

For the reasons explained more fully below, the Court concludes that the Designation Motion must be denied. First, the Court concludes that the Designation Motion is moot. While the Designation Motion was pending, and on the eve of the Original Hearing, the Plan Proponents reached a settlement with Canada of his objections to confirmation. While the Plan Proponents orally announced the general terms of that settlement at the commencement of the Original Hearing, they had not yet prepared the formal documentation required to modify the Amended Plan to contain the terms of the Canada settlement.

With the agreement of the Kornman Parties, however, the Court proceeded with the confirmation hearing (with Canada now supporting confirmation), understanding that the Kornman Parties could supplement their objections to confirmation once the plan modification was filed. The Plan Proponents filed the "Plan Modification to Trustee's and Client Claimants' First Amended Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code" (the "Plan Modification") on June 12, 2007, *see* Docket No. 1189, and affected creditors were notified of the opportunity to change their votes. *See* Docket No. 1190. Of significance to the Designation Motion,

the creditors affected by the Plan Modification were the Class 4 creditors – the very same creditors whose votes are requested to be designated in the Designation Motion. Notwithstanding the opportunity to change their votes, none of the Client Claimants wished to do so.

At the conclusion of the Original Hearing on June 15, 2007, the Court took confirmation under advisement. However, the Court orally announced that it had at least two concerns about the confirmability of the Amended Plan, as modified by the Plan Modification (the "Modified Plan").[7] Presumably in response to the Court's expressions of concern, the Plan Proponents filed, on June 22, 2007, the Trustee's and Client Claimants' Second Amended Joint Plan of Liquidation under Chapter 11 of the United States Bankruptcy Code," *see* Docket No. 1201 (the "Second Amended Plan"), and a "Joint Supplemental Disclosure Statement Regarding Trustee's and Client Claimants' Second Amended Joint Plan of Liquidation . . ." (the "Supplemental Disclosure Statement"), *see* Docket No. 1202. The Kornman Parties filed objections to the Supplemental Disclosure Statement, but an agreement was reached as to those objections and an Amended Joint Supplemental Disclosure Statement (Docket No. 1233) was approved by Order entered on July 12, 2007. The creditors affected by the changes proposed by the Second Amended Plan, including the Client Claimants, were re-solicited.

In other words, after the Kornman Parties filed the Designation Motion alleging that the voting process was tainted by an improper solicitation of the Client Claimants' votes, the Plan Proponents (for other reasons) started the process over again. The Plan Proponents obtained

---

[7]The Court gave no assurance to the Plan Proponents that these were its only concerns. In fact, the Court specifically stated that other of the Kornman Parties' objections might be sustainable as well – the Court simply needed more time to reflect upon those objections and the extensive evidentiary record that had been made during the Original Hearing.

**Memorandum Opinion and Order** **Page 10**

approval of an Amended Supplemental Disclosure Statement and sent new ballots to, among others, the Client Claimants. The Court then conducted a supplemental confirmation hearing on July 31, 2007 at which the Plan Proponents presented a new vote tabulation. Therefore, the votes upon which the Plan Proponents rely to support confirmation of the Second Amended Plan are votes which were cast after approval of not one, but two disclosure statements.[8] Moreover, those votes were cast not blindly in accordance with the Term Sheet, but rather were clearly cast thoughtfully in response to the Amended Supplemental Disclosure Statement, because the terms of the Second Amended Plan vary significantly from those contemplated by the Term Sheet.[9] Accordingly, the Designation Motion has been rendered moot by the filing of the Second Amended Plan, the Court's approval of the Amended Supplemental Disclosure Statement, and the Client Claimants' subsequent vote.

Second, although the parties have cited no cases so holding (and the Court's research has similarly revealed no cases so holding), the Court concludes that the prohibition against pre-disclosure statement solicitation is simply inapplicable on the facts of this Case - *i.e.*, where the entities allegedly "solicited" in violation of § 1125(b) are *co-proponents* of the plan. The Court notes

---

[8] The Kornman Parties' argument is not stated crisply in this respect; the Kornman Parties ask that the Court not count the ballots cast by the Client Claimants in response to the Plan Proponents' formal solicitation. However, by citing to cases talking about "lock-up" agreements, the Kornman Parties also appear to argue that the Client Claimants' execution of the Term Sheet back in February was the act which effectively constituted the ballot. The Court notes that if the Kornman Parties are correct that execution of the Term Sheet effectively constituted the ballot, then that defect could never be cured. The Court does not believe §§ 1125 and 1126(e) should be interpreted to lead to such a Draconian result. More importantly, however, the Court finds for reasons stated later in this Memorandum Opinion and Order that execution of the Term Sheet did not constitute the cast of a vote. *See infra* at pp. 13-15.

[9] For example, while under both the Term Sheet and the Second Amended Plan, the Client Claimants' claims will be allowed in an amount equal to 65% of the fees paid to Heritage, the Term Sheet provided that the Client Claimants would be treated as allowed general unsecured claims in Class 4, and that they would receive a periodic distribution of a pro rata share of funds available in a creditor trust. The Second Amended Plan now contemplates that Canada (who was originally defined as an "Insider" under the Term Sheet and was treated in Class 5) will have a portion of his claim allowed in Class 4, and will receive (after payment of the creditors formerly in the convenience class) the first $500,000 in distributions to Class 4, and will thereafter share 50/50 with the Client Claimants as to certain assets until he receives another $500,000 in distributions.

that all of the signatories to the Term Sheet, except Mikron,[10] are joint proponents of the plan. A reading of § 1125(b) that requires a creditor intending to jointly propose a plan to draft a disclosure statement, get it approved, and then mail it to himself before agreeing to vote for it, under penalty of disenfranchisement, would be absurd. *Small v. U.S.*, 544 U.S. 385, 404 (2005) (Thomas, J. dissenting) (describing as a tool of statutory construction the "canon against absurdities"). In other words, if a creditor believes that it has sufficient information about the case and the available alternatives to jointly propose a Chapter 11 plan with another entity (whether that co-proponent is another creditor, the debtor, or a trustee (who also believes that it has sufficient information)), it is absurd to think that the signing of a term sheet by those parties (that contains the material terms of their to-be-filed joint plan and states that the co-proponent creditor(s) will vote for their agreed upon joint plan) is an improper solicitation of votes in accordance with § 1125(b).

Third, while the Court agrees with the Kornman Parties that under the plain meaning of § 1125(b), the statute is violated whenever there has been a "solicitation" prior to transmittal of a court-approved disclosure statement, the Court notes that the term "solicitation" is nowhere defined by the Bankruptcy Code. The majority of courts to have considered the contours of the term have defined it narrowly. *Zenter GBV Fund IV v. Vesper*, 19 Fed. Appx. 238, 247 (6th Cir. 2001)(unpublished disposition) (the terms "solicit" and "solicitation" must "be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan . . . [t]he terms do not encompass discussions, exchanges of information, negotiations, or tentative arrangements. . . ." ); *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 101-02

---

[10] Mikron is not a creditor of the estate and is therefore not entitled to vote on the plan.

**Memorandum Opinion and Order** **Page 12**

(3rd Cir. 1988) (the term "solicitation" must be read narrowly. A broad reading of § 1125 can seriously inhibit free creditor negotiations . . . we find no principled, predictable difference between negotiation and solicitation of future acceptances. We therefore reject any definition of solicitation which might cause creditors to limit their negotiations"); *In re Kellogg Square P'Ship*, 160 B.R. 336 (Bankr. D. Minn. 1993). As the Third Circuit noted in *Century Glove*,

> A narrow definition might allow a debtor to send materials seeking to prepare support for the plan, 'for the consideration of the creditors,' without adequate information approved by the court. Though such preparatory materials may undermine the purpose of adequate disclosure, the potential harm is limited in several ways. First, a creditor still must receive adequate information before casting a final vote, giving the creditor a chance to reconsider its preliminary decision. The harm is further limited by free and open negotiations between creditors."

*Century Glove*, at 102.

The Court finds this reasoning persuasive. Therefore, even if the Court were to rule that § 1125(b) requires plan proponents to solicit themselves only after court approval of a disclosure statement, the Court would align itself with those courts that have concluded that the term "solicitation" as used in § 1125(b) should be viewed "very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan of reorganization." *Zenter GBV Fund IV v. Vesper*, 19 Fed. Appx. 238, 247 (6th Cir. 2001) (unpublished decision); *In re Snyder*, 51 B.R. 432 (Bankr. D. Utah 1985).

Here, when viewed in the light cast by a narrow construction of the term "solicitation," the Term Sheet is not a request for an official vote. Rather, the official request for a vote on the Amended Plan occurred after approval of the Amended Disclosure Statement.[11] The Term Sheet is

---

[11] And, the official request for a vote on the Second Amended Plan occurred after approval of the Amended Supplemental Disclosure Statement.

**Memorandum Opinion and Order** **Page 13**

"the written memorialization of the negotiations towards settlement of the legal disputes that have prevented confirmation to date, and of the negotiations toward confirmation of a plan, and that is not the solicitation of a vote." Transcript of hearing held 6/23/06 in *In re Owens Corning*, No. 00-3837 (Bankr. D. Del. 6/23/06), *available to ECF users at* https://ecf.deb.uscourts.gov (docket no. 18233 at p. 14:14-18)  As one commentator has noted,

> courts considering whether or not settlement discussions between debtors (or trustees) and creditors have crossed the line from negotiation to solicitation have carefully preserved the right to negotiate and have not found impermissible solicitation where it was clear that arm's length negotiations, in fact, had occurred, even where the creditor agreed to support the debtor's plan . . . as consideration for the agreed treatment of the creditor's claim under the debtor's to-be-filed plan.

Robert J. Keach, *A Hole in the Glove: Why 'Negotiation' Should Trump 'Solicitation'*, 22-JUN Am. Bankr. Inst. J. 22 (June 2003) (characterizing a narrow construction of the term "solicitation" as the majority view).  It is clear that the Term Sheet is the product of arm's length negotiations which spanned many months.

The Term Sheet here is most like the agreement in *In re Kellogg Square P'ship*, 160 B.R. 336 (Bankr. D. Minn. 1993). In *Kellogg Square*, the debtor entered into a post-petition, pre-disclosure statement agreement with one of its pre-petition creditors.  The agreement provided, among other things, for a consensual treatment of the creditor's claim, and it stated that the creditor would cast a ballot in favor of the debtor's plan.  In denying a motion to designate the creditor's vote on the ground that the debtor violated § 1125(b), the court stated that the

> agreement to accept the Debtor's plan, made post-petition but before approval of the disclosure statement, remained executory until [the creditor] actually filed its accepting ballot . . . Neither the recitation in the disclosure statement, nor the parties' execution of the written memorandum, constituted an acceptance of the plan as such. The agreement did not purport to exempt the Debtor from its statutory obligation to present [creditors] with a court-approved disclosure statement.  The resultant status

> of the agreement, then, is crucial: had the final, court-approved disclosure statement revealed information that materially bore on [the creditor's] interests, and had the Debtor previously failed to disclose that information to [the creditor], the creditor' would have had a right under general, nonbankruptcy law to repudiate the agreement via rescission, and then to cast a rejecting ballot. Ultimately, for the purposes of §§ 1125(b) and 1126(e), the act by which the Debtor "solicited" [the creditor's] vote must be deemed to have taken place after the Court approved the amended disclosure statement, and only when the Debtor's plan and disclosure statement and a ballot were actually presented to [the creditor' in the formal process specified by § 1125(b)].

*Kellogg Square*, 160 B.R. at 339-40.

The two decisions from Delaware primarily relied upon by the Kornman Parties are distinguishable.[12] In each of those cases, the agreement provided that a breach of the creditor's agreement to vote for the plan could not be compensated by money damages and permitted the debtor to seek specific performance of the creditor's agreement to vote for the plan in the event of a breach. Accordingly, the locked-up creditor could not "reconsider its preliminary decision" to vote in favor of the plan after receiving adequate information, and the locked-up creditor was stripped of the Bankruptcy Code's protection against the harm caused by solicitation without court-approved, adequate information. *See Century Glove*, at 102. Therefore, the bankruptcy courts in *NII Holdings* and *Stations Holding* focused on the specific performance provisions and ruled that the post-petition

---

[12] The Kornman Parties, in addition to citing to *NII* and *Stations Holding*, also cite *In re Media Central, Inc.*, 89 B.R. 685, 685-686 (Bankr. E.D. Tenn. 1988), and include a parenthetical indicating that the *Media Central* court disallowed votes improperly solicited by the debtor. While votes were disallowed there, the parenthetical is incomplete and thus misleading. The *Media Central* court did state that a court may disallow votes which have not been solicited in accordance with the provisions of title 11. However, the court further noted that debtor's counsel did not intend to rely on any of such votes because it intended to file an amended plan and disclosure statement and re-solicit votes. Therefore, according to the *Media Central* court, debtor's counsel did not object to the request that votes received from the initial solicitation be disallowed, and the court did so.

**Memorandum Opinion and Order**            **Page 15**

lockup-agreements executed in those cases violated § 1125(b).[13] *See* Daniel J. DeFranceschi, *Delaware Bankruptcy Court Announces Bright-Line Rule for Use of Lock-Up Agreements in Chapter 11 Cases*, Am. Bankr. Inst. J., Feb. 16, 2003.

Finally, the Court notes that § 1125 was designed to "discourage the undesirable practice of soliciting acceptance or rejection at a time when creditors and stockholders were too ill-informed to act capably in their own interests." *In re Clamp-All Corp.*, 233 B.R. 198, 208 (Bankr. D. Mass. 1999) (holding that creditor's dissemination of competing plan and unapproved disclosure statement during exclusivity period violated § 1125 and quoting *Solicitation of Plan Rejections under the Bankruptcy Code*, 62 Am Bankr. L.J. 261, 264 (Summer, 1988); *see also In re Dow Corning Corp.*, 227 B.R. 111 (Bankr. E.D. Mich. 1998) (discussing in detail the legislative history of § 1125(b)). Here, the entities whose votes are targeted for designation by the Kornman Parties – *i.e.*, the Client Claimants, cannot seriously be characterized as too ill-informed to act capably in their own interests. *See In re Gilbert*, 104 B.R. 206, 215 (Bankr. W.D. Mo. 1989) (finding violation of § 1125(b) but declining to designate votes in part because the solicited creditor "was sufficiently sophisticated and resourceful to protect the interest it then had in debtors' bankruptcy from any untoward advances by other creditors"). The fundamental purpose of § 1125(b) would thus not be served by its application to the votes of the Client Claimants here.

Designation under § 1126(e) is permissive in nature, and a bankruptcy judge has discretion

---

[13] The *Stations Holding* court was clearly concerned about the locked-up creditor's ability to change its vote after receiving adequate disclosure. The bankruptcy judge stated "You got their commitment to vote for a plan not inconsistent with the plan summary, a three-page document, conditioned only on a disclosure statement being approved. You didn't say hey, if the disclosure statement reveals information that causes you to want to change your vote, you can change your vote." *See* Transcript of hearing conducted 9/25/02 in *Stations Holding*, No. 02-10882 (Bankr. D. Del. Sept. 25, 2002), *available to ECF users at* https://ecf.deb.uscourts.gov (docket no. 196, p. 23:7-12).

**Memorandum Opinion and Order** **Page 16**

in designating votes. *In re Adelphia Communications Corp.*, 359 B.R. 54 (Bankr. S.D.N.Y. 2006) (declining to designate ballots allegedly voted in bad faith); *see also In re Gilbert*, 104 B.R. 206 (Bankr. W.D. Mo. 1989) (finding a technical violation of § 1125(b) but declining to designate votes). As the *Adelphia Communications* court commented,

> [a] right to vote on a plan is a fundamental right of creditors under chapter 11. Designation of a creditor's vote is a drastic remedy, and, as a result, designation of votes is the exception, not the rule. The party seeking to have a ballot disallowed has a heavy burden of proof.

*Adelphia Communications*, 359 B.R. at 61.

In exercising its discretion here, the Court concludes that designation of the Client Claimants' votes would only serve a strategic purpose. It would not further any bankruptcy policy. Designation here "would have the effect of protecting parties who do not need protection from their own informed choices." Keach, *supra* p. 14, at 46. The Client Claimants' status as joint plan proponents establishes that any violation of § 1125(b) was purely technical. Because the Client Claimants have been extremely active participants in the Case and are represented by very capable counsel, and because the plan here is a relatively straight-forward plan of liquidation of Heritage's remaining assets,[14] the Court concludes that designation of the Client Claimants' votes is not appropriate. So, even if the Term Sheet constituted an improper solicitation of the Client Claimants' votes by the Trustee, the Court would exercise its discretion and not designate the votes of the Client Claimants under the unique facts of the Case.

---

[14] The assets remaining in the estate after the issuance of two other Memorandum Opinions concurrently with this one are, essentially, (i) cash proceeds from several court-approved settlements, (ii) unliquidated litigation claims, (iii) two liquidated claims resulting from judgments that the Trustee testified are perhaps uncollectible, and (iv) one promissory note executed by a former Heritage client which has matured, but for which payment demand has been made and no payment has been received. Under the Second Amended Plan, those assets will be transferred to a creditor trust that will then make disbursements to creditors as the assets are liquidated.

For all of these reasons, the Designation Motion is denied.

**SO ORDERED.**

**### End of Memorandum Opinion and Order ###**